UNITED STATES v. PAVEL BABICHENKO

Case No. 1:18-cr-00258-EJL

**GOVERNMENT'S ATTACHMENT ONE**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

UNITED STATES OF AMERICA,        )
                                 )        CASE NO.: 1:18-CR-0258-EJL
                Plaintiff,       )
                                 )
            vs.                  )
                                 )
PAVEL BABICHENKO,                )
*also known as*                  )
PAUL BABICHENKO,                 )
                                 )
                Defendant.       )        Boise, Idaho
                                 )        August 31, 2018
_____)        10:01:40 a.m.
And related parties and cases    )

DETENTION HEARING

THE HONORABLE RONALD E. BUSH PRESIDING
MAGISTRATE JUDGE OF THE U.S. DISTRICT COURT

DEPUTY CLERK/ESR:

KELLY MONTGOMERY
U.S. District Court

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1

APPEARANCES:


FOR THE PLAINTIFF:

    **KATHERINE L. HORWITZ,**
    Assistant U.S. Attorney
    800 Park Blvd., Suite 600
    Boise, ID 83712
    208-334-1155
    kate.horwitz@usdoj.gov




FOR THE DEFENDANT:

    **JOHN CHARLES DeFRANCO, CJA Counsel**
    Ellsworth, Kallas & DeFranco
    1031 E. Park Blvd.
    Boise, ID 83712
    (208) 336-1843
    jcd@greyhawklaw.com




ALSO PRESENT:

    **LISA MELCHERT,** USPO

1:18-CR-0258-EJL        U.S. v. Pavel Babichenko        08/31/18        **Detention Hearing**

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

2

## WITNESS and EXHIBIT INDEX

### Witnesses

WITNESSES FOR THE PLAINTIFF:                           PAGE #

**None.**


WITNESSES FOR THE DEFENDANT:

**RYAN WILSON**
 Direct Examination by Mr. DeFranco        32
 Cross-Examination by Ms. Horwitz          59

* * * * *


### Exhibits

EXHIBITS FOR THE PLAINTIFF:                         ADMITTED

Exhibit 1 Photo of 12586 Bridger Warehouse
   with contraband                           --

Exhibit 2 Photo of 12586 Bridger Warehouse          --

Exhibit 3 Letter from Midstar to Goodman Bancroft    --

Exhibit 4 Email from Kristina Babichenko to
   accountant regarding Condo in Brazil      --


EXHIBITS FOR THE DEFENDANT:

Exhibit 1 Video of property in Brazil (thumb drive)  50

* * * * *

CLOSING ARGUMENT ON BEHALF OF PLAINTIFF             54
CLOSING ARGUMENT ON BEHALF OF DEFENDANT             59

JUDGE'S RULING                                      68

* * * * *

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      **Detention Hearing**

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

3

```
 1   BOISE, IDAHO                          FRIDAY, AUGUST 31, 2018

 2                           *  *  *  *  *

 3             PROCEEDINGS BEGAN AT 10:01:40 A.M.

 4             THE CLERK:  All rise.  The United States District

 5   Court for the District of Idaho is now in session.  The

 6   Honorable Ronald E. Bush presiding.

 7             THE COURT:  Thank you.  Please be seated.

 8             THE CLERK:  The Court will hear the detention

 9   hearing in Case Number 1:18-CR-258-EJL, United States of

10   America versus Pavel Babichenko.

11             Counsel, if you'll please state your appearances

12   for the record, beginning with the government.

13             MS. HORWITZ:  Kate Horwitz for the United States.

14   Good morning, Your Honor.

15             MR. DeFRANCO:  Your Honor, John DeFranco.  I'm

16   present today on behalf of Pavel, Pavel Babichenko.  He

17   actually goes by Paul.  So if I refer to him as Paul, Paul

18   and Pavel are the same.  Thank you.

19             THE COURT:  All right.  Thank you, counsel.

20             Mr. Babichenko, good morning to you sir.  Would you

21   please stand so you can be sworn in by the clerk.

22             PAVEL BABICHENKO, DEFENDANT HEREIN, SWORN

23             THE COURT:  You may be seated.  Sir, I need you to

24   get a little closer to the microphone, state your full and

25   true name and your date of birth.
```

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1            DEFENDANT PAVEL BABICHENKO:  Pavel Babichenko.

2    6/12/81.

3            THE COURT:  All right.  Sir, at your prior

4    appearance I had advised you of the fact the government had

5    filed a motion for detention and discussed with you your

6    rights in that regard.  We had set a time and place for that

7    hearing, continued it until today, so that your counsel would

8    be available.  We're ready to proceed with that now.

9            Ms. Horwitz, are you ready to go?

10           MS. HORWITZ:  Yep.

11           THE COURT:  And Mr. DeFranco?

12           MR. DeFRANCO:  Yes, Your Honor.

13           THE COURT:  All right.  Then, Ms. Horwitz, do you

14    have witnesses?

15           MS. HORWITZ:  No, Your Honor.  Just proffer.

16           THE COURT:  All right.  I'll hear your proffer.

17           MS. HORWITZ:  So as this Court has heard in the

18    prior three detention hearings, the scope of this trafficking

19    conspiracy was vast.  And based on this 4-plus year

20    investigation, the defendant operated with his co-

21    conspirators over 100 separate business entities to sell

22    their counterfeit goods online to thousands of customers.

23           And I apologize for the redundancy of my proffer,

24    Your Honor, and I appreciate the Court's patience.

25           THE COURT:  Well, it's -- it's a redundancy only

1:18-CR-0258-EJL       U.S. v. Pavel Babichenko       08/31/18       Detention
                                                                      Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                      5

1 for you and me, not for Mr. Babichenko, so you need to make

2 your full case.

3          MS. HORWITZ:  Yes.

4          MR. DeFRANCO:  Or his attorney, Your Honor.  Thank

5 you.

6          THE COURT:  Well, or his attorney.  Yes.

7 Obviously.

8          MS. HORWITZ:  Absolutely, Your Honor.  I was

9 just --

10          THE COURT:  Go ahead.

11          MS. HORWITZ:  Thank you.

12          So their personal relationship to each other, as

13 well as the business entities associated with each, I'm going

14 to enumerate for some, but not all of the defendants, and the

15 conspirators, and I believe necessary for the Court's

16 analysis of detention today.

17          Now these entities and the relationships were based

18 on subpoenaed records, online database searches of the Idaho

19 Secretary of State, and surveillance of the shipments from

20 12586 West Bridger Street, Suite 110, in Boise, Idaho, where

21 this defendant, along with his co-conspirators, operated

22 their trafficking scheme; as well as undercover purchases on

23 Amazon and eBay as registered sellers.

24          So Pavel Babichenko is a United States citizen.  He

25 is the brother of Piotr, Timofey, and Gennady Babitchenko, as

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                          Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                          6

1  well as Anna Iyerusalimets.  Now there are other siblings

2  that are not listed there.  These siblings are the co-

3  conspirators and co-defendants relevant to today's hearing.

4          He resides in Boise, Idaho.  And during the

5  counterfeit trafficking conspiracy, Pavel Babichenko owned or

6  controlled the following entities among others.  Midstar

7  Distributors, LLC.; Midstar, LLC; Midway Distributors, Inc.;

8  Midway Distributors, LLC; Midway Cellular, LLC; Pacific

9  Cellular Distributor, LLC; Power Moxie, LLC; and SaharaCase,

10  LLC.

11          Piotr Babichenko is also a United States citizen

12  and again brother to Pavel, Gennady, Timofey, and Anna

13  Iyerusalimets.  He resides in Boise, Idaho.  And during the

14  counterfeit trafficking conspiracy, Piotr Babichenko owned or

15  controlled the following entities, among others.  Blue Ocean

16  Distributions, LLC; Midway Distributor, LLC; Mobi, LLC; Mobi

17  Recycle, LLC; Mobile Recycle, LLC; Power Moxie, LLC;

18  SaharaCase, LLC.

19          Timofey Babichenko is also a United States citizen,

20  a brother of Pavel, Gennady, Piotr and Anna Iyerusalimets.

21  He resides in Boise, Idaho, and during the counterfeit

22  trafficking conspiracy Timofey Babichenko owned or controlled

23  the following entities, among others.  Ariginall, LLC; Global

24  Distributing LLC; Global Distributors, LLC; SaharaCase, LLC;

25  Wholesale Gadgets, LLC; Wholesale Cell Phones, LLC.

1:18-CR-0258-EJL       U.S. v. Pavel Babichenko       08/31/18       Detention
                                                                      Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    7

1          Gennady Babitchenko is a United States citizen and

2    brother to Pavel, Timofey, Piotr and Anna Iyerusalimets.  He

3    resides in Boise, Idaho.  During the counterfeit trafficking

4    conspiracy, Gennady Babitchenko owned or controlled the

5    following entities, among others.  Babichenko, LLC;

6    Babichenko Dental Lab, Incorporated; Babichenko & Sons, LLC;

7    European Denture Center; Morning Star Christian Church,

8    Incorporated; Morning Star Missions, Incorporated; and

9    Russian Christian Church.

10          Now, Your Honor, I would have -- I will proffer

11    that the investigators have found approximately 157 different

12    entities associated with this conspiracy.

13          Over the course of this investigation, FBI and HSI

14    agents have identified over 50 U.S. Customs & Border

15    Protection seizures of counterfeit electronic goods

16    associated with this conspiracy.

17          Now I've enumerated to the Court many of these

18    already, and Mr. Pavel Babichenko's co-defendants herein

19    [sic], but he, by far, has the most attributed to him.

20          On April 23rd, 2013, Customs & Border Protection

21    seized 1500 counterfeit Motorola batteries that were

22    addressed to Pavel Babichenko at 200 North Maple Grove, Number

23    200 in Boise, Idaho.

24          On September 19, 2013, CBP seized 20 counterfeit

25    Samsung Notes and 30 Samsung Galaxy S2, which all were deemed

1:18-CR-0258-EJL      **U.S. v. Pavel Babichenko**      08/31/18      **Detention Hearing**

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

8

1  counterfeit by CBP, addressed to Pavel Babichenko at 12586

2  West Bridger Street address, Boise, Idaho.

3            And, Your Honor, when I say 12586 West Bridger,

4  I'll just be referring to the Boise, Idaho warehouse in

5  shorthand.

6            September 25th, 2013, CBP seized 20 counterfeit

7  Apple iPhones headed for Midstar, LLC, at the 12586 West

8  Bridger Street warehouse.

9            The same day, September 25th, 2013, CBP seized 30

10 counterfeit Motorola phones, again headed for Midstar, LLC,

11 at the 12586 West Bridger Street warehouse.

12           September 26th, 2013, CBP seized 30 counterfeit

13 Motorola phones, again headed to Midstar at the 12586 West

14 Bridger Street warehouse.

15           On September 30th, 2013, CBP seized 20 counterfeit

16 Verizon phones, addressed to Midstar, LLC, at 12586 West

17 Bridger Street.

18           February 28th, 2014, CBP seized 2000 counterfeit

19 Samsung and Motorola batteries.  Again headed to Midstar,

20 LLC, at the 12586 West Bridger Street warehouse.

21           April 25th, 2014, CBP seized 79 counterfeit Apple

22 iPhones headed to Midstar, LLC, at 12586 West Bridger Street.

23           June 15, 2014, CBP seized 20 counterfeit Apple

24 iPhones headed to Pavel Babichenko at 2890 South Pasa Tiempo

25 Way in Boise, Idaho.  I believe actually it's Meridian,

1:18-CR-0258-EJL        U.S. v. Pavel Babichenko        08/31/18        Detention
                                                                       Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                      9

 1   Idaho, Your Honor.  That is Mr. Babichenko's personal

 2   residence.

 3              November 16th, 2016, 50 counterfeit Samsung phones

 4   headed to Midstar Distributors; again 12586 West Bridger

 5   Street warehouse.

 6              November 30th, 2016, 600 counterfeit Samsung

 7   chargers and 600 counterfeit Samsung headsets headed to

 8   Midstar, LLC, at 12586 West Bridger Street.

 9              And finally, July 11th, 2017, CBP seized 33

10   counterfeit Samsung Galaxy phones and 33 Samsung counterfeit

11   Note phones headed to Midstar Distributors at 2890 South

12   Pasa Tiempo Way.  Again, Mr. Babichenko's personal residence.

13              Now in addition to the vast amount of counterfeit

14   goods that CBP has seized coming in internationally and

15   headed to this defendant, either at his personal residence

16   or at a warehouse from which he operates, we had a

17   confidential human source working with FBI who conducted

18   hand-to-hand, both purchases of counterfeit iPhones and

19   Samsung cell phones from this defendant at his 12586 West

20   Bridger Street warehouse.

21              Now during this undercover purchase, the two were

22   discussing the counterfeit nature of the goods and discussing

23   how it's too risky to sell iPhones on Amazon because Apple,

24   the trademark holder, is a more aggressive trademark holder

25   in pursuing counterfeit peddlers.

---

1:18-CR-0258-EJL        U.S. v. Pavel Babichenko        08/31/18        Detention
                                                                           Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                10

1          MR. DeFRANCO:  Counsel, May I interrupt?

2          MS. HORWITZ:  Yeah.

3          MR. DeFRANCO:  Is that the person who's identified

4  as stating that it's too risky, is that -- is that Mr.

5  Babichenko, Paul?

6          MS. HORWITZ:  Correct.

7                  (Pause in the Proceedings)

8          MS. HORWITZ:  So overall, in this conspiracy and

9  during this investigation, agents made 14 undercover online

10 purchases from Amazon and eBay of various co-conspirators,

11 as well as three total hand-to-hand buys; two, as I

12 previously stated, were attributed to this defendant.

13          On October 26th, 2017 [sic], FBI, with the CHS,

14 conducted an undercover purchase of 20 Apple iPhones and

15 Samsung  battery cell phones.

16          THE COURT:  What was that date again, please?

17          MS. HORWITZ:  October 26, 2016.

18          THE COURT:  Go ahead.

19          MS. HORWITZ:  For $2500 cash, paid by the CHS.  And

20 as previously stated, during this recording, Pavel warns the

21 CHS not to sell these goods on Amazon because it's, quote,

22 "to risky."

23          Pavel also recommends selling lesser-known brands

24 like LG, Casio and Motorola.

25          On January 5th, 2017, the same CHS, working with

1:18-CR-0258-EJL       U.S. v. Pavel Babichenko       08/31/18       Detention
                                                                              Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    11

1  FBI, conducted a second hand-to-hand purchase from the

2  Bridger Street warehouse and Pavel Babichenko, of 10

3  counterfeit iPhones, this time for $1500.  During the

4  recorded interaction, the CHS asked Pavel Babichenko, have

5  you tried telling the people to stop making these errors,

6  meaning errors on the box, the counterfeit boxes.  To which

7  Pavel responds, I just don't get how they make these

8  mistakes.

9       And, Your Honor, I would note that in purchasing --

10 in the 14 undercover online purchases conducted by FBI and

11 HSI, the counterfeit goods sometimes bears obvious

12 misspellings and spatial errors on Apple iPhone boxes that

13 are just not attributed to a real product or the standard

14 that Apple itself holds it -- holds itself to.

15       Now in addition, those items were submitted to

16 Apple, the trademark holder, and deemed counterfeit.

17       The third undercover purchase on December 2nd, 2016,

18 and, Your Honor, I would note this is temporally going back,

19 was from the same confidential source working with FBI, again

20 at the Bridger Street warehouses.  And I believe, Your Honor,

21 it was at the 12554 Bridger warehouse, not the 125586 -- or

22 125486 Bridger warehouse.  They're across the street from

23 each other.

24       CHS purchased, again, counterfeit iPhones for

25 $1740 from David Babichenko, in co-defendant Mikhail

1:18-CR-0258-EJL      **U.S. v. Pavel Babichenko**      08/31/18      **Detention
Hearing**

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    12

 1  Iyerusalimets' presence.  Again during this undercover

 2  purchase, the conspirators are openly discussing the

 3  counterfeit nature of the goods.  In fact Mikhail

 4  Iyerusalimets state simply that they catch fire because

 5  they're fake.

 6          On October 24th, 2017, FBI, HSI, purchased through

 7  Amazon.com from Tim Babichenko, through Ariginall, two Apple

 8  iPhone 5C G--.

 9          THE COURT:  Ariginall being one of the entities?

10          MS. HORWITZ:  Correct, Your Honor.

11          THE COURT:  All right.

12          MS. HORWITZ:  And it's spelled A-R-I --

13          THE COURT:  All right.  I'm familiar with it.  Go

14  ahead.

15          MS. HORWITZ:  They received those goods, provided

16  it to the trademark holder, Apple, who deemed it counterfeit.

17  And additionally, and notably, the box says -- misspells

18  California, it has two Ls, it's a C-A-L-L-F-O-R-N-I-A, comma,

19  no space, A-S-S-E-M-B-L-E-D.

20          And, again, all 14 undercover purchases and all

21  bulk purchases through the hand-to-hand buys were reviewed by

22  the trademark holders and deemed counterfeit.

23          Now in addition to the four years that -- four-plus

24  years that investigators have been looking into this scheme

25  and actively investigating it, on August 22nd, 2018, FBI, HSI,

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                          Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    13

1   IRS, Postal Service executed 12 search warrants, two on the

2   Boise, Idaho warehouses used in this conspiracy, located on

3   Bridger Street, 12586 and 12554, respectively.  Those two

4   Bridger Street warehouses are the offices and storage spaces

5   for Pavel, Timofey, Piotr, David -- David Bibikov and Mikhail

6   Iyerusalimets.

7            Primarily this defendant operates out of the 12586

8   Bridger Street warehouse.

9            On-site that day were over a dozen representatives

10  from Samsung, Apple, UL and other trademark holders.  And I'd

11  note UL is technically a certification mark holder, Your

12  Honor.  Who examined samples from the warehouse during the

13  execution of the search warrants and Apple and Samsung

14  representatives determined these to be counterfeit.

15           Now the volume was such that it was simply

16  impossible to review every item.  Your Honor, this is

17  Government's Exhibit 1, which is a photograph of the 12586

18  West Bridger Street warehouse.

19           THE COURT:  Kelly, do we have that system on?

20           THE CLERK:  I'll good.

21           THE COURT:  Thank you.  Go ahead.

22           MS. HORWITZ:  Government's Exhibit 2, a different

23  perspective of the same warehouse, Your Honor.

24           Now because these were deemed --

25           THE COURT:  This is the warehouse?  The

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      **Detention**
**Hearing**

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                14

1  government's proffer is that this particular defendant

2  conducted business from?

3          MS. HORWITZ:  Correct, Your Honor.

4          THE COURT:  Okay.

5          MS. HORWITZ:  But not alone.

6          THE COURT:  All right.

7          MS. HORWITZ:  He conducted this business, along

8  with his brothers and other various employees that he used to

9  repackage the phones and prepare them for shipment and get

10 them to the end -- of the customers buying through eBay and

11 Amazon and their own proprietary websites.

12         THE COURT:  Go ahead.

13         MS. HORWITZ:  Now FBI and HSI executing this

14 warrant collected approximately, and this is a rough

15 estimation, 41,000 separate items that are suspected as

16 counterfeit contraband.

17         Now in process, are samples from the items taken

18 from the warehouse, which will be shipped to the trademark

19 holders and confirmed, via sampling, that they are

20 counterfeit, in addition to the samples already determined

21 counterfeit by the trademark holders on-site during the

22 execution of the warrant.

23         Additionally, agents in the 12586 Bridger Street

24 warehouse found stacks of IMEI stickers.  Now IMEIs are

25 unique identifiers for individual phones, but these stickers

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      **Detention Hearing**

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    15

 1 | had the same numbers.

 2 | Also in the warehouse were counterfeit empty

 3 | packaging for phones in bulk.  Industrial shrink wrapping

 4 | machines.  And of course the contraband seized by HSI and

 5 | FBI.

 6 | Now also in the warehouse were Sahara boxed items,

 7 | which the government left as presumed non-contraband because

 8 | these defendants operate in part, a business under SaharaCase

 9 | that does not include counterfeit goods, and those boxes were

10 | left at the warehouse, Your Honor.

11 | Additionally over 3000 packages that were mailed

12 | from the Bridger Street warehouses on August 20th and August

13 | 21st, 2018, had been collected by investigative agents and a

14 | search warrant to open those packages and then send them

15 | respectively to the trademark holders is planned in the near

16 | future.  But just the volume, Your Honor, I think speaks,

17 | again, to the scope of this conspiracy.

18 | THE COURT:  Can you proffered to me more detail

19 | about that?  Are you telling me that the government contends

20 | that these packages were prepared for shipment and found in

21 | the warehouse or had been delivered to the post office or

22 | some other package company and were in route, so to speak?

23 | MS. HORWITZ:  I am not entirely sure about the

24 | entire body of those packages, Your Honor, so I won't proffer

25 | to you specifically, but it is my understanding that it is

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1   the latter, that they were not -- the packages were not found

2   on site, but were collected or interrupted via the mailing

3   process. But I would have to double check that, Your Honor,

4   to know with certainty.

5          THE COURT: All right. And you say those -- and

6   how -- how is it that the government contends that they were

7   all sent on the 20th and the 21st?

8          MS. HORWITZ: Those were the dates that the agents

9   collected them, Your Honor. So I would imagine,

10  theoretically, it would have to be --

11         THE COURT: Okay.

12         MS. HORWITZ: -- the court's proffer of latter

13  explanation, but I just can't independently verify that based

14  on my memory. So I don't want to proffer it to the Court.

15         THE COURT: Go ahead.

16         MS. HORWITZ: Now during this investigation, FBI,

17  HSI and postal have also conducted surveillance of the

18  Bridger Street warehouse mailings, which is the second

19  hypothetical that the Court discussed. And during one day of

20  such surveillance, on December 4th, 2017, agents estimated

21  approximately 354 phones, and 847 batteries were being

22  shipped from the 12586 Bridger Street warehouse. But we have

23  more than the tangible packages that are being surveyed and

24  found in the warehouse. We have the movement of money and

25  substantial sums from this defendant to Hong Kong recipient,

1:18-CR-0258-EJL       U.S. v. Pavel Babichenko       08/31/18       Detention
                                                                          Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    17

1    as well and his admission that he sent over approximately

2    $300,000 a month to his Hong Kong supplier in order to buy

3    his supply of goods and that was based on his inter- -- Pavel

4    Babichenko's interview with the law enforcement on August

5    22nd, 2018.

6            So just by way of example, Your Honor, from one

7    Midstar account, beginning in 2010, to Hong Kong --

8            THE COURT:  Beginning when again?

9            MS. HORWITZ:  Say again?

10           THE COURT:  Beginning when again?

11           MS. HORWITZ:  October 27th, 2010.

12           THE COURT:  Go ahead.

13           MS. HORWITZ:  And ending December 29th, 2010, from

14   one -- well, actually no, Your Honor, there are two Midstar,

15   LLC, bank accounts, one ending in 7407, the other ending in

16   6620.  There are a total of over $3,055,264.60 of wire

17   transfers.

18           Now these -- interestingly I can go through each

19   wire transfer, Your Honor, but I would rather just proffer

20   the total sum to the Court.  I will pluck out some though,

21   because I think it speaks to the nature of the transfer and

22   the increasing sophistication of the scheme.

23           On November 2nd 2010, Midstar, LLC, account ending

24   in 7407, wired $1,030,000 to Hong Kong.

25           In 2017 the sum transfers from Midstar, LLC,

1:18-CR-0258-EJL     U.S. v. Pavel Babichenko     08/31/18     **Detention Hearing**

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    18

1   account 6620, are indicative of money laundering structuring.

2   They go from larger sums to $10,000.

3           On September 6th, 2017, there were two transfers of

4   $10,000.

5           THE COURT:  Great.  Can you backup for a moment.

6   Before you were talking to me about a period of -- you said

7   October 27th, 2010, to December 29th, 2010, did you mean that

8   to be 2017?

9           MS. HORWITZ:  I did, Your Honor, I misspoke.

10          THE COURT:  All right.

11          MS. HORWITZ:  I apologize.

12          MR. DeFRANCO:  Your Honor, may I follow-up on your

13  question?  I had December 29th, 2010, the period ending

14  December 29th, 2010, should that be --

15          THE COURT:  That's what I -- that's what I was

16  referring to.

17          MR. DeFRANCO:  -- 2017?

18          THE COURT:  Yeah.

19          MR. DeFRANCO:  Is that correct?

20          MS. HORWITZ:  Well --

21          THE COURT:  Ms. Horwitz, give us again the proffer

22  as to the time period that you're speaking of.

23          MS. HORWITZ:  Between October 27, 2010, and ending

24  December 29th, 2017.

25          THE COURT:  Yes.  Okay.

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    19

 1          MS. HORWITZ:  And this is regarding Midstar, LLC,

 2  account ending in 6620; and Midstar, LLC, account ending in

 3  7407.

 4          The large transfer of over, slightly over $1

 5  million was on November 2nd, 2010.

 6          And then beginning in September -- for beginning

 7  in, really September 15, 2017, we see structuring amounts of

 8  transfer.  In total from the two --

 9          THE COURT:  All right.  So you're using that in a

10  term of art sense, in the context of proof associated money

11  laundering and so on.  But it would be better, by way of

12  your proffer, to explain to me what you mean by that.

13          MS. HORWITZ:  Certainly, Your Honor.  Because there

14  are certain monetary thresholds that trigger recording

15  requirements from financial institutions, oftentimes you see

16  money launderers, quote, "structuring their transfers" in an

17  attempt to avoid these types of financial obligations on the

18  bank's part to report.  $10,000 is a -- is such a threshold

19  and so when you see that, oftentimes it's indicative of -- or

20  sometimes it can be indicative of someone who is attempting

21  to transfer money in an evasive manner.  But the flow of money

22  does not -- unless the Court has other questions?

23          THE COURT:  No.

24          MS. HORWITZ:  Or if defense counsel has other

25  questions on the wire transfers from Midstar to Hong Kong

1:18-CR-0258-EJL       U.S. v. Pavel Babichenko       08/31/18       Detention
                                                                          Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    20

```
 1  I'll move on.

 2            THE COURT:  Go ahead.

 3            MS. HORWITZ:  The money moves not only from this

 4  defendant and his entities to Hong Kong, but also from Hong

 5  Kong to this defendant, or to an entity he controls.

 6            Between 2010 and 2012, $6,073,134.70 were wired

 7  from Hong Kong to a Midstar, LLC --

 8            THE COURT:  All right, counsel, let me interrupt

 9  you.  I want to see both of you in chambers for a minute.

10  All right?

11            MS. HORWITZ:  Okay.

12            THE CLERK:  All rise.  Court is in recess.

13       (Court Recessed at 10:30:11 a.m. until 10:37:07 a.m.)

14            THE CLERK:  All rise.  Court is again in session.

15            THE COURT:  Thank you.  Please be seated.

16            All right, ladies and gentlemen, I have seen at

17  least one, although the one I saw is now out of the

18  courtroom, if there are any defendants in this case who are

19  in the courtroom, they need to leave because being here, I

20  think indirectly runs afoul of conditions I've placed on

21  release, so.

22            All right, you may proceed.

23            MS. HORWITZ:  Thank you, Your Honor.

24            So as previously discussed, we have seen movement

25  of money through just two accounts numbering in the millions
```

1:18-CR-0258-EJL       U.S. v. Pavel Babichenko       08/31/18       Detention
                                                                            Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    21

1  headed to Hong Kong, but the transfers and the wires are also

2  being received by Midstar, LLC, account ending in 7407 from

3  Hong Kong and China.

4         Between October 22nd, 2010, and March 30th, 2012,

5  there were approximately $6,073,134.70 worth of wire

6  transfers into -- from Hong Kong, the Midstar, LLC, bank

7  account ending in 7407.

8         There are also other unexplained wire transfers in

9  the millions of dollars.  Also from Midstar account 7407, on

10 November 11, 2010, there's a wire transfer from Midstar to

11 Billfish [phonetic] USA, in the amount of $1,080,000.

12        But as this Court knows, the transference of money

13 in illicit proceeds transcends beyond this Midstar account.

14 The following are examples of money moving between co-

15 conspirators and Gennady Babitchenko, who was then funneling

16 the money to Brazil.

17        On or about March 6th, 2014, Global Distributing,

18 LLC, an entity associated with Timofey and Kristina

19 Babichenko, wrote a check to Henry Babichenko in the amount

20 of $35,000.  Now both Pavel and Gennady admitted that the

21 latter is also known as Henry, during their August 22nd, 2018,

22 interviews with law enforcement.

23        On or about March 25th, 2014, Midstar, LLC, wrote a

24 check to Global Distributing, LLC, for $105,000.

25        Just five days later, on April 1st, 2014, Global

1:18-CR-0258-EJL     U.S. v. Pavel Babichenko     08/31/18     Detention
                                                                         Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    22

1  Distributing, LLC, wrote a check for $105,000 to Gennady

2  Babitchenko.

3          On or about May 3rd, 2014, Global Distributing, LLC,

4  deposited $50,000.

5          On or about April 21st, 2014, Global Distributing

6  wrote a check to Gennady Babitchenko for $12,000 for, quote,

7  "a loan."

8          On or about May 19th, 2014, Global Distributing

9  deposited $68,000 in cash.

10          On or about June 1st, 2014, European Denture wrote a

11  check for $13,138 to Global Distributing.

12          On June 3rd, 2014, Global Distributing deposited

13  that check.

14          On July 25th, 2017, Mountain Wireless Distributing,

15  an entity associated with Anna and Mikhail Iyerusalimets,

16  wrote a check for $10,000 to Gennady.

17          On January 4th, 2016, Mountain Wireless Distributing

18  wrote another $10,000 check to Gennady.

19          On October 17th, 2014, Global Distributing, LLC

20  wrote a check to Gennady for $25,000 for Samsung XE500T1C

21  tablets.

22          And on September 10th, 2015, and September 22nd,

23  2015, Pavel Babichenko wired $50,000 to Midstar Constructoes,

24  in Portuguese, LTD, in Brazil.  And construction is spelled

25  C-O-N-S-T-R-U-C-T-O-E-S.

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                          Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    23

1          In the following 21 wires, European Denture, a

2   business entity controlled by Gennady Babitchenko, wired

3   money to Babichenko Constructoes, in Portuguese again, a

4   Brazilian construction company.

5          On June 20th, 2012 --

6          THE COURT:  Can you backup.  The latter items that

7   you had mentioned, you had said Midstar Construction?

8          MS. HORWITZ:  Correct, Your Honor.

9          THE COURT:  All right.

10          MS. HORWITZ:  So there were two --

11          THE COURT:  All right.  Okay.

12          MS. HORWITZ:  -- there were two Brazilian.

13          THE COURT:  Okay.  I just wanted to make sure.

14          MS. HORWITZ:  Yeah.

15          THE COURT:  Go ahead.  All right.

16          MS. HORWITZ:  On June 20th, 2012, and these are

17   transfers from European Denture to Babichenko Construction,

18   the Brazilian construction company.

19          THE COURT:  All right.

20          MS. HORWITZ:  On June 20th, 2012, $21,000.

21          On June 29th, 2012, $10,000.

22          On August 6th, 2012, $10,000.

23          On February 22nd, 2013, $50,000.

24          On August 21st, 2013, $60,000.

25          On December 2nd, 2013, $60,000.

1:18-CR-0258-EJL        U.S. v. Pavel Babichenko        08/31/18        Detention
                                                                              Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                                24

1        On March 20th, 2014, $60,000.

2        On September 25th, 2014, $100,000.

3        On December 1st, 2014, $100,000.

4        On December 2nd, 2014, $100,000.

5        On February 23rd, 2015, $70,000.

6        On April 16, 2015, $100,000.

7        On June 11th, 2015, $100,000.

8        On September 21st, 2015, $100,000.

9        On December 21st, 2015, $100,000.

10       On April 15, 2016, $100,000.

11       On June 13th, 2016, $100,000.

12       On June 27th, 2016, $100,000.

13       On August 2nd, 2017, $100,000.

14       That's a total of $1,441,000 in one account

15  controlled by Gennady Babitchenko to Brazilian construction

16  accounts.

17       Now HSI has located residential apartment buildings

18  built by these two construction companies and the Babichenko

19  brothers in Brazil.  I am going to butcher this, Your Honor,

20  but specifically in Paratibe and two on Mangabeira and

21  they're eponymously named Babichenko, with Roman numerals

22  after them, and they are all in Joao Pessoa, Brazil.

23       The apartment buildings are new.  And according to

24  HSI have been listed for sale individually in Brazil by the

25  Babichenkos.

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    25

1           During his August --

2           THE COURT:  And that's -- that's new to me, right?

3           MS. HORWITZ:  That's new to you, Your Honor.

4           THE COURT:  Okay.

5           MS. HORWITZ:  And I can't remember if this is new

6   to you as well, Your Honor.  But during his August 22nd, 2018,

7   interview with law enforcement, Pavel admitted that these

8   apartments were for profit.

9           Additionally, when investigators spoke with Vasiliy

10  Rudyi, the Morning Star Church trustee, this week, he told

11  them that the Babichenkos apartments in Brazil were not

12  associated with the church.

13          In Gennady Babitchenko interview, also on August

14  22nd, 2018, he admitted to transferring over $1 million to

15  Brazil via wires and he described this as a, quote, business

16  investment.

17          He also admitted to law enforcement that his

18  denturist businesses are not cash businesses.  Meaning that

19  the customers don't frequently pay with cash.  And he

20  asserted, when confronted, that the movement of money between

21  codefendants and their various entities --

22          THE COURT:  This is Gennady -- or Gennady you're

23  talking about?

24          MS. HORWITZ:  Correct, Your Honor.

25          THE COURT:  All right.

1:18-CR-0258-EJL       U.S. v. Pavel Babichenko       08/31/18       Detention
                                                                    Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    26

1          MS. HORWITZ:  Correct.  Gennady asserted that the

2    movement of money were loans and payments on those loans from

3    his brothers, their associates and their businesses.  But he

4    admitted that he does not charge interest on these loans, nor

5    does he necessarily expect to be repaid for these loans.

6          He also asserted at one point during the interview,

7    the one large cash deposit were funds that he had had for

8    several years based on a small -- or small is my add on

9    there, Your Honor, and I retract it -- a lawn care business

10   that his family had when they first moved to California.

11         Now turning to Government's Exhibit Number 3.  This

12   is a letter from the Samsung legal representative,

13   instructing Midstar, LLC, to cease its sale of counterfeit

14   goods.  This is dated March 28th, 2014.  And in response to

15   this letter, Samsung legal counsel received this.

16         "Dear Andrew," Samsung legal counsel.

17         "Please be informed that Midstar, LLC, is the

18       dissolved entity and is not in business.  Its previous

19       owner is no longer in the U.S., but has left to South

20       America for an indefinite period of time for a mission

21       trip."

22         Now as we know from the CBP seizures, Midstar

23   Distributors continued to receive packages or at least was

24   being sent packages internationally that had counterfeit

25   goods in them.

1:18-CR-0258-EJL        U.S. v. Pavel Babichenko      08/31/18       Detention
                                                                        Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    27

1           As previously stated on November 16, 2015, and

2    November 30th, 2015, 600 counterfeit Samsung chargers, 600

3    counterfeit Samsung headsets, and 50 counterfeit Samsung

4    phones were destined for Midstar Distributors and Midstar,

5    LLC, respectively.

6           Do you want me to go through that again, Your

7    Honor?

8           THE COURT:  No.

9           MS. HORWITZ:  Okay.  Additionally, turning to

10   Government's Exhibit 4, this is an email between two

11   codefendants and family of this defendant, Pavel Babichenko,

12   from Kristina Popudnik, which is the maiden name of Kristina

13   Babichenko who is married to Timofey Babichenko, asking

14   there -- well, asking Troy Sloan:

15          "We have a condo in Brazil and Tim was wondering if

16        we could pay with business money."

17          To which he replies:

18          "If the condo is not part of the business then no.

19        You need to pay for it with personal money and keep the

20        condo separate from the business in case the business is

21        ever part of a lawsuit."

22          Now in addition to this body of evidence that we

23   have of their movement of assets and intents to, at least in

24   part live in Brazil, in 2015 a confidential human source told

25   HSI that the Babichenkos were laundering money through the

1:18-CR-0258-EJL       U.S. v. Pavel Babichenko       08/31/18       Detention
                                                                                    Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    28

1  church, the Morning Star Church, and moving money to Brazil

2  as part of a plan to relocate there.  Recently, federal

3  agents also spoke with the trustee of the Morning Star

4  Church, Vasiliy Rudyi, who also indicated that the

5  Babichenkos had planned to relocate to Brazil.

6          Now regarding this defendant, Pavel Babichenko, he

7  has Brazilian legal residency status, according to HSI, and

8  stated during the October 26th, 2016, undercover purchase,

9  conducted by FBI and the CHS, that he was actively working

10 towards getting Brazilian citizenship.  This defendant is

11 referred to by the other codefendants, in their interviews,

12 as being the leader of this scheme and he has substantial

13 international ties.

14          Regarding his travel, on August 5th, 2010; May 14th,

15 2012; October 13th, 2012; August 6th, 2013; May 15, 2014;

16 October 4th, 2014; May 8th, 2015; August 7th, 2015; April 20th

17 2016; and June 5th, 2017; this defendant traveled to Brazil.

18          He also just recently returned from Brazil on

19 August 20th, where he went with his brothers Gennady, and

20 Timofey, and Igor Babichenko who lives in Florida.

21          Additionally, on July 15th, 2016, and August 7th,

22 2017, he traveled to China.

23          There is also evidence that this defendant has

24 additional assets of which neither this Court nor the

25 government is aware.  During the execution of the search

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                        Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                          29

1    warrant at his house on Pasa Tiempo Way, agents discovered

2    checks from an unknown Philippine bank account, as well as

3    liquidated and easily transportable assets, like a silver

4    bar.

5              Additionally, in the 12586 Bridger Street

6    warehouse, agents executing the search warrant discovered

7    approximately 30 diamond rings.  It's unknown at this time,

8    Your Honor, whether or not those are authentic diamonds.

9              But additionally, as this Court knows, Mr.

10   Babichenko refused to submit an affidavit of his assets

11   before this Court.

12             That concludes the government's proffer, Your

13   Honor.

14             THE COURT:  Well, to be clear, he gave me an

15   affidavit, but as to certain portions of the affidavit there

16   was not detail.  All right.  So that's different than what

17   you said, so I just don't want it to be --

18             MS. HORWITZ:  True, Your Honor.

19             THE COURT:  -- misunderstood.

20             MS. HORWITZ:  And I, of course, have not seen the

21   affidavit.

22             THE COURT:  Right.

23             MS. HORWITZ:  But it concerns the government that

24   Mr. Babichenko seems to be, from the government's position --

25   but that's more of an argument.

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                        Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    30

1           THE COURT:  All right.

2           MS. HORWITZ:  Thank you.

3           THE COURT:  Mr. DeFranco, do you wish to have a

4    short recess before you begin with your response?

5           MR. DeFRANCO:  Actually, Your Honor, may I call one

6    witness and then have a short recess?  He's a businessman

7    that will provide an employment opportunity to my client.

8           THE COURT:  All right.

9           MR. DeFRANCO:  And I'd like to get him back to work

10   if I could.

11          THE COURT:  Okay.  That'd be fine.

12          MR. DeFRANCO:  Thank you, sir.

13          Ryan Wilson.

14          THE COURT:  We'll need you to come through, and

15   just stand to the right of counsel's table there, stop right

16   there, we'll get you sworn in.

17          **RYAN WILSON, DEFENDANT'S WITNESS, SWORN**

18          THE CLERK:  Thank you.

19          THE COURT:  All right.  Our witness box is right

20   here.  You'll need to take a seat in it.

21          THE CLERK:  Please state your full name.

22          THE COURT:  Oops, oops, let's get you seated and

23   get the microphone close to you.

24          THE WITNESS:  Okay.

25          THE COURT:  All right.  Go ahead.  I'm sorry.

1:18-CR-0258-EJL       U.S. v. Pavel Babichenko      08/31/18      **Detention
Hearing**

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                   31

WILSON - DIRECT

1    THE CLERK:  Please state your full name and spell

2    your last name for the record.

3    THE WITNESS:  Ryan LaMar Wilson, W-I-L-S-O-N.

4    THE COURT:  You may inquire.

5    MR. DeFRANCO:  Thank you.

6    **DIRECT EXAMINATION**

7    BY MR. DeFRANCO:

8    Q.   Mr. Wilson, are you a resident of the Treasure Valley?

9    A.   Yes, I am.

10   Q.   And what do you do for a living, sir?

11   A.   I'm an electrical contractor.

12   Q.   Okay.  Where do you work?

13   A.   My office is out of Homedale

14   Q.   And what's the name of your business?

15   A.   Idaho Electrical Service.

16   Q.   And I'm assuming that provides electrical services to

17   people in need in the Treasure Valley?

18   A.   That's correct.

19   Q.   What was your education leading up to having this

20   opportunity?

21   A.   I went to -- I went to Boise State for a trade school

22   for four years.

23   Q.   And does not include, is there -- is that to get a

24   license to be an electrician?

25   A.   It is.

1:18-CR-0258-EJL       U.S. v. Pavel Babichenko       08/31/18       Detention
Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    32

```
                           WILSON - DIRECT
```

1  Q.   In addition to the four years of school, do you also

2  need on-the-job experience?

3  A.   Yes, you need 8000 hours in that four years.

4  Q.   And you did that through a trade school?

5  A.   I did the trade school is just for mostly code, code

6  updates.  On-the-job training is through an employer.

7  Q.   All right.  And that was through Boise State University?

8         THE COURT:  Sir, did you just tell me you were

9  doing 2000 hours a year?  Is that right?

10        THE WITNESS:  That's correct.

11        THE COURT:  Wow.  Okay.  Go ahead.

12 BY MR. DeFRANCO:

13 Q.   And that was through BSU?

14 A.   The schooling was through BSU.  I was employed by AME

15 Electric to get my 8000 hours.

16 Q.   Okay.  So -- before we get to AME --

17 A.   Mm-hmm.

18 Q.   -- did you serve in the United States military?

19 A.   Yes.

20 Q.   What branch?

21 A.   Army.

22 Q.   And you were generally -- or honorably discharged in

23 what year?

24 A.   I was in '97.

25 Q.   And then after that you went onto a different line of

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                        Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    33

                          WILSON - DIRECT

1  work?

2  A.   Yes, I did.  I worked for a cable TV company.

3  Q.   Okay.  And that -- and you found that to be

4  unsatisfactory?

5  A.   That's correct.

6  Q.   And you began working for AME?

7  A.   Yes, I did.

8  Q.   What's AME?

9  A.   It's Alan Michael Emery Electric.

10 Q.   And how long did you work there?

11 A.   Ten years.

12 Q.   Okay.

13         THE COURT:  Mr. DeFranco, I think the most useful

14 thing for me would be, some information about his business.

15 How long he's been in business and the nature of the work

16 that they do.

17         MR. DeFRANCO:  Understood.

18 BY MR. DeFRANCO:

19 Q.   So AME gave you the experience that you needed to start

20 your own business?

21 A.   Yes, that's correct.

22 Q.   And you started Total Electric?

23 A.   Yes, I did.

24 Q.   And that was kind of a predecessor of the business that

25 you currently own?

1:18-CR-0258-EJL     U.S. v. Pavel Babichenko     08/31/18     Detention
                                                                     Hearing

                   NW TRANSCRIPTS, LLC. - Idaho Division
                  P.O. Box 33, Issaquah, Washington 98027-0002
                    206-953-7066 - gayle@nwtranscripts.com              34

WILSON - DIRECT

1  A.   That's correct.

2  Q.   Okay.  What's the nature of the business that you own

3  right now?

4  A.   Right now we wire new construction homes and we also

5  have some industrial accounts in the food processing

6  industry.

7  Q.   Okay.  So the residential work is done both in counties

8  Ada and Canyon?

9  A.   Yes, it is.

10  Q.   And the commercial shop work sounds like food processing

11  plants, more towards Oregon?

12  A.   That's correct, yes.

13  Q.   And your residence is in Canyon County?

14  A.   Yes, it is.

15  Q.   But you do business in Ada County?

16  A.   Yes, we do.

17  Q.   And mostly residential?

18  A.   Yes.

19  Q.   And you employ a gentleman in the company by the name of

20  Alex?

21  A.   That's correct.

22  Q.   And he -- you've learned that he was a -- that Paul is a

23  cousin of his?

24  A.   Yes.

25  Q.   And how long has Alex been employed?

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                    Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                          35

```
                          WILSON - DIRECT
 1  A.    Roughly 11 months.

 2  Q.    And have you found him to be a good employee?

 3  A.    Yes, he's very good.

 4  Q.    And have you learned that Paul has very similar

 5  experience you have with regards to being a licensed

 6  electrician?

 7  A.    Yes, I've heard that.  Yes.

 8  Q.    And he went through the same program, BSU?

 9  A.    Yes.

10  Q.    And you have an opening right now for Paul?

11  A.    We do.

12  Q.    Okay.  And you would like to hire him as an electrician?

13  A.    Yes.

14  Q.    Okay.  And the absolute base rate of pay would be how

15  much?

16  A.    $15 an hour.

17  Q.    And depending on his experience you may be able to

18  negotiate upward?

19  A.    That's correct.

20  Q.    And how would you describe your business right now?

21  A.    Busy.

22  Q.    Okay.  I think your words were blowing up.  Is that

23  correct?

24  A.    Blowing up.  Okay, yeah.

25  Q.    I think that's what you said this morning when I was
```

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                    Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                36

                              WILSON - CROSS

1  talking to you.

2  A.    Okay.

3  Q.    The residential side of the business is very busy.

4  A.    It's -- yes, it is.

5  Q.    And is that what you would use Paul to be working in?

6  A.    Yes, Paul would be with my residential crew.

7              MR. DeFRANCO:  No further questions.  Thank you.

8              THE COURT:  All right.

9              Ms. Horwitz, do you have questions?

10             MS. HORWITZ:  The only question I have, Your Honor,

11  and I apologize I probably I missed this.

12                        **CROSS-EXAMINATION**

13  BY MS. HORWITZ:

14  Q.    Is Alex -- what's the last name of your employee?

15  A.    Bibikov.

16  Q.    Okay.  Thank you.

17  A.    Mm-hmm.

18             MS. HORWITZ:  No further questions Your Honor.

19             THE COURT:  All right.  Thank you, sir.

20             THE WITNESS:  Okay.

21             THE COURT:  You may step down.  You're free to go.

22             THE WITNESS:  Thank you.

23             THE COURT:  Mr. DeFranco?

24             MR. DeFRANCO:  Your Honor, I propose we take a

25  short recess.

1:18-CR-0258-EJL     **U.S. v. Pavel Babichenko**     08/31/18     **Detention Hearing**

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    37

1            THE COURT:  All right.  We'll take a 10 minute

2   recess.

3            THE CLERK:  All rise.

4       (Court recessed at 11:01:53 a.m., until 11:12:25 a.m.)

5            THE CLERK:  All rise.  The Court is again in

6   session.

7            THE COURT:  Thank you.  Please be seated.

8            All right, Mr. DeFranco, do you have further

9   witnesses?

10           MR. DeFRANCO:  Your Honor, I'm going to forgo

11  witness testimony and then -- I'm going to proffer the

12  information.

13           THE COURT:  All right.

14           MR. DeFRANCO:  So, but can I asked the Court some

15  questions?

16           THE COURT:  Go ahead.

17           MR. DeFRANCO:  When I'm proffering, I'm proffering,

18  but when I'm arguing, I need to be arguing.

19           THE COURT:  Right.

20           MR. DeFRANCO:  So, and --

21           THE COURT:  Right now I just want to hear your

22  proffer.

23           MR. DeFRANCO:  Okay.

24           THE COURT:  And then we'll hear argument from the

25  government and then it will be your turn.

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                    Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    38

1              MR. DeFRANCO:  Okay.

2              THE COURT:  All right?

3              MR. DeFRANCO:  Yeah.  Got it.

4              THE COURT:  Go ahead.

5              MR. DeFRANCO:  Your Honor, I -- right now I'm going

6    to be proffering some information that I received from Vlad

7    Shelubay.  Vlad Shelubay his Paul's father-in-law, the

8    defendant Paul.

9              THE COURT:  Can you spell that please?

10             MR. DeFRANCO:  Yes.  S-H-E-L-U-B-A-Y.  And the

11   first name Vlad, V-L-A-D, short for Vladimir.

12             THE COURT:  All right.  Your client's father-in-

13   law?

14             MR. DeFRANCO:  Yes, sir.

15             THE COURT:  Go ahead.

16             MR. DeFRANCO:  Your Honor, so, obviously, this is a

17   very close family.  Vlad Shelubay is in the courtroom.  Vlad

18   is -- was close to -- is close to Paul, obviously, being his

19   father-in-law, but he also knew Paul's father.  And I think,

20   is it fair to assume that you take notice of Ms. Melchert's

21   Pretrial report?

22             THE COURT:  Of course.

23             MR. DeFRANCO:  Okay.  So in there, obviously Paul's

24   father is identified and unfortunately this year Paul's

25   father passed away from colon cancer.  And Paul's father very

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                      Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                          39

1  much was the patriarch of the family and like his son,

2  Gennady, is a pastor in the -- in a Christian church.  As I

3  understand it, it's a Christian church -- as I understand it

4  from Vlad Shelubay, it's a Christian church that is of the

5  evangelical nature and Paul's father was very much dedicated

6  to giving back and helping the poor.  In fact one of the

7  tenets of their faith is that you give back 10 percent.  And

8  in fact, he had encouraged his sons to give back as much as

9  20 percent of their income.

10        The initial idea for a mission came from the

11  patriarch, Paul's father.  And again, Mr. Shelubay, as he

12  explained it to me, they -- as church members struck out

13  trying to find a mission work that they could do, somewhere

14  where it was in need.  They researched Mexico and found that

15  Mexico was very much up to capacity with regards to

16  missionary work and settled on Brazil because of the need.

17  And so it be -- the idea began with my client's father.

18        My client's father, my client and his brothers

19  began this notion of branching out to Brazil and working with

20  the local government to provide relief to the poor.  And in

21  Brazil the  -- where the poor lived is very conspicuous.

22  They live in, I learned about this during the Olympics, the

23  favelas, these are communities that are very much shanty-

24  towns and it's a source of embarrassment internationally for

25  the country, Brazil.  And it's also -- the complexity and the

1:18-CR-0258-EJL        U.S. v. Pavel Babichenko       08/31/18      Detention
                                                                    Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                              40

1   -- and just the true poor that live in these community is

2   incredible.  So my client and his brothers struck out to be

3   able to begin this work with the Brazilian government.

4   There's a program called La Casa and when they initially

5   traveled to Brazil they met up with other missionaries from

6   England, they developed a relationship with them and they

7   kind of piggybacked on the hard work that these folks had

8   done and they started their own mission experience, so.  And

9   it began with obviously obtaining the appropriate visas and

10  there's a lot of bureaucratic work that needs to be done

11  before you can even begin any of the work.  You initially buy

12  the property from a provider, you buy it in -- or an owner,

13  you buy it in an area that is, you know, close to these areas

14  that are inhabited by poor folk, and then you have to begin

15  the work of developing the property.

16          Now I am -- I talked to my client about the work

17  that you have to go through in order to do business in

18  Brazil.

19          THE COURT:  Are these business investment visas or

20  humanitarian visas?

21          MR. DeFRANCO:  Well, as I understand it they came

22  on --

23          THE COURT:  Do you know?

24          MR. DeFRANCO:  -- their residential visas.

25          THE COURT:  Okay.

1:18-CR-0258-EJL        U.S. v. Pavel Babichenko        08/31/18        Detention
                                                                       Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                                    41

1           MR. DeFRANCO:  For lack of a better term.

2           THE COURT:  Okay.

3           MR. DeFRANCO:  Here's what I know.  I know that,

4    first of all, to become a citizen of Brazil is extremely

5    difficult.  To become -- you can travel on a tourist visa

6    which is, I think, originally how the Babichenkos traveled

7    to the country of Brazil.  And then beyond that, you can

8    attempt to obtain a residential visa.  I don't know if it's

9    a residential visa, but if you can obtain some form of

10   residence, I think it makes it much easier to do business.

11           In addition, I think, and I proffer, this is from

12   my client, that in order to do business in Brazil, so if

13   you'd like to open up a bank account or contract with the

14   government you have to have this residential status.  So you

15   have to at least be there on that type of visa in order to be

16   able to participate in this La Casa program that's

17   constructing housing for the poor.

18           So that's -- that's how it began and that's -- you

19   know, I think that the government has argued that, you know,

20   this is all some form of exit strategy from the U.S.  And,

21   you know, from my client's perspective that's not the case.

22           These -- the -- now the -- the question that you

23   might be asking yourself is, is this a humanitarian exercise

24   or is it a for-profit exercise?  Ms. Horwitz, in her argument

25   indicated that there's conversation that these are for sale

1:18-CR-0258-EJL        U.S. v. Pavel Babichenko        08/31/18        Detention
                                                                                   Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                                    42

1    and/or for-profit.  I know that the value of the property is

2    -- it has -- the property has value, it's real estate and

3    its -- there's a -- as I understand it, the work that's done

4    -- again, I'm proffering, this is from my client -- that the

5    government will ultimately paying you for the construction

6    that's done on that land and it's capped and you have to be

7    very frugal and it's also really difficult, in Brazil, to get

8    contractors to do the work.  You're responsible for building

9    all the roadways, and egress, and ingress from the

10   properties.  And then you're also responsible for the

11   buildings themselves.

12           And it's been proffered that these buildings have

13   the Babichenko name on it.  They are really very un-austere

14   construction signs that are labeling these residential

15   condos.  They're kind of these vertical units and they're

16   made with, I don't want to say cheap finishing materials,

17   they're nice, but it's -- they're materials that in Brazil

18   that are commonly used, like tile, and it's a very simple

19   floor plan.  And the floor plan is very small.  It almost has

20   a commercial feel to it.  And the idea is that individuals

21   that are poor will move there, they will pay a reduced rate

22   of rent through the government and live there and that would

23   be the charitable enterprise that was envisioned by the

24   patriarch of the Babichenkos and that was the -- that was

25   the mission of the -- of the brothers in terms of what they

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                        Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                          43

1  were doing.  They look at it very much as an outreach and

2  doing something that -- as would give back as it were.

3         And that's the way it was explained to Vlad

4  Shelubay as well, the father-in-law.  In fact he had an

5  opportunity to travel to Brazil and see these -- these

6  properties and he took some video; and I have that video.

7  I've shared that video with counsel.  And if the Court has an

8  interest in looking at that video, you could see it as well

9  and --

10         THE COURT:  I have an interest in seeing what you

11  want to present to me for me to consider.

12         MR. DeFRANCO:  Okay.  And I think I would like you

13  to consider that and I can explain why in my argument to the

14  Court.

15         THE COURT:  Well, but it has to be in the open

16  courtroom.

17         MR. DeFRANCO:  Okay.

18         THE COURT:  I'm not going to take something back

19  into chambers and look at it.

20         MR. DeFRANCO:  Fair enough.  Well, then just

21  logistically, you know, I don't know if my computer is

22  compatible with the Court system.  I mean I could show the

23  video on my computer screen to anybody who would want to see

24  it in the courtroom.

25         THE COURT:  Well, why don't you see if someone's

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                44

1  here who could come and see if that's something that can work

2  for us.  And while they're coming I'll hear from -- further

3  from you.  All right?

4          MR. DeFRANCO:  Okay.  That makes perfect sense.  I

5  want to certainly be as sufficient with your time as I can be

6  today.  Thank you.

7          So in addition, Your Honor, Vlad would -- realizes

8  that there's probably some concern about the flow of

9  information between defendants, because the fact that they

10 are very close family members.  In fact my client's wife is

11 an indicted co-conspirator and she was even here today.  And

12 so, and that's been a concern to me as well, you know, the

13 integrity of the process is always a real big concern in both

14 minds of the prosecuting attorney and the Court.

15         And, you know, I asked Vlad in the short run, if my

16 client were released, would it be possible for Paul to live

17 in his house, where he and his wife Nadia live, and then

18 Nadia and Vlad could move to Paul's house and help care for

19 the children.  As you are aware from Ms. Melchert's report,

20 there are five children between Natalia and Paul, one of

21 which is a 5 month old.  So she probably could appreciate the

22 help.

23         And, you know, Vlad's not entirely pleased with the

24 notion of having to leave his own home, but he would do

25 whatever it would take to see that Paul was released.  And if

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                        Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                        45

1  Paul -- if there was a ruling from this Court that Paul not

2  have contact with his wife, or live with his wife, we could

3  accommodate that.  And right now financially, because there's

4  no money, it would be difficult to go out and strike out and

5  get an apartment or something like that, but if Paul were

6  employed, obviously, he'd be able to do that as well.

7          So, Your Honor, that's the information that I think

8  Mr. Shelubay would have provided to the Court regarding the

9  Brazil properties, had he taken the stand, and I'll treat

10  that as proffer.  Obviously, interspersed with some of the

11  more technical aspects of this investment in Brazil that that

12  information -- a portion of that information came from my

13  client.

14          Thank you.

15          THE COURT:  Mr. Rubin, we're still some time from

16  getting done with this.  You're welcome to stay if you'd like,

17  but --

18          MR. RUBIN:  Thank you, Your Honor.  I appreciate

19  that.

20          THE COURT:  All right.  Okay.

21          All right, so nothing further by way of proffer.

22  Now we're waiting to see if we can get the video, is that

23  right, Mr. DeFranco?

24          MR. DeFRANCO:  Yes, Your Honor.  Actually there is,

25  in the context of proffer there probably is one other thing

1:18-CR-0258-EJL       U.S. v. Pavel Babichenko       08/31/18       Detention
                                                                      Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                               46

1    I'd like to bring to the Court's attention.

2              THE COURT:  Okay.

3              MR. DeFRANCO:  And again this is in the form of

4    proffer from my client.

5              With regards to Government's Exhibit Number 1,

6    that's the picture of the --

7              THE COURT:  Yes, I know.

8              MR. DeFRANCO:  You've probably seen it a million

9    times already, so.  Those boxes, and according to my client,

10   the majority of those boxes contain SaharaCase.  Again, you

11   know, I -- I don't know, the government's position, it's

12   seems to arguing that the volume of cell phones is a very

13   aggravating fact in this case, but the -- my client's take on

14   Exhibit Number 1 is that, to the extent that that Exhibit

15   Number 1 was used to show the volume of cell phones, that's

16   not an entirely accurate argument.  That's more related to

17   SaharaCase.

18             And SaharaCase, and this is proffer from my client,

19   is very important right now because cell phone cases are

20   designed for the cell phones that are in existence.  And when

21   a company that builds a case, builds a new case for a cell

22   phone, they actually have to go to the company, the

23   manufacturer and they will, the company or manufacturer

24   actually will develop a dummy that is an exact replica, it

25   doesn't work like a phone, but it's a dummy of the physical

1:18-CR-0258-EJL       U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                      Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                                47

1   form of the phone and the manufacturers of cases use those

2   molds in order to make their phones that will fit that

3   year's brand new cell phone release.  So the -- and

4   obviously those have value for new phones coming out.  But

5   there's another trend in the market that occurs that when

6   the new phone comes out, there's a purchase rush for that new

7   phone but then the price drops on the last year's phone and

8   that price drop --

9            THE COURT:  Finish what you're doing please.

10           MR. DeFRANCO:  Okay.  Thank you.  That price drop

11  will precipitate a sales frenzy on the old phone.  And so the

12  old phone is already in existence.  The cases for the old

13  phones have been produced, but the shelf-life for those --

14           THE COURT:  I -- fine, but really what is important

15  in all of this from your client's perspective is, you're

16  proffering to me that it's not what it seems to be from the

17  government's allegations?

18           MR. DeFRANCO:  Right.

19           THE COURT:  Is that right?

20           MR. DeFRANCO:  Yes.

21           THE COURT:  Okay.

22           MR. DeFRANCO:  But I'm also, because there's

23  another aspect to this.

24           THE COURT:  Go ahead.

25           MR. DeFRANCO:  The other aspect to this is that

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                          48

 1   those cell phone cases, after the mad rush for the old phones

 2   is over, will become virtually worthless because all those

 3   old phones will be sold primarily during the Christmas

 4   holiday.  So that inventory of old cell phone cases, if they

 5   missed that window of opportunity in selling those cases

 6   it'll be gone and they'll be virtually worthless because the

 7   inventory will have already been sold and the phone cases

 8   will have already been sold during that particular holiday.

 9           So there's -- my clients -- my client is a

10   wholesaler of refurbished phones and a retailer of newly

11   manufactured cell phone cases.  And the fact that he's in

12   custody and can't sell those cases is a hardship.

13           THE COURT:  All right.  So I thought you were

14   trying to tell me that the inventory included a bunch of

15   cell phone cases that just were -- no, there wasn't a market

16   for them anymore, but now you're telling me that -- and I

17   don't mean now, but you're suggesting to me that -- that I

18   should consider, in a release decision, whether or not your

19   client would be able to sell cases he has right now.  Is

20   that right?

21           MR. DeFRANCO:  I think you should, yes.

22           THE COURT:  Okay.

23           MR. DeFRANCO:  Because otherwise that's --

24           THE COURT:  All right.  I'll be interested in your

25   argument about why that's true.

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                     49

1          Okay, so Mr. Ward can you help him -- Mr. DeFranco

2    see if you can get this video loaded please.

3               (Off Record Colloquy of Mr. Ward)

4          THE COURT:  We're off the record.

5       (Court recessed at 11:28:45 a.m., until 11:35:28 a.m.)

6          THE CLERK:  All rise.  Court is again in session.

7          THE COURT:  Thank you.  Please be seated.  Back on

8    the record.

9          The Court has just viewed a video.  We're going to

10   have Mr. DeFranco make the disk that contains the video,

11   Defendant's Exhibit 1.

12         Any objection to its admission, Ms. Horwitz?

13         MS. HORWITZ:  No, Your Honor, so long as defense

14   counsel asserts that the video seen in chambers is the video

15   on the disk.

16         THE COURT:  Well, I guess that was understood, but

17   now that you -- why don't you -- why don't you confirm that,

18   Mr. DeFranco.

19         MR. DeFRANCO:  Your Honor, John DeFranco on behalf

20   Paul, confirming that the thumb drive I have in my hand is

21   the exhibit that the Court just watched.

22         THE COURT:  All right.  So why don't you bring that

23   forward.  Give that to Ms. Montgomery please.  We'll make

24   that Defendant's Exhibit 1.

25               (Defendant's Exhibit 1, admitted)

1:18-CR-0258-EJL     **U.S. v. Pavel Babichenko**     08/31/18     **Detention**
**Hearing**

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          50

 1          THE COURT:  Then, Mr. DeFranco, if you'll go back

 2   to the podium and just make a proffer as to what it

 3   contains.

 4          MR. DeFRANCO:  Certainly.  So, Your Honor, as I

 5   mentioned, Vlad Shelubay, my client's father-in-law, traveled

 6   with the family to Brazil.  When he traveled, he traveled on

 7   a tourism visa.  He shot the video of the construction and

 8   the purpose of that was to just memorialize the experience.

 9   He had that video's stored on a camera.  He was kind enough

10   today to transfer that to that video.  And he actually had

11   edited a portion of it and set it to music, as I understand

12   before, but he took a portion of the video that he had

13   captured and made it in a digestible exhibit format of a

14   minute and a half.  It showed the construction itself.  It

15   also showed the surrounding area.  I received that this

16   morning and I've tendered it to the Court.

17          THE COURT:  Can you proffer when that was taken?

18          MR. DeFRANCO:  Your Honor, I would have to guess.

19   I could certainly ask Mr. Shelubay.

20          THE COURT:  Well, I don't want to guess.  If you

21   know then that's fine.

22          MR. DeFRANCO:  I don't know off the top of my head,

23   but I certainly could find that out.

24          THE COURT:  All right.  All right, does that

25   complete your proffer then?

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                        Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    51

 1              MR. DeFRANCO:  Yes, sir, it does.

 2              THE COURT:  All right.

 3              Ms. Horwitz, did you have any further proffer?

 4              MS. HORWITZ:  Your Honor, I think I would just like

 5    to make clear, I can't recall if this was specifically

 6    covered, but in the 12586 Bridger Street warehouse,

 7    investigators did encounter cases marked SaharaCase, which

 8    were left at the warehouse.  And --

 9              THE COURT:  Yes.  You had said that before.

10              MS. HORWITZ:  Okay.  And the 42,000, approximately,

11    items seized by the agents at the execution of that search

12    warrant, those were the contraband cell phones and cell phone

13    accessories, or suspected contraband cell phones and cell

14    phone accessories that were seized and taken out of the

15    warehouse.  And that is pursuant to 18, U.S.C., Section 2320

16    and 49, U.S.C., Section 8302(a)(6) which obliges the

17    government to seize and eventually destroy, once found, and

18    confirmed to be contraband.

19              THE COURT:  These -- the 42,000, you say, were

20    taken out of the 12586 Bridger warehouse?

21              MS. HORWITZ:  And that 12554 Bridger warehouse,

22    Your Honor.

23              THE COURT:  All right.

24              MS. HORWITZ:  Thank you.

25              THE COURT:  All right.  And the government's

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1  proffer is that the government believes that none of that

2  seized property included Sahara phone cases?

3          MS. HORWITZ:  Correct, Your Honor.

4          THE COURT:  Okay.

5          MS. HORWITZ:  It's my understanding that the

6  SaharaCase goods were left at the warehouse for the very

7  purpose of not interfering with the business of that

8  particular subpart.

9          THE COURT:  Oh.  My inquiry was a little more

10 focused than that, because you had represented earlier on

11 that it wasn't possible to look at everything.

12         MS. HORWITZ:  Correct, Your Honor.  I believe that

13 what has happened, but I have not been fully debriefed,

14 because it's my understanding that the agents are still, as

15 of like yesterday they completed this effort, and I haven't

16 had a chance to meet with them specifically on this, but

17 it's my understanding that every box was looked through, the

18 items were counted and suspected counterfeit cell phones and

19 cell phone accessories were contained and all of the boxes

20 seized.

21         I have not specifically asked the agents whether or

22 not a SaharaCase got slipped into a box, but it's my

23 understanding that the approximately 41,000 items are all

24 cell phones and cell phone accessories.

25         THE COURT:  Okay.  I --

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      **Detention Hearing**

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    53

 1            MS. HORWITZ:  Maybe I'm misunderstanding your

 2    point, Your Honor.

 3            THE COURT:  Well, no.  No, I'm just -- was smiling

 4    because I -- and I appreciate there's lots that you're trying

 5    to keep track of, as am I.  You just said 41,000, before you

 6    said 42,000.  I don't know that --

 7            MS. HORWITZ:  My notes say 42, Your Honor.

 8            THE COURT:  All right.  Okay.

 9            MS. HORWITZ:  42,000.

10            THE COURT:  All right.  Then let's hear your

11    argument please.

12              **CLOSING ARGUMENT ON BEHALF OF PLAINTIFF**

13            MS. HORWITZ:  For the past decade, Pavel Babichenko

14    has controlled a large-scale sophisticated operation

15    trafficking in counterfeit cell phones and cell phone

16    accessories out of 12586 Bridger Street warehouse.

17            Now as part of this criminal enterprise, this

18    defendant has traveled to Hong Kong to purchase directly from

19    manufacturers.

20            THE COURT:  Can I have you back up to the very

21    beginning?

22            MS. HORWITZ:  Yes, Your Honor.

23            THE COURT:  The government is arguing not that

24    there's a risk of danger here, but it's the risk of flight

25    that your motion is based upon, correct?

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com

1          MS. HORWITZ:  That's correct, Your Honor.

2          THE COURT:  All right.  So what the Court is

3  concerned with is whether or not there is a preponderance of

4  the evidence, demonstrated by the government, that would

5  establish that there is no reasonable set of conditions that

6  would reasonably assure the defendant's presence at future

7  proceedings if released.  And so all of this argument is

8  focused on that issue, right?

9          MS. HORWITZ:  Absolutely, Your Honor.

10          THE COURT:  All right.  Thank you.

11          MS. HORWITZ:  And I will say to the extent that I

12  delve into the general background of the scheme and the

13  counterfeiting components and the evidence therein, I think

14  it bespeaks to the point that this defendant faces extremely

15  serious charges for a very large, allegedly large criminal

16  enterprise.

17          Now this Court is well aware that it can consider

18  the sanctions and the strength of the evidence in determining

19  whether or not this defendant is a flight risk and that's

20  kind of where I'm bringing this -- this component in.

21          I also think that his international travel to China

22  and his connections thereto, are another component of his

23  ability to flee internationally, not only because of the

24  means that he shown to have had access to, but also because

25  of his substantial contact, both through Brazil and China.

1:18-CR-0258-EJL       U.S. v. Pavel Babichenko       08/31/18       Detention
                                                                          Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                             55

1          So as shown, the conspiracy was vast and the

2    defendants operated over 100 separate business entities to

3    sell their counterfeit goods online to thousands of

4    unsuspecting customers.

5          Now over the course of this investigation, FBI and

6    HSI agents have identified over 50 U.S. Customs & Border

7    Protection seizures of counterfeit electronic goods

8    associated with this conspiracy.  The vast majority of those

9    are directly attributed to either Pavel Babichenko by name or

10   Midstar, LLC.

11         Additionally, FBI and HSI agents have made over 14

12   undercover purchases of counterfeit electronic goods between

13   November 2015 and December 2017 through Amazon and eBay.  And

14   as this Court heard, FBI, working with the confidential human

15   source, bought directly, in-person, from Pavel Babichenko at

16   the 12586 Bridger Street warehouse, counterfeit cell phones

17   in bulk for cash.

18         Now as discussed, Pavel traveled with his brothers,

19   Piotr and Timofey Babichenko to China and Hong Kong to

20   directly to obtain their supply.  Additionally, Pavel with

21   his family, Piotr, Timofey Babichenko and Gennady Babitchenko

22   to Brazil numerous times, I believe the most, Your Honor.

23   I'd have to go back and double check Gennady's, but he -- no,

24   I think -- I can't remember.

25         But they travel there with the purpose of funneling

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                    Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                        56

 1  money to build eponymous condominiums.  And as the Court saw,
 2  while those condominiums may take advantage of --
 3          THE COURT:  Ms. Horwitz, you've used the term
 4  eponymous many times and it appears in your moving papers as
 5  well, which means that they've named the buildings their
 6  family name.  So what difference does that make here?  Are
 7  you intentionally emphasizing that for purposes of the
 8  decision I have to make?
 9          MS. HORWITZ:  I think, Your Honor, I think if this
10  was going to be a charitable institution, or if they were
11  going to assert that this is part of the Morning Star Church
12  institution, I think the fact that they put their name on it,
13  as opposed to the church's name, speaks to the underlying
14  purpose of the condominiums.  That may be a  stretch, but
15  that's why I've been emphasizing it.
16          THE COURT:  All right.  I understand.  Go ahead.
17          MS. HORWITZ:  And of course there's nothing that
18  says that use of a federal program in Brazil, that's used to
19  encourage building condominiums for favelas, people who are
20  living in favelas can't be for-profit.  And according to
21  Gennady, Vasiliy Rudyi -- well, according to Gennady, the
22  Brazilian properties are an investment and he's the one
23  that's wired over $1 million to one bank account to Brazil.
24          According to Vasiliy Rudyi, the trustee of the
25  Morning Star Church, these Brazilian properties of the

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                        Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                          57

 1   Babichenkos are not associated with the Morning Star Church.

 2          In total, Your Honor, what we've -- what we've seen

 3   today is a substantial scheme -- or what the government

 4   alleges is a substantial scheme and it requires a large

 5   amount of capital, an ability to negotiate international

 6   businesses.  As you heard from defense counsel, it's

 7   difficult to get things done in Brazil.  You have to have

 8   ties there in order to build and use construction.

 9          Simply the conspiracy and the charges alleged,

10   require means that are the very fear that the government has

11   that this defendant will flee.  His international ties, his

12   capital.  And especially concerning are the substantial means

13   and unknown assets of this defendant.

14          When you couple these traits with the defendant's

15   plans and efforts to funnel money and assets to Brazil, as

16   well as their stated purpose, to multiple people over a

17   period of years, that they're going to relocate to Brazil,

18   his legal residency status and his efforts, according to

19   himself and his undercover video, to gain Brazilian

20   citizenship.  And the preponderance standards is more than

21   met here, Your Honor.

22          THE COURT:  All right.  Thank you, Ms. Horwitz.

23          MS. HORWITZ:  Thank you.

24          THE COURT:  Mr. DeFranco.

25   ///

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                       Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    58

1              **CLOSING ARGUMENT ON BEHALF OF DEFENDANT**

2              MR. DeFRANCO:  Your Honor, the fact that this is

3      such a long investigation, I don't know that that's

4      necessarily a helpful fact for the government.  It sounds

5      like there were civil suits many years ago.  I know that my

6      client retained attorneys and fought to protect his identity

7      as a businessman.

8              I can tell the Court that my client is a wholesaler

9      of cell phones.  And what the government is referring to as a

10     counterfeit cell phone, my client would prefer to

11     characterize as a refurbished cell phone.

12             I don't know a whole lot about cell phones.  I

13     suspect I'm going to no more than I'll ever want to know

14     about them in handling this matter, but one of the things

15     that I learned from my client is that a very important

16     distinguishing feature on a cell phone is what's called an

17     IMEI number.  And an IMEI number is particular to that

18     individual phone.  So on an iPhone, on an older iPhone you

19     can actually look at the back and it will have the number on

20     it.  On the newer models, I have an 8, iPhone 8, you would go

21     into the "about" and you can see the IME number in there.

22     And that IME number is very important because you need that

23     in order to have a service provider activate that phone so it

24     will work.  And each phone has its individual IME number.

25             So my client, as a wholesaler, has -- goes into the

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                          59

1   marketplace in bulk, purchases, you know, big batches of used

2   cell phones and he's in the business of refurbishing those.

3   Some of that work is done in China.  So the travel to China

4   or the Philippines, he indicated to me that the Philippines

5   also does the same work as the refurbishing process.  So a

6   new bezel [phonetic] setting for the phone, glass, all that

7   stuff is done as part of the business, so it can enter into

8   the resale market.

9        Now certainly the government has raised some

10  interesting things in their proffer as it relates to

11  scienter.  Apparently my client is surreptitiously recorded

12  making statements that are consistent with him having

13  knowledge and saying, hey, let's sell this in a way online,

14  that would provide an opportunity for us to be able to engage

15  in the marketplace without the watchful eye of the people

16  that own the trademarks.  That's a bad fact for the defense,

17  if that's true.

18       But I'm thinking about this case overall.  And I

19  know that the trademark world, you expose yourself to treble

20  damages, you expose yourself to all sorts of penalties where

21  you can lose a lot of money.  And in this case what we're

22  talking about is my client losing his freedom.

23       And the thing that's -- I guess I don't even have

24  to address the risk of danger because the government has

25  conceded that there is no risk of danger.  I mean we're not

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                        Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                               60

1  talking about this money being funneled, using the

2  government's term, into some illicit business that's used to

3  purchase firearms, or drugs, and where the community is

4  somehow at risk.

5         What we're talking about, I suppose, in terms of

6  danger to the public, reference to these products is that an

7  imitation battery, or an imitation charger, or a phone that

8  didn't come from the manufacture could burst into flames and

9  hurt somebody.

10         Again I, you know, I'm having a hard time wondering

11 what sentencing would look like in this case.  I can

12 appreciate the guidelines will be there, but I don't know

13 that we're going to have, you know, someone coming into Court

14 about -- talking about the fact that their lifetime savings

15 has been depleted or, you know, they've lost everything.

16         I suppose the real victims here are the

17 manufacturers who are having a bite taken out of their

18 business, whether it be as the manufacturer of the cell

19 phones or a reseller of refurbished phones.

20         Ironically, the businesses that manufacture these

21 phones, like Samsung and Apple are in the business of selling

22 refurbished phones.

23         If Apple, at one of their stores has a phone that

24 doesn't -- the packaging is dented or something, it goes

25 back to Apple and they sell it off as a refurbished phone.

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                  Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    61

1  And that -- my client has been a wholesaler for many years in

2  that business.  And as you can imagine, the profit margin is

3  pretty tight and you have to be very sophisticated in terms

4  of how you access the market in order to turn a profit.  And

5  he's been a good businessman.  And in some ways I think that

6  works against him in terms of arguing that now he has these

7  resources based on his contacts from having done a legitimate

8  business overseas that makes him a flight risk.

9          But, you know, going no further than Ms. Melchert's

10  report, the things that are going to keep him here are these

11  communities of people that have come here in support of that

12  man.  In addition, he has five kids, a five-month-old here

13  as well.  He's not going to do anything that's going to put,

14  you know, their futures at jeopardy because of his decisions

15  as a -- his decisions as a businessman.  He is absolutely 100

16  percent tied to this community.  He has incredible affection

17  for this community.  This is the community that gave his

18  father escape from Georgia where he was prosecuted as a

19  Christian.  He married into a Ukrainian family who they don't

20  -- they're not friendly with Russia.  They're unhappy with

21  Russia's behavior in terms of the way they've treated the

22  Ukraine as an imperialistic opportunity to gain access to a

23  waterway.  They are not happy about that.  They love this

24  country and this is where they want to stay.

25          And this Brazilian opportunity was an opportunity

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                        Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    62

 1  -- yes, it has value and its investment, but it's an

 2  investment rooted in opportunity for people to escape the

 3  favelas and live in an humanitarian setting.  And I don't

 4  think that my client ever had any plans on living in that.

 5          And then the signs that are on that, as you can see

 6  from the video, the people that are participating in the La

 7  Casa program, that their family name appears on those

 8  buildings so the construction workers know where to go to do

 9  the finishing work.  To where to go to do the construction.

10  And the idea is that La Casa, that program, you'll know who's

11  responsible.  What family is responsible for that

12  construction by virtue of the fact that their name appears.

13  And it's not in flashing lights.  It's very un-austere and

14  its mailed to Babichenko Place.  That's where you would get

15  your mail if you were a poor person ultimately living in one

16  of those subsidized housing units.

17          So I, you know, it -- I think Ms. Horwitz's

18  comments was, it may be a stretch with regard to the family

19  name, but, you know, I'm arguing that it's more a necessity

20  in terms of a business practice in identifying the

21  property --

22          THE COURT:  Well, I think her argument, Mr.

23  DeFranco, was that if -- if the purpose of the construction

24  was part of a mission for the church that it would have a

25  different name than Babichenko.  So, frankly, this is -- this

1:18-CR-0258-EJL        U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                         Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    63

1  is a piece of what I'm thinking about, but it's not as

2  significant as other things, so.

3          MR. DeFRANCO:  Fair enough.  And I think you

4  identified as much, so I apologize if I spent too much time

5  on that particular issue because I'm more concerned about

6  other stuff in this case.  And primarily what I'm concerned

7  about is this material that's in the warehouse, these

8  SaharaCases.

9          You know, the -- you have a lot of power as a

10  Magistrate in setting conditions of release and one of the

11  things that you could do is say that the proceeds from the

12  sale of the SaharaCase be deposited into a neutral bank

13  account.  I think you would have the authority in setting

14  conditions of release.

15          And what I was talking about with those SaharaCases

16  is that those have value in the marketplace, but there's a

17  very narrow window of time when you'll be able to sell those

18  items and that typically it's the Christmas holiday.  And

19  because that -- that those are for older phones already in

20  existence and those phones likely are not going to be for

21  sale after the price drop happens.  It'll be a mass rush to

22  the marketplace to purchase those.  And then there will be a

23  mass rush to the marketplace to purchase cell phone covers

24  that will ultimately protect those cell phones.  So that --

25  that stuff in that warehouse has value, but it has a shelf

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                        Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                          64

1    life.

2            And so -- and my client, his intent is, if he gets

3    out is to work full-time as an electrician and he would also,

4    probably in the evenings, have to figure out a way to unload

5    those SaharaCases in order to make money.

6            I don't think that the Court -- I don't think it's

7    fair for the Court to consider not releasing him because he

8    has the opportunity to make money and have resources.  I

9    think the Court's analysis is more discrete and complex, you

10   know, the idea is, is that I don't want -- whatever resources

11   your obtaining by virtue of an employment that pays 15-plus

12   an hour, or if you're able to make a bunch of money selling

13   SaharaCases, I don't want that being used to fuel some sort

14   of exodus, an illegal exodus from the United States, because

15   legally he's not going to be able to leave.

16           The first thing I did, once I heard that Gennady

17   was detained was I freaked out and got my client's passport

18   and his wife, and brought it to Ms. Melchert's office.  At

19   7:30 a.m. in the morning I was outside of her office with my

20   client's passports and my client was more than happy to

21   provide that material through his father-in-law.

22           You know, my client has no designs on leaving this

23   community.  This community has done a lot for him and he's

24   invested.  And more importantly the thing that he cares most

25   about in the whole wide world are five children and his

1:18-CR-0258-EJL       U.S. v. Pavel Babichenko       08/31/18       Detention
                                                                          Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com          65

 1  spouse.  And, you know, they're not going anywhere.

 2          With regards to the resident visa, Your Honor, I --

 3  you know, I -- what I would argue to the Court is that being

 4  a Brazilian citizen is certainly one thing.  If somebody has

 5  dual citizenship, you know, that suggests that, you know, you

 6  might be able to travel easier into that other nation.  But

 7  he is a resident visa.  And the resident visa wasn't part of

 8  a plan to, you know, have an escape valve from the United

 9  States if things got too hot.  That residential visa was a

10  mechanism whereby you could create a bank account and do

11  business and contract in Brazil.  And having to do that was

12  important.  And having to fund that project was important.

13          And having to be there in order to monitor the

14  contractors is really important.  Anybody that's ever built a

15  house or anything, knows that the amount of oversight

16  required by a general contractor or somebody that has an

17  investment, things get -- go sideways very quickly, unless

18  somebody's there to make sure that there's lien releases, and

19  everything gets done appropriately and that's basically what

20  these folks were doing.  They were going to Brazil, they were

21  working with an attorney's office, they were working closely

22  with the government.

23          Every time they traveled there, they went through

24  customs and they spent at least an hour in customs answering

25  questions about why they were there.  And in turn they knew

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                 Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                66

1  that if we build this thing down there, everybody's going to

2  be asking questions.  There's proper documentation, according

3  to my client, that they're working with the government in the

4  La Casa program and it is a charitable enterprise.

5       So, you know, I just don't believe that it's fair

6  to simply look at that property and characterize it as a

7  machine that fuels the flight risk argument.  I just -- I

8  don't see that it's that, based on the information that I

9  received -- received heretofore.

10      My client has indicated that he's more than willing

11 to wear the electronic bracelet on his ankle, so the

12 probation department would know what -- his whereabouts.  I

13 mean you could be even more creative.  You could require that

14 he turn himself into the jail for weekends, you know, when

15 he's not work.  The bottom line is, my client is 100 percent

16 absolutely committed to following the rules as it relates to

17 conditions of release and I think you have the power to

18 fashion conditions of release that guarantee that he shows up

19 for Court.  He has no criminal history.  He's never failed to

20 appear.  I think there was some mention of a misdemeanor

21 charge and I might be confusing it was something else, but

22 there was no disposition.

23      THE COURT:  There's a misdemeanor charge in Payette

24 County.

25      MR. DeFRANCO:  In Payette County and there was no

1:18-CR-0258-EJL     U.S. v. Pavel Babichenko     08/31/18     Detention
                                                                     Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                              67

1  disposition.  I didn't know what that was and I neglected to,

2  you know, chase that information down.  I apologize but, you

3  know, if he's out he could also figure out what that's all

4  about.

5          But, you know, from all intents and purposes,

6  citizen, seems like a nice guy, successful businessman and

7  not a flight risk.  I'd ask that you consider releasing him

8  with conditions.

9          THE COURT:  Okay.  Thank you, Mr. DeFranco.

10          Ms. Horwitz, I gave Mr. DeFranco a little leeway.

11  He kind of started doing some more proffer in the course of

12  that.  It's hard sometimes to keep that line drawn.  It's

13  your motion, I'll give you the last piece of argument.  And

14  if you have anything -- proffer to counter any of that then

15  you can have a chance to do so.

16          MS. HORWITZ:  Thank you, Your Honor.  The

17  government rest

18          THE COURT:  All right.

19                    **JUDGE'S RULING**

20          THE COURT:  All right.  So, Mr. Babichenko, we've

21  covered a lot of ground here this morning and in dealing with

22  all of this, the Court's responsibility is to take that

23  information and consider it in the context of what the law

24  requires me to consider and then make a decision based upon

25  what the law requires me to consider.  I don't get to act

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                        Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                            68

1 | free-form in all of this.

2 |         My consideration of what to do begins with the

3 | motion that the government has filed, which is a request that

4 | the Court order that you be detained because the government

5 | contends that you are a risk to flee, that is, to not show up

6 | for further proceedings, and that there are no conditions

7 | that can be imposed that would reasonably assure your

8 | appearance at further proceedings in this case.

9 |         And in considering all of that, I first -- well,

10 | the guidelines for my thinking about those things is, are

11 | those that are found in federal law at 18, United States

12 | Code, Section 3142, that is titled, "Release or Detention of

13 | Defendant Pending Trial."

14 |         In this particular instance, where the government

15 | argues that you are a risk of flight, the burden of proof

16 | that they have to make is by a preponderance of the evidence.

17 | In other words, that I'm persuaded, more than not, that there

18 | are no conditions that could be imposed that would reasonably

19 | assure your appearance going forward.  To get to that point,

20 | I have to first decide whether there is a risk of flight at

21 | all.

22 |         In this case, given the six charges that you face

23 | which carry with them, if the entirety of a sentence were to

24 | be imposed on each charge, if you were to be convicted on

25 | each charge, which is an unusual scenario in terms of a

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      **Detention
Hearing**

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    69

1  sentence, but you face potentially 80 years in the

2  penitentiary if the sentences were to be imposed

3  consecutively.

4          There were also the four forfeiture allegations

5  which involve allegations by the government that there's

6  substantial sums in money and substantial amounts of property

7  that were used in connection with the alleged crimes and the

8  government says that you should have to forfeit any interest

9  you have in any of that.  And then of course, there's the

10  possibility for fines in very large amounts as well.

11          There is, inescapably, in the Court's view, a risk

12  of flight in that setting, so I then have to examine what the

13  statute calls on me to consider in terms of whether there are

14  conditions that could possibly be imposed that would protect

15  against that.

16          In all of this, the statute sets out various

17  factors.  The factors include that I'm to consider the nature

18  and circumstances of the offenses charged, including whether

19  or not there's a crime of violence alleged, a crime of

20  terrorism; whether it involves a minor victim, or a

21  controlled substance; a firearm, an explosive or a

22  destructive device.  Well, none of the latter things exist

23  in this setting.  The nature and circumstances, as well as

24  the weight of the evidence are heavily emphasized by the

25  government in its argument.  And in that regard, the

1:18-CR-0258-EJL        U.S. v. Pavel Babichenko        08/31/18        Detention
                                                                                Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                  70

1    government characterizes the criminal enterprise that they

2    allege is reflected in the indictment that's been issued in

3    this case is a vast, and of many years standing, and enormous

4    sums of money, and -- and money laundering to go along with

5    it.

6              In that regard, the -- what's known as the weight

7    of the evidence is -- is to be given the least weight in my

8    decision, but it is something that I'm to consider.  And in

9    this particular case, given what's been described, it has a

10   considerable weight as to what ought to be done.  The scope

11   of the allegations, the amounts of the allegations.  Your

12   counsel has done a very fine job in arguing on your behalf as

13   to all these various factors.

14             Underneath all of that, among other things, is the

15   government's contention and proffer that the result of the

16   warrants executed at the warehouses came away with, what the

17   government contends are 42,000 items in the warehouse that

18   are suspected to be counterfeit devices of the nature that

19   Ms. Horwitz had talked about.  Of course that's -- that's

20   what's in the warehouse.  And she also made proffer as to

21   significant amounts of what the government contends are

22   counterfeit devices that were in the process of being shipped

23   and had been retrieved apparently, from wherever they had

24   been placed for shipment just in the two days that she

25   referenced, so that suggested a tip of an iceberg that could

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                              Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                          71

1  reasonably be drawn by inference.  So that's important to my

2  consideration.

3        Then I consider your history and your

4  characteristics, so I -- in that I examined what I know about

5  your character that's been presented to me, your physical and

6  mental condition, your family ties, employment, financial

7  resources, length of residence in the community, your

8  community ties, your past conduct, history relating to drug

9  or alcohol abuse, criminal history and record concerning

10 appearance at Court proceedings.

11        By and large all of that information, Mr.

12 Babichenko, tilts in your favor.  You're a longtime resident

13 of Idaho.  You have -- your business here, your family is

14 here, your relatives are here, your -- some of these things

15 are difficult to pin down in this kind of an analysis because

16 one of the things I look at is your financial resources.

17 Well, in this setting, at least it has been represented to

18 me that your financial resources have all been seized largely

19 by the government.

20        Now the government on the other hand  says, well,

21 by the way in executing her search warrants, we found

22 evidence that suggest that there are other assets that we

23 don't know about that this defendant has.

24        So your physical and mental condition, there's no

25 issue that's relevant here, so far as I'm aware of that.  So

1:18-CR-0258-EJL        U.S. v. Pavel Babichenko        08/31/18        Detention
                                                                                    Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                                      72

 1  all those things would support released to the community.

 2          Then I consider whether or not, at the time of your

 3  arrest of the alleged offense you were on probation, parole,

 4  or other release pending trial, sentencing, appeal, or

 5  completion of a sentence and that's not true here.

 6          So, largely, on balance, all of that is -- it could

 7  support a decision on my part going either way.  The area

 8  that is -- that tilts the balance on what I've heard, Mr.

 9  Babichenko, is the evidence about the wire transfers, the

10  transfers between the companies in large amounts.  Your --

11  the allegations about your doing hand-to-hand, so to speak,

12  transactions with -- with specific statements about the

13  counterfeit goods.  About counterfeit goods being involved in

14  the transactions.  The trips you have made to Brazil and

15  China.  The fact that you are a -- you have a resident visa

16  in Brazil.  The proffer that you are seeking citizenship in

17  Brazil.  And all of that doesn't -- if one tries to

18  characterize all of that as being done as part of a mission

19  for your faith, in light of everything else it doesn't ring

20  true in the Court's assessment based upon this record.  And

21  what it does suggest is that there is an intention to leave

22  the United States and that you have both sophistication and

23  the resources to attempt to do so.  And that given the

24  enormity of everything else that's alleged, and the Court

25  acknowledges that in doing so that I'm turning, in large part

1:18-CR-0258-EJL     U.S. v. Pavel Babichenko     08/31/18     Detention
                                                                   Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                          73

 1  here, to the weight of the evidence, but in this case it's

 2  significant that I -- even if I -- if your passport is taken

 3  and I order that you be on location monitoring and other

 4  things that might be intended to try to protect against that

 5  risk, I don't think that it could rise to the level where it

 6  would reasonably assure your appearance at further

 7  proceedings.

 8          So that's a -- that's a decision that is a -- one

 9  that I reached -- I reach after considering all of those

10  matters and for the reasons I just described, I conclude that

11  the government's motion should be granted.

12          Ms. Horwitz, anything further?

13          MS. HORWITZ:  No.  Thank you, Your Honor.

14          THE COURT:  Mr. DeFranco?

15          MR. DeFRANCO:  No, Your Honor.

16          THE COURT:  We'll be in recess.

17          THE CLERK:  All rise.  Court is adjourned.

18            PROCEEDINGS CONCLUDED AT 12:13:31 P.M.

19                      *  *  *  *  *

20

21

22

23

24

25

1:18-CR-0258-EJL      U.S. v. Pavel Babichenko      08/31/18      Detention
                                                                        Hearing

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    74

## CERTIFICATION


I (WE) CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE ELECTRONIC SOUND RECORDING OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.


**NW TRANSCRIPTS, LLC
IDAHO DIVISION
P.O. BOX 33
ISSAQUAH, WASHINGTON 98027-0002
(206) 953-7066
gayle@nwtranscripts.com**


/s/ Gayle Martin-Lutz
FEDERALLY CERTIFIED MANAGER/OWNER

/s/ Gayle Martin-Lutz                          09/14/18
TRANSCRIBER                                    DATE


**1:18-CR-0258-EJL        U.S. v. Pavel Babichenko        08/31/18        Detention
                                                                          Hearing**

NW TRANSCRIPTS, LLC. - Idaho Division
P.O. Box 33, Issaquah, Washington 98027-0002
206-953-7066 - gayle@nwtranscripts.com                    75