# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>vs.<br><br>PAVEL BABICHENKO,<br><br>     Defendant. | Case No.: 1:18-cr-00258-BLW<br><br>**MEMORANDUM DECISION AND ORDER RE: DEFENDANT PAVEL BABICHENKO'S MOTION TO REOPEN DETENTION HEARING**<br><br>**(Dkt. 252)** |

Pending before the Court is Defendant Pavel Babichenko's ("Pavel") Motion to Reopen Detention Hearing (Dkt. 252). Having carefully considered the record, participated in oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I.  FACTUAL AND PROCEDURAL BACKGROUND

1.     After Pavel's indictment for trafficking and money laundering in mid-August, the Court heard the Government's Motion for Detention on August 31, 2018. (Dkt. 96).

2.     The undersigned found that no set of conditions could reasonably assure Pavel's and the other co-defendants' appearance at trial and detained them as a risk of flight under the Bail Reform Act, 18 U.S.C. § 3143(b). (Dkt. 97). Among other things, the Court relied on proffer showing Pavel's extensive money transfers from the U.S. to Brazil to entities alleged to be controlled by Pavel and other co-defendants; his legal resident status in Brazil, and statements alleged to have been made by him to others that he is seeking to obtain Brazilian citizenship; his repeated travel to Brazil over a period of many years; his alleged direct involvement in the sale of bulk counterfeit goods, with Pavel openly making statements describing the goods as

counterfeit; and the large volume of alleged counterfeit goods in Pavel's possession or control. *Id*.

3. On September 7, 2018, Pavel filed an appeal from the detention order before U.S. District Judge Edward J. Lodge. (Dkt. 99). A hearing was conducted, with additional proffer and argument. (Dkt. 123). On September 25, 2018, Judge Lodge issued a Memorandum Decision and Order denying Pavel's appeal, keeping intact this Court's prior detention order. (Dkt. 127). Pavel did not appeal.

4. On October 22, 2018, the Government filed a Motion for Complex Case Designation Pursuant to 18 U.S.C. § 3161(h)(7)(ii) and Trial Continuance (requesting that trial be reset from October 23, 2018 to October 1, 2019). (Dkt. 134). Although the Government represented in its motion that no defendants objected to a trial continuance, co-defendant Gennady Babitchenko ("Gennady") filed an objection as to (1) the length of the continuance (seeking instead only a 90-day continuance), and (2) the Government's complex-case designation efforts. (Dkt. 135).[1] That same day, Judge Lodge granted a 90-day continuance and reset the trial date for January 22, 2019. (Dkt. 136).

5. On November 30, 2018, U.S. District Judge B. Lynn Winmill granted the Government's request for complex-case designation, "[g]iven the obvious complexity" of the case, but denied the Government's request for a one-year continuance. (Dkt. 157). Instead, Judge Winmill reset the trial date for June 3, 2019. *Id*.

6. On December 6, 2018, Gennady filed a Motion to Continue Jury Trial or Alternatively, to Withdraw and for Substitution of Counsel, requesting a one-month trial

---

[1] Pavel and the other co-defendants eventually followed suit – each objecting to the Government's complex-case designation efforts and any additional trial continuance beyond January 22, 2019. (Dkts. 137-141, 143, 147, 148).

continuance from June 3, 2019 to July 29, 2019. (Dkt. 159). On December 11, 2018, Judge

Winmill granted the motion and reset the trial date for July 29, 2019. (Dkts. 161, 162).

7. On January 28, 2019, Pavel filed a Motion for Release Pending Trial. He

contended that his continued detention violated the Due Process Close of the Fifth Amendment

of the Constitution of the United States (Dkt. 165). The motion was based on – indeed expressly

relied on – a similar motion filed by Gennady. *Id*. (citing Dkt. 164)). On January 30, 2019, Judge

Winmill denied the motion. (Dkt. 166).

8. On February 2, 2019, Pavel appealed the denial of his motion for release. (Dkt.

169). On March 22, 2019, the Ninth Circuit affirmed, stating in relevant part: "[P]retrial

detention in this case has not been excessively prolonged and does not violate due process under

the circumstances of this case" and "contentions that anticipated future delays will render

[Pavel's] detention unconstitutional are not yet ripe." (Dkt. 192).

9. On May 15, 2019, the grand jury issued a Superseding Indictment which brought

additional charges against Pavel (conspiracy to commit wire fraud, conspiracy to traffic in

counterfeit goods, trafficking in counterfeit goods, money laundering conspiracy, and money

laundering) and expanded the scope of the criminal forfeiture allegations. (Dkt. 210).

10. On May 30, 2019, Gennady filed a Motion to Reopen Detention Hearing pursuant

to 18 U.S.C. § 3142(f)(2). He contended that new information had surfaced that was unknown to

him at the time of his initial hearing. (Dkt. 218). On June 4, 2019, Pavel moved to join in that

motion, claiming that "[m]any of the same issues the defense would like to present have been

argued in the co-defendant's memorandum in support of the motion to reopen detention." (Dkt.

227) (citing Dkt. 218)). The next day, Judge Winmill denied the motion, without prejudice. (Dkt.

229).

11.     During a June 6, 2019 status conference with Judge Winmill, Pavel and other co-defendants asked for a trial continuance to October 2020. They cited their need to investigate this alleged massive conspiracy, which would include: (1) international evidence and witnesses, (2) defense experts, and (3) culling through the huge amount of electronic discovery and physical evidence. (Dkt. 231). On July 19, 2019, Judge Winmill agreed to reset the trial date for October 5, 2020, but continued to stress the need to expeditiously proceed to trial and informed the parties that the trial may be reset again, but on an earlier date. (Dkt. 281).

12.     On June 25, 2019, Pavel filed the at-issue Motion to Reopen Detention Hearing. (Dkt. 252). He made various arguments, including: (1) the Government's initial proffer regarding statements made during undercover purchases were taken out of context, mischaracterizing the nature of his statements and actions; (2) the Government's initial proffer regarding errors on certain packaging was incomplete, without considering Pavel's status as a cell phone wholesaler (purchasing items at auction from the manufacturer *but others* would package for sale or sell to other distributors) and, thus, his lack of knowledge about such mistakes; (3) the Government's initial proffer regarding checks from an unidentified Philippine bank account originated from a legitimate businesses that has since gone out of business; and (4) the evidence of wire transfers to Brazil and China initially proffered by the Government to reflect that Pavel was a flight risk were legitimate investments and business expenses. *Id*. Pavel further offers that "[h]e will show up for court," owing, in part, to the presence of his extended family in Idaho and his strong ties to the community, and that, separately, "[t]here are incredible tools available and skilled people who can ensure [his] appearance." *Id*. On July 5, 2019, the Government responded, arguing that Pavel has failed to demonstrate new and material information as required under § 3142(f) to warrant the reopening. (Dkt. 262).

13. On July 8, 2019, the Court requested a written memorandum from each party (1) identifying the expected trial date (the parties were not in agreement as to the expected trial date at the time (*see supra*)); and (2) offering argument on whether the detention to date or continued detention through October 2020 would violate Fifth Amendment Due Process Clause protections for Pavel. (Dkt. 264).

14. On July 30, 2019, the Court held a hearing on the Motion to Reopen Detention Hearing. The Court made certain assessments of the record following the evidence, proffer, and argument, and also informed the parties that the Court was concerned about the due process implications of pretrial detention in this case, given the lengthy period of detention which had already occurred combined with the even longer period of detention which would occur with an October 2020 trial setting.

## II. ALLEGED CHANGES IN CIRCUMSTANCES SINCE THE INITIAL DETENTION HEARING

15. On July 19, 2019, as requested by the Court on July 8, 2019, each party filed a memorandum (1) identifying the expected trial date; and (2) offering argument on the due process concerns raised by Pavel's detention to date and/or continued detention through October 2020. (Dkts. 283, 284).

16. The Government relies on three factors to determine if a due process violation exists: (1) the non-speculative length of expected confinement; (2) the extent to which the Government (the prosecution and/or the court system) bears responsibility for pretrial delay; and (3) the strength of the evidence indicating a risk of flight, a threat to the trial process, and/or a danger to the community." (Dkt. 283) (citing *United States v. Aileman*, 165 F.R.D. 571, 581 (N.D. Cal. 1996)). With this standard in mind, the Government argued:

- The actual trial date is uncertain, as both the Government and Court aspire to conduct the trial before October 2020. Regardless, lengthier detentions have been found not to violate due process in other complex cases.

- The complexities of the case are due to Pavel's and other co-defendants' actions as their conduct (moving large volume of counterfeit products, creating hundreds of business entities to evade detection, opening hundreds of bank accounts, conducting thousands of wire transfers to obfuscate the source of the funds – involving dozens of coconspirators spread across three continents) was directly responsible for the necessary, complex, and lengthy investigations that have produced voluminous physical and electronic evidence contributing to corresponding pretrial delays.

- Pavel and other co-defendants sought lengthy continuances, not the Government.

- Pavel continues to be a flight risk. Financial activity suggests Pavel has plans to relocate to Brazil and is facing serious criminal liability. Pavel is also a risk of flight after his brother Igor fled to Brazil at the end of June 2019, after being approached by the FBI.

17.     Pavel relies on a variety of factors to determine if a due process violation exists, including: (1) the length of detention; (2) who bears responsibility for the delay; (3) the gravity of the charges against him; and (4) the strength of the evidence underlying detention. (Dkt. 284) (citing *United States v. Rodriguez*, 2012 WL 6690197, at *1 (W.D.N.Y. 2012); *United States v. Omar*, 157 F. Supp. 3d 707, 715 (M.D. Tenn. 2016); *United States v. Gelfuso*, 838 F.2d 358, 359 (9th Cir. 1988)). Pavel also raises a Sixth Amendment concern. (Dkt. 284). With this standard in mind, Pavel argued:

- By the time trial commences, he will have spent twenty-six months in custody, longer than any court has ever upheld against a due process challenge based on flight risk alone.

- Lengthy pretrial detentions are constitutional only under extraordinary circumstances (dangerous international terrorism threats and/or incorrigibly violent criminal defendants) – none of which applies here.

- His lengthy pretrial detention represents a due process violation for someone with no prior criminal history, who poses no danger, and for whom the evidence of flight risk is a circumstantial opportunity for flight only.

- Because of the Government's approach to prosecuting this case and the lack of organized discovery, the Government bears the responsibility for the delay. Instead of attempting to cogently organize its evidence, the Government has instead "buried him in paper, providing him piecemeal with an amount of data that represents millions of pages of discovery" (a practice that has been criticized in other jurisdictions).

- Though serious, the charges against him are not of a nature warranting a lengthy pretrial detention. Moreover, this case is not like other serious fraud cases like Bernie Madoff, Marc Dreier, or David H. Brooks, who were each released on conditions. "[H]e has inflicted no personal economic misery on any human being."

- He is not a flight risk, owing to the absence of any criminal history, the "peaceful nature of his existence," his "inclination to stand tall against the allegations," the lack of evidence showing an inclination towards flight, and his ties to Idaho, his community, and his family. Regardless, the Government's case for flight is circumstantial; criminal charges, without more, are insufficient to prove an irremediable risk of flight.

- Detention will result in defense counsel being vastly less prepared for trial than if he were released, therefore implicating his Sixth Amendment rights. Not only is the location of incarceration inconvenient for visitation, but incarceration restricts effective communication and access to litigation technology.

18.     During the July 30, 2019 hearing on Pavel's Motion to Reopen Detention

Hearing, the Government provided the following proffer and argument:

- After being approached by federal investigators, Igor Babichenko – Pavel's brother, who resides in Florida and has been connected with the involved financial transfers – traveled with his family to Brazil earlier this summer and did not return as scheduled. To date, Igor has not returned to the United States and, on July 17, 2019, the FBI went to Igor's house and found a realtor lock box on the door.

- A new cooperating witness ("CW") informed the Government that Pavel and other co-defendants approached the CW to work as a customer service representative for the cell phone business. CW's responsibilities included opening a new bank account and Amazon account to sell counterfeit products, while culling out negative feedback to maintain high seller status and deleting any comments relating to references made about counterfeit products. The CW also indicated the Babichenko family planned to move to Brazil.

- Pavel's minimal equity and interest-only loan in his current residence in Eagle, Idaho – despite significant money transfers to Brazil exceeding the value of the home – indicates that he is a flight risk and intends to flee to Brazil.

- Evidence relating to: (1) emails discussing "almost real" products and payroll rundowns for employees; (2) instant message conversations between Pavel and manufacturers discussing "fake" goods and strategies to avoid detection by customs; (3) other co-conspirators' involvement in selling counterfeit products at a 6% "cut," while forwarding multi-million-dollar balances to Pavel and other co-defendants; (4) financial statements and extensive money transfers between Pavel and over twenty countries, including $5 million from Hong Kong alone; and (5) labels for iPhones containing identical IMEI numbers, alongside direction that colors reflected within IMEI numbers nonetheless correspond to actual product.

19.     At the same hearing, Pavel provided what his counsel contended was "new"

information supporting reconsideration of the prior detention order, including:

- The IMEI numbers/stickers central to the Government's proffer at both detention hearings mischaracterized Pavel's actions; the duplicate stickers came from the manufacturer and were to be discarded.

- Pavel and his wife have five children who are having difficulty coping with the absence of their father.

- His minimal equity in his current house (that he built in 2005-2006) can be explained by the 2007 economic downturn and his difficulty securing loans in the following years. The re-structured interest-only loan payments effectively represented rent on the residence (as compared to a 30-year mortgage payment) rather than not paying and having to proceed to foreclosure. Currently, there is equity in the residence, based on "premium" payments (following conversation from interest-only loan to both an interest and principal loan in 2016). His last payment was in July 2018.

- The Government's evidence is circumstantial, reflecting only the business "dynamic" of a world-wide wholesaler.

- He effectively has no assets (at least not in the United States) – since being incarcerated, the Government has seized his assets.

- Igor stayed in Brazil to maintain the business affairs that Pavel and other co-defendants were responsible for prior to their arrest. Regardless, despite Igor's failure to return to the United States, other co-defendants currently out on pretrial release have abided by their release agreement and have not fled.

- Pavel is willing to surrender not only his U.S. passport and Brazilian residency card, but also those of his entire immediate family.

- Pavel's detention impedes his ability to review discovery and assist counsel.

## III. LEGAL FRAMEWORK

Congress enacted the Bail Reform Act to give courts "adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released" or pose a risk of flight, and thus governs a court's decision about whether to release an arrestee pending trial. *United States v. Salerno*, 481 U.S. 739, 742 (1987). The Speedy Trial Act accommodates delay caused by an unusually complex case by recognizing that an ends-of-justice delay may be appropriate when:

> the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section.

18 U.S.C. § 3161(h)(7)(B)(ii). A case is sufficiently complex when it involves multiple defendants, multiple counts of complex wire-fraud charges, voluminous discovery, and witnesses from both within and outside the judicial district. *See United States v. Butz*, 982 F.2d 1378, 1381 (9th Cir. 1993). Therefore, application of the complex-case time frame under the Speedy Trial Act will sometimes lengthen the period of pretrial detention of a defendant.

The substantive due process constitutional infirmities of pretrial detention emerge if detention is punitive (or becomes punitive) rather than regulatory. In *Salerno*, the Supreme Court ruled that the Bail Reform Act is unmistakably a regulatory response from Congress as to those types of criminal cases (and those criminal defendants) who properly should be detained before trial to prevent danger to the community – a response which included particular details as to the process by which such a decision would be made and supported. *Salerno*, 481 U.S. 739, 746-52. Those "process" details of a hearing – an opportunity for the defendant to be heard; for counsel to present evidence, proffer, and argument; the burden upon the Government to prove that

detention is required; and the steps that must be taken by the court to justify an order of detention

– all pertain as well to whether procedural due process guarantees are satisfied. *Id*. at 750-53; *see*

*also id.* at 746 (procedural due process requires that "[w]hen government action depriving a

person of life, liberty, or property survives substantive due process scrutiny, it must still be

implemented in a fair manner.") (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). The

Court summarized its holding on the due process issues in this manner:

> In our society liberty is the norm, and detention prior to trial or without trial is the
> carefully limited exception. We hold that the provisions for pretrial detention in the
> Bail Reform Act of 1984 fall within that carefully limited exception. The Act
> authorizes the detention prior to trial of arrestees charged with serious felonies who
> are found after an adversary hearing to pose a threat to the safety of individuals or
> to the community which no condition of release can dispel. The numerous
> procedural safeguards detailed above must attend this adversary hearing. We are
> unwilling to say that this congressional determination, based as it is upon that
> primary concern of every government—a concern for the safety and indeed the
> lives of its citizens—on its face violates either the Due Process Clause of the Fifth
> Amendment or the Excessive Bail Clause of the Eighth Amendment.

*Id*. at 755.[2]

Hence, as a general matter, the Bail Reform Act – in and of itself – withstands a due

process challenge analysis. Nonetheless, relevant here, the Court in *Salerno* went on to say that

"[w]e intimate no view as to the point at which detention in a particular case might become

excessively prolonged, and therefore punitive, in relation to Congress' regulatory goal." *Salerno*,

481 U.S. at 747, n.4. The Ninth Circuit Court of Appeals, along with certain other Circuits,

"requires assessment on a case by-case basis" in order to determine whether pretrial detention

amounts to a due process violation. *United States v. Gelfuso*, 838 F.2d 358, 359 (9th Cir. 1988)

(citing *United States v. Gonzales-Claudio*, 806 F.2d 334, 340 (2nd Cir. 1986)). On that score,

courts "have tended to focus principally on three factors: (1) the non-speculative length of

---

[2] There is no Eighth Amendment challenge at issue here, and if there was it would almost
certainly be found lacking given the holding in *Salerno*.

**MEMORANDUM DECISION AND ORDER -- 10**

expected confinement; (2) the extent to which the government (the prosecution and/or the court system) bears responsibility for pretrial delay; and (3) the strength of the evidence indicating a risk of flight, a threat to the trial process, and/or a danger to the community." *Aileman*, 165 F.R.D. at 581.

## IV.  DISCUSSION[3]

### A.  The Alleged Changes in Circumstances Since the Initial Detention Hearing, Without More, Do Not Warrant a Departure From the Court's Previous Detention Order(s); If Anything, Just the Opposite

Pavel first seeks pretrial release based upon allegedly-changed circumstances from the date of earlier detention hearings. However, the changed circumstances described by his counsel are almost in their entirety *not* changed circumstances from those put before the Court at his original detention hearing. That he simply disagrees[4] with the Government's arguments is not enough to represent new information bearing on the issues of whether there are conditions of release that will reasonably assure his appearance at trial and the safety of the community. In short, the purported changed circumstances were more in the nature of alleged Government mischaracterizations, alongside a description of the impacts of his continued lengthy detention

---

[3] The substantive and procedural similarities between Pavel and Gennady are obvious and, therefore, this Decision's overall template and progression through the issues raised largely mirror those within the Court's July 26, 2019 Memorandum Decision and Order addressing Gennady's related Motion to Reopen Detention Hearing. (Dkt. 287).

[4] For example, Pavel offers alternate explanations for statements he made and/or certain circumstances that, in the Government's mind, reflect concerted efforts to engage in counterfeiting activity. (Dkt. 252) (claiming reference to "too risky" related to profit margins on low-end phones, not counterfeit nature of same phones; arguing that, as mere wholesaler who purchased many items in bulk at auction (with no involvement in product packaging), he was unaware of spelling errors on cell phone boxes and/or duplicate IMEI numbers/stickers; explaining that checks from unidentified Philippine bank account emanated from discontinued refurbishing business there; and justifying money transfers to Brazil as legitimate real estate investment opportunities outside United States).

upon his family, upon his ability to assist his counsel in the preparation of his defense, and in the form of suggested conditions for release.

Hence, the most salient of the underlying circumstances which previously gave rise to the detention order remain unchanged, and the proposed additional conditions (such as surrender of the family members' passports and any Brazilian residency cards they may hold) do not tip the balance in favor of release solely under application of the 18 U.S.C. § 3142(g) factors. Further, the weight of the evidence supporting the alleged charges against Pavel was enlarged upon by the Government at the July 30, 2019 hearing, lending not only additional credence to the Government's previous argument regarding the seriousness (and volume) of the alleged crimes, but also the impression of a more prominent link between Pavel and such alleged crimes. Pavel's own evidence, proffer, and argument at the same hearing do not persuade the Court that there are changed circumstances sufficient to support a different decision under the Bail Reform Act.[5] Therefore, drawing upon the record that had been previously established, combined with the evidence and argument made by counsel more recently, the Court is satisfied by a preponderance of the evidence that Pavel remains a risk of not appearing for further proceedings and that no conditions can be imposed which will reasonably assure his appearance in the future – indeed,

---

[5] This includes Pavel's alleged lack of assets – presumably to suggest that he could not leave the United States at a moment's notice. However, at the July 30, 2019 hearing, the undersigned reminded Pavel's counsel that Pavel's financial affidavit provided at the time of his request for court-appointed counsel (Dkt. 78) was purposely left incomplete in material respects. The Court was willing to assume in the circumstances (given the scope of the seizures made by law enforcement and the forfeitures sought by the Government) that Pavel should have counsel appointed for him; however, considering additional information proffered by the Court, there is some question as to whether he has additional financial resources. Regardless, in this context, the Court will not attach credibility to a defendant's arguments who says in the first instance that he cannot identify his financial assets and then says later that he has none and therefore could not flee. But neither will the court assume on this record that he does have enough assets to flee the country. Therefore, the Court will not attach credibility one way or the other; that is, the Court will not assume either the Pavel has no resources whatsoever, nor that he has substantial resources.

there is now even a stronger case that the Government has put forward as to the evidence against

Pavel and, thus, the strength of the evidence in a § 3142 analysis is arguably even more robust.

But that conclusion and the Court's assessment of it here are based upon provisions of the

Bail Reform Act alone, independent of the tension between the Bail Reform Act and the Fifth

Amendment's Due Process Clause. Those competing considerations are addressed below.

**B.      Constitutional Considerations:  Pavel's Continued Pre-Trial Detention Has Moved From Regulatory to Punitive In Nature**

Alternatively, Pavel contends that his detention (already approximately 11 months in

length) violates Fifth Amendment substantive due process protections. Ancillary to that claim is

his argument that his Sixth Amendment right to assist in his defense is already compromised (or,

even if not yet compromised at this point, certainly will be violated if he is required to remain in

custody, which, he points out, will continue until at least October 2020 if the current trial setting

holds). He emphasizes the practical difficulties in communicating from jail with his attorney and

assisting counsel in reviewing and evaluating the enormous amount of electronic and other

information seized by the Government. Such seized (primarily electronic information)

constitutes the great bulk of discovery in this case along with the investigative reports from the

various federal law enforcement agents working on the case.

This is an unusual case, but the volume of material turned over by the Government is by

no means unique in the world of federal felony white-collar crime prosecutions.[6] The amount of

---

[6] Pavel contends that the Government has "buried him in paper, providing him piecemeal with an amount of data that represents millions of pages of discovery." To the extent Pavel is implying that not all discovery has been produced to date, the Court is satisfied on the current record that the great bulk of such discovery has been produced. Of significance as well is the fact that a discovery master has been employed by order of Judge Winmill. That person is experienced in handling large volumes of electronic and other evidence in complex cases and some of the delay in getting the discovery into the hands of defense counsel is due to the work being done by the discovery master. Ultimately, however, the discovery master's work will make

"information" makes defending the case more daunting but not impossible for both defense counsel and his client (the same is true, of course, for the Government). The fact that a client is in custody pending trial is also a challenge, and ordinarily requires finding the best possible avenue to obtain the assistance of the client, notwithstanding his or her detention, and the best possible avenue for counsel and/or counsel's assistants or experts to communicate with the client regarding the same.

However, the nuances of those Sixth Amendment concerns come into play when combined with the protections of the Fifth Amendment's Due Process Clause, which is also implicated in Pavel's current circumstances and which present an additional potential reason for release. The due process issue has arisen because of the length of detention to date, and the additional period of detention between now and the October 2020 trial setting, raising the question of whether that length of detention alone, or if combined with the present expectation of additional detention into October 2020, tips the balance such that his detention has become or will become punitive, rather than regulatory, in nature.

In January 2019, Pavel previously made a due process challenge to his continued detention. After being turned down at the district court level, the Ninth Circuit also ruled against Pavel in March 2019, but did so saying that "anticipated future delays will render [Pavel's] detention unconstitutional are not yet ripe." (Dkt. 192). The Government might well contend that (even though Pavel has been detained an additional seven months since that challenge was made) any claim that the length of his detention violates his due process rights is *still* not yet ripe. But such an argument, at least in the context of this case, creates an impossible choice for a defendant like Pavel. At what point does his detention cross the line – 15 months, 18 months,

_____

the work of defense counsel more efficient and much faster than if they had to digest and organize such information on their own.

two years? What about the time it takes for the courts to consider his claim, at which point, if the Court was to agree that his detention had gone on too long, he would then have not only been detained past the point at which the Constitution would say his due process rights had been violated, but for an even longer period of time on top of that? Pavel has been in custody for nearly a year and faces the prospect of incarceration as a pretrial detainee for another 14 months and perhaps longer. His claim may not be dropping off the tree, but it is certainly ripe in those circumstances.

Hence, there is good reason for the Court to consider the due process implications of Pavel's continued detention pending trial, and whether his detention has become punitive in nature and no longer consistent with the regulatory purpose of Congress in enacting the Bail Reform Act. The issue is a straightforward one; its resolution, however, not so much. It asks, in a pretrial setting where a defendant is entitled to the presumption of innocence and the tilt of the table is for pretrial release as provided by the Constitution and framed by the Bail Reform Act, is an 11-month detention period to date and an expected additional period of detention until a trial date in October 2020 (for a potential total period of *more than two years* in *pretrial* detention) too much?[7]

The U.S. Supreme Court, the Ninth Circuit, and other federal courts who have written upon the Due Process Clause-concerns raised by a lengthy pretrial detention have emphasized the very case-specific nature of such an inquiry. The Ninth Circuit "requires assessment on a case-by-case basis" in order to determine whether pretrial detention amounts to a due process violation. *Gelfuso*, 838 F.2d at 359 (citing *Gonzales-Claudio*, 806 F.2d at 340). A sensible application of that case-by-case assessment was conducted in *Aileman*, 165 F.R.D. 571. There,

---

[7] This calculation does not include the time of detention during the trial itself, which appears likely will be a trial of some weeks rather than some days.

the trial court examined the various decisions of the higher courts and concluded that the decisions "have tended to focus principally on three factors: (1) the non-speculative length of expected confinement; (2) the extent to which the government (the prosecution and/or the court system) bears responsibility for pretrial delay; and (3) the strength of the evidence indicating a risk of flight, a threat to the trial process, and/or a danger to the community." *Id*. at 581.

The issue also involves the interplay between the Speedy Trial Act and the due process issues raised by lengthy pretrial detention – after all, as a general matter, if a defendant goes to trial within the time period ordinarily required under the Speedy Trial Act, it is very unlikely that there are due process issues with that defendant's detention pending trial. Indeed, the Government seems to argue that because the prior trial date continuances in this case were deemed to be "excludable" time under the Speedy Trial Act, Pavel's due process rights could not possibly be compromised by the length of pretrial detention. That argument draws in part upon the statement in *Salerno* that the "the maximum length of pretrial detention is limited by the stringent time limitations of the Speedy Trial Act." *Salerno*, 481 U.S. at 747. Hence, there is a bright line drawn by the outer trial date boundaries of the Speedy Trial Act.

But due process violations stemming from pretrial detention can still arise even when trial dates are continued for lengthy periods of time beyond the usual six-month measure using "excludable time" under application of the Speedy Trial Act. As noted earlier, the *Salerno* court made no holding "as to the point at which detention in a particular case might become excessively prolonged and therefore punitive, in relation to Congress' regulatory goal." *Id*. at 747. This is a case that now raises that question – in other words, is Pavel's detention now, or will it become, excessively prolonged and therefore punitive, *notwithstanding* the fact that the delays which have pushed the trial to a date more than two years after the first Indictment was brought are deemed excludable time under the Speedy Trial Act?

That brings the Court to the *Aileman* factors (drawn from circuit court decisions considering similar challenges) as applied to this case, along with the factors employed in the Bail Reform Act. The first *Aileman* factor asks what is the "non-speculative length of expected confinement?" Pavel's confinement has been nearly a year in length already and will exceed two years by the time of the current trial setting. The Government argues it would be speculative to assume that the trial will be held in October 2020, as Judge Winmill has held out the possibility that a trial may be held *earlier* than October 2020. However, as of today, the trial is *set* for October 2020. There is a trial setting. Discovery (although apparently mostly complete) is not fully complete, and considerable effort will be needed to study and make sense of the information (for both sides of the case) before trial. The case involves multiple defendants and a myriad of charges, with one Superseding Indictment already filed. There will be, no doubt, pretrial motions, perhaps some involving evidentiary issues and all will require considerable time and effort from the parties and the Court. Against that backdrop, the Court concludes that, even though the October 2020 trial is not set in stone, it is more likely than not that the trial will be held at that time rather than earlier on.

The second *Aileman* factor concerns the Government's (the prosecution and/or the court system) role in any pretrial delay, as distinct from that of the defendant. In this case, fingers point to all quarters, so to speak. The court system has some connection to the delay, because the dockets (both criminal and civil) are overburdened in the District of Idaho. However, Judge Winmill is well-known for his consistent and concerted efforts to move cases as quickly as possible (on both dockets). Furthermore, Judge Winmill has designated this as a "complex case" for Speedy Trial Act purposes, which recognizes that the size of the case (as to the number of defendants, claims, evidence, and general nature) justifies a period of time to trial which exceeds that ordinarily permitted under the Speedy Trial Act. Finally, the Government spent several years

investigating this case before bringing an Indictment (and then a Superseding Indictment); executed multiple search warrants as part of that investigation; seized dozens of computers and other electronic storage devices from businesses and other locations associated with the defendants and their businesses; and seized (as the Government has frequently emphasized) thousands of alleged counterfeit or otherwise illegal goods at multiple warehouse locations connected to the defendants.

Pavel points to the investigation conducted by the Government and the amount of information and tangible property seized by the Government to argue that the second factor weighs against the Government. However, the scope of the investigation and the enormous volume of the seized goods and electronic information are also a product of the *defendants'* conduct. It is the allegedly illegal conduct of the defendants (to include Pavel) traversing multiple international boundaries (electronically and in person), arranging the manufacture of enormous amounts of counterfeit electronic goods, conducted through dozens of business entities under suspicious circumstances, and utilizing the deposit and transfer of significant sums of money over a period of years – all of which the Government contends were the result of illegal activity. It is inescapable that such activities (whether illegal or legal) would create the mountain/morass of potential evidence that the defendants, their counsel, and the Government are all dealing with now, and which at some point the Court will be dealing with as well. In that setting, this factor can be equally assessed against the defendants as against the Government.

The final *Aileman* factor considers the strength of any evidence indicating a flight risk, a threat to the trial process, and/or a danger to the community. It is this factor which ultimately determines the due process issue for Pavel, in that the other factors do not weigh compellingly one way or the other in favor of Pavel or the Government. Hence, the Court has reconsidered the nature of the evidence offered and the arguments made at the time of the original decision to

detain Pavel, and has added to its consideration the further unfolding of this case (pertinent to this issue) as described above. The Court's prior decision was a "close" one. The question was whether there existed a set of conditions that would reasonably assure Pavel's presence at future proceedings, which the Court was persuaded at the time had been proven by the Government to *not* be possible. However, this is not a case in which a detained defendant is argued to be a risk to national security, involved in organized crime involving murder conspiracies, or implicated in terrorist activity as was at play in other reported decisions rejecting due process challenges to length of detention. There is some suggestion from the Government that there is a potential threat to the trial process if Pavel is released, but as has been recounted at great length in the parties' briefing and in this Decision, the Government has already gathered enormous amounts of information and conducted years of investigation which led to the filing of the Indictments in this case. That is water under the bridge, the great bulk of which can't be tampered or interfered with at this time.

Left, then, is the risk of flight – a concern described by this Court in the original order of detention, and a concern reiterated in the decisions reviewing that order. Under the Bail Reform Act, courts consider the § 3142(g) factors to decide whether there are conditions of release that "will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(g). The Court considers the nature and circumstances of the charges, the weight of the evidence supporting such charges, the defendant's history and characteristics, and the nature and seriousness of the danger to any person or the community if the defendant is released. *Id*. Of importance here, when considering the Bail Reform factors in the context of a substantive due process analysis, there is no compelling evidence that the Defendant would pose a danger to any person or the community if released. The crimes alleged are property crimes – alleged to be of considerable magnitude, the

Court acknowledges, but property crimes nonetheless – and the alleged victims have suffered financial losses, not injuries or death or the threat of the same.[8]

Courts also have made special note that the justification for detention in the face of a due process challenge over the length of pretrial detention is far more compelling when detention is based upon a serious risk of danger to any person or the community, than if detention is based upon a risk of non-appearance. *See Oreana*, 986 F.2d at 631 ("[T]he constitutional limits on a detention based on dangerousness to the community may be looser than the limits on a detention period based solely on risk of flight. In the former case, release risks injury to others, while in the latter case, release risks only the loss of a conviction."); *accord*, *El-Hage*, 213 F.3d at 80. This distinction between cases in which detention is sought based on risk of flight, not risk of danger, also was described in *Salerno* – the case in which the Supreme Court upheld the constitutionality of the Bail Reform Act. There, the Court said:

> The only arguable substantive limitation of the [Excessive] Bail Clause is that the Government's proposed conditions of release or detention not be "excessive" in light of the perceived evil. Of course, to determine whether the Government's response is excessive, we must compare that response against the interest the Government seeks to protect by means of that response. Thus, when the Government has admitted that its only interest is in preventing flight, bail must be set by a court at a sum designed to ensure that goal, and no more.

*Salerno*, 481 U.S. at 754 (internal citations omitted).

---

[8] Such details distinguish this case from reported decisions which have ruled that an extended period of pretrial detention does not violate the Due Process Clause of the Fifth Amendment. *See, e.g., Salerno*, 481 U.S. 739 (defendants were deeply involved in operation of La Cosa Nostra family, with charges including conspiracy to commit murder); *Gelfuso*, 838 F.2d 358 (defendant charged with conspiracy and attempt to distribute cocaine and distribution of cocaine, in addition to racketeering and loansharking); *El-Hage*, 213 F.3d 74 (defendant charged with, among other counts, six conspiracies to murder U.S. citizens and destroy property of United States abroad, alleged to be key participant in Bin Laden terrorist organization); *United States v. Oreana*, 986 F.2d 628 (2d Cir. 1993) (RICO charges based upon predicate acts of murder, conspiracy to murder, loansharking, and illegal possession of weapons.).

Finally, the Court considers these factors against the essential core of the Constitutional issue, which is the matter of due process. Substantive due process "prevents the government from engaging in conduct that 'shocks the conscience,' or interferes with rights 'implicit in the concept of ordered liberty.'" Salerno, 481 U.S. at 746 (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952)). Procedural due process then requires that "[w]hen government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner." *Id*. (citing *Mathews*, 424 U.S. at 335).

What does that require here, for Pavel? On balance, when weighing the competing interests of Pavel and his due process rights against the interests of the Government as reflected in the Bail Reform Act, the Court concludes that Pavel's substantive due process rights on the present facts of this case, having already been in custody in pretrial detention for nearly a year, and facing continued pretrial detention to exceed more than two years, must hold sway. The punitive feel of keeping a defendant incarcerated for that length of time in a pretrial setting where he is presumed innocent under our Constitution, is apparent on its face. It is even more compellingly so in Pavel's circumstances, in a setting where his criminal record is a blank slate and he has significant contacts to the community as found in his businesses and family obligations.

The single most concerning aspect of Pavel's background in regard to whether his circumstances support a finding that even a multi-year pre-trial detention remains a regulatory measure rather than a punitive act, is the risk of flight to Brazil given his contacts to that country and the nature of certain of his alleged prior business and financial dealings. But again, the contention that extended detention constitutes a due process violation is to be evaluated upon its own facts, as the Court has described above. And, the Court considers the other differences between a Bail Reform Act decision and an evaluation of a potential substantive due process

violation, such as the fact that this case does not present a serious risk of danger to a person or the community, but rather a risk of flight, and therefore the due process concerns take on a heightened importance.

Evaluating this due process challenge on its own facts should also emphasize the entirety of Pavel's life circumstances. Here, Pavel's world before being charged in this case distilled down to his immediate and extended family, including wife Natalie, and five young children as to whom he has the responsibilities of husband and father. In such facets of his life, Pavel would have reason to draw upon the rights of "life, liberty and the pursuit of happiness." That statement in the Declaration of Independence is among the wellsprings of the Bill of Rights and their protections of life and liberty. Hence, even though the most obvious example of liberty in considering the protections of substantive due process in criminal proceedings is freedom from the restraint of imprisonment, there is more to the meaning of liberty under the frame of the Constitution. Liberty includes not just freedom from restraint, but other fundamental elements of our daily lives as well.[9]

This full meaning of liberty has been part of our jurisprudence since the earliest years of our Republic. It was described (and its historical anchors in the law summarized) by the Supreme Court in *Meyer v. Nebraska*, 262 U.S. 390 (1923), a case which considered the meaning of "liberty" as that word is used in the Fourteenth Amendment, which reads in pertinent part: "No state shall…deprive any person of life, liberty, or property, without due process of law…." In *Meyer*, the Court said that "[w]hile this court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration…" and went on to say:

---

[9] The Court considered carefully the measure of Pavel's circumstances against those of his brother, Gennady, whom this Court has released already based upon due process. The strength of Pavel's circumstances as supporting a due process challenge is not as strong as was true for Gennady, but they are strong enough.

> Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.

*Id.* at 399 (citations omitted).

Consider how the template placed by the Supreme Court in *Meyer* illustrates exactly how Pavel's liberty already has been abridged, and why continued detention has turned from regulatory to punitive. Each of the areas of his daily life – his business, his family, and his ability to "enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness" – has been taken away from him. *Id.* Significantly, his absence also deprives many others from being fully involved in such activities of their own, particularly where he has been absent from his family, his wife and young children, and therefore also absent from fulfilling the role of husband and father.

That such parts of a daily life are not just quotidian but rather are essential to life and liberty needs no legal citation in the country in which we live. It is enough that we recognize immediately the importance of such things in our own lives and can therefore recognize their importance in the lives of others, including the life of a person whose detention may have been proper under the Bail Reform Act, but is no longer proper under the Constitution when that detention leaves not just a mark but rather threatens a profound wound in the life and liberty of a presumptively innocent person.

The Court need not decide the exact day that Pavel's pretrial detention turned punitive in nature, other than to declare that it has occurred by now, having been incarcerated for more than 11 months already and facing the bleak prospect of another 14 months or longer in custody,

absent an order from this Court ordering that he be released and thereby bring a stop to the unraveling of the due process protections that the Constitution guarantees to him.

Accordingly, the Court will order that Pavel be released from custody, pending further proceedings, on conditions. However, the Court will *not* allow such release until after a hearing has been conducted to hear from Pavel's counsel, the Government's counsel, and the pretrial services officer upon the details of appropriate conditions of release, which remain an appropriate use of the Bail Reform Act so long as such conditions do not create the functional equivalent of detention. **That hearing is set for August 7, 2019 at 9:30 a.m. in Boise, Idaho, Courtroom 7 before the undersigned**.

DATED: August 5, 2019

_____
Ronald E. Bush
Chief U.S. Magistrate Judge