RAFAEL M. GONZALEZ, JR.
ACTING UNITED STATES ATTORNEY
KATHERINE L. HORWITZ, OKLAHOMA STATE BAR NO. 30110
CHRISTIAN S. NAFZGER, IDAHO STATE BAR NO. 6286
ASSISTANT UNITED STATES ATTORNEYS
TIMOTHY FLOWERS, TENNESSEE STATE BAR NO. 030151
UNITED STATES DEPARTMENT OF JUSTICE TRIAL ATTORNEY
1290 W. MYRTLE STREET, SUITE 500
BOISE, IDAHO 83702
TELEPHONE: (208) 334-1211
FACSIMILE:(208) 334-1413

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 1:18-cr-00258-BLW |
| vs. | |
| PAVEL BABICHENKO, GENNADY BABITCHENKO, PIOTR BABICHENKO, TIMOFEY BABICHENKO, KRISTINA BABICHENKO, NATALYA BABICHENKO, DAVID BIBIKOV, ANNA IYERUSALIMETS, MIKHAIL IYERUSALIMETS, | **GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS IN LIMINE (ECF 799, 806, 807, 808, 810, 812, 813, 815, 817, 818, 821, 822, 823, 847)** |
| Defendants. | |

The United States of America, by and through, Rafael M. Gonzalez, Jr., Acting United States Attorney for the District of Idaho, and the undersigned Assistant United States Attorneys for the District of Idaho, hereby responds to the Defendants Motions in Limine, ECF 799, 806, 807, 808, 810, 812, 813, 815, 817, 818, 821, 822, 823, and 847.

## FACTUAL BACKGROUND

The Defendants are charged with orchestrating numerous crimes in connection with a sprawling criminal organization based in the Boise area of Idaho.  ECF 210.  The Defendants are charged with wire fraud, mail fraud, trafficking in counterfeit trademarks, conspiracy, and money laundering arising from actions taken in connection to dozens of corporate entities that were created, used, and maintained in connection with trademark-counterfeiting activities.  *Id.* at 2–4.  The Defendants' conduct spans at least a decade and involves allegations of selling electronic devices—to include phones, chargers, batteries, and other items—as "new" and "genuine" when in fact they were not.  *Id.* at 6–8.  This conduct also includes trafficking in an expansive list of consumer electronics and accessories, including labels and packaging, that bear spurious corporate trademarks.  *Id.* at 10–16.  The Defendants also face allegations of laundering the proceeds of these crimes using a variety of complex financial transactions.  *Id.* at 17–21.

Given the vast period charged in the Superseding Indictment, and the correspondingly extensive conduct at issue, the Government has noticed—and will likely introduce—numerous items of evidence to prove each charge.  For the alleged counterfeiting activity, the Government anticipates calling an array of witnesses from law enforcement, private industry, the general population, and even the conspiracy itself.  These witnesses will, among other things, contextualize the defendants' conduct, evaluate products (where applicable), offer background testimony, introduce records, and testify about interactions with individual defendants.  The Government will, for example, call certain witnesses who will testify that they purchased Samsung and Apple cellphone chargers from the Defendants' companies, and that those devices caught on fire or otherwise

performed unsafely.  The Government will also proffer communications that convey these individuals' dissatisfaction with the purchased items, including pictures of the items in question.  Through the trademark holders, moreover, the Government will proffer expert testimony that counterfeit chargers bearing the trademark holders' mark are not manufactured by the trademark holders and thus do not undergo the rigorous safety testing or contain the components of genuine chargers.

Certain direct evidence from the Defendants themselves will also be admitted, including an undercover video of a hand-to-hand purchase of counterfeit phones and chargers from 2016.  In this video, a Confidential Human Source ("CHS") engages in direct communications with Mr. Iyerusalimets and co-defendant Mr. Bibikov.  The trio discuss a number of issues directly relevant to the underlying prosecution, including a police raid that resulted in "some guy g[etting] shut down," with police "seiz[ing] all his product," *see* 787-2, at 4:8–25; Mr. Iyerusalimets claiming that he had dongles, which are adapter cords, that "make noise . . . cause they're fake," *see id.* at 8:12–13; Mr. Iyerusalimets mentioning misspellings on certain accessories, *see id.* at 8:19– 9:8; Mr. Iyerusalimets explaining that he had had accounts shut down by Amazon due to selling "branded" products, and then explaining how to exploit Amazon's reinstatement protocols: "[Y]ou've got to sell accessories, and things that are ***not branded***, for them to see that you are legit.  And ***then*** you can start selling, submitting invoices, and paying them."  *Id.* at 13:17–20 (emphases added).

Mr. Iyerusalimets also discusses a lawsuit brought by Apple against a company, with him mentioning that he lost six accounts due to the action.  *See id.* at 14: 20–15:11.  He mentions that Apple "opened all the accessories," and then discusses how the dongle "fires

up," with Mr. Iyerusalimets mentioning that "they," presumably Apple, "don't really care as much about the cable because the cable is not going to burn.  That thing's a fire hazard." *See id.* at 15:5–16:25.  He then states, **"**Yeah. The dongles, yeah. I had them beep.  I had them explode. I had them smoke. . . .  I had a phone that blew up in my other place already. It made a huge hole in my carpet."  *Id.* at 16:6–16:14.  The video accompanying this transaction shows Mr. Iyerusalimets laughing throughout this exchange.

Mr. Iyerusalimets' statements during the undercover buy align with the approach taken among all conspirators to avoid having their Amazon seller accounts shutdown. Namely, they fabricated invoices for "new" products, sent the invoices to Amazon as proof of the quality of product sold, and then itemized the steps that the business would take in the future to avoid "mistake[nly]" sending the "wrong inventory."  *See* Ex. 1, at 1 (asserting that they had "gone through [their] inventory and saw that [their] used and new phones were on the same shelf," which they purportedly corrected by "separat[ing] the used items from the new items").

Time and time again, the conspirators received warnings from Amazon that their accounts would be shut down and received demands for proof of product authenticity.  The conspirators took a uniform approach to these threats of termination—in texts, emails, and in the undercover buy videos, they coordinated how best to fool Amazon to have their many selling accounts reinstated.  When an account was terminated or suspended, then the conspirators simply opened new accounts.  *See* Ex. 2, at 22–26 (discussing account suspensions for "branded," refusing to sign for certified letters, opening new businesses, and instructing "don't sell iPhones anymore").  To do so, they used evasive measures to hide their identity from Amazon by, *inter alia*, creating new businesses, new bank accounts, and

using new hot spots for internet access.  They also paid young employees to do the same.

Multiple employees and members of the conspiracy will testify at trial and explain this

scheme.  The termination of selling accounts and the conspirators' response to termination

is, therefore, a key component of the fraud.

## LEGAL FRAMEWORK

A motion in limine is a "procedural mechanism to limit in advance testimony or

evidence in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009).

District courts have broad discretion to make evidentiary rulings to ensure a fair and orderly

trial.  Within this broad discretion, courts may rule on the relevancy and weight of the

probative value of the proffered evidence.  A motion in limine should not, however, be used

to resolve factual disputes or weigh evidence.  *C&E Servs., Inc., v. Ashland Inc.*, 539 F. Supp.

2d 316, 323 (D.D.C. 2008).  To exclude evidence on a motion in limine, "the evidence must

be inadmissible on all potential grounds."  *See Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d

844, 846 (N.D. Ohio 2004).  Rulings in limine are provisional:  they "are not binding on the

trial judge [who] may always change [her] mind during the course of a trial." *Ohler v. United

States*, 529 U.S. 753, 758 n.3 (2000).  Accordingly, denial of motions in limine merely mean

that "without the context of trial, the court is unable to determine whether the evidence in

question should be excluded."  *Ind. Ins. Co.*, 326 F. Supp. 2d at 846.

## ARGUMENT

For efficiency's sake, the Government herein consolidates its responses to the

Defendants' motions in limine, many of which raise the same or similar issues.  For

organizational purposes, the defense motion(s) addressed are incorporated into the

headings.

I.      **Conduct Evidencing the Conspiracies (ECF 823, at 5–10)**

The Defendants are alleged to have conspired to commit wire and mail fraud, trafficking in counterfeit goods, and money laundering.  *See* ECF 210, at 5–7, 10–11, 17–18. The investigation revealed a mountain of evidence.  During the course of this investigation, law enforcement discovered thousands of counterfeit cellphone products, accessories, and packaging bearing a number of counterfeit trademark and certification marks held by, among others, Apple Inc., AT&T Inc., HTC, LG Electronics Inc., Motorola, Inc., Qualcomm Inc., Samsung Electronics Co., Ltd., Sprint Corp., UL LLC, and Verizon Communications Inc.  Law enforcement acquired this evidence through:  (1) undercover online buys from the Defendants' businesses on eBay and Amazon; (2) hand-to-hand buys directly from Pavel Babichenko and David Bibikov from the Bridger Street Warehouses; (3) surveillance of the outbound mail from the Bridger Street Warehouses; (4) execution of a warrant collecting the outbound packages mailed from the Bridger Street Warehouses on August 21 and 22 of 2018; and (5) execution of warrants at the Defendants' homes and Bridger Street Warehouses.

Based on the investigation, the Defendants were smuggling, repackaging, and mailing out thousands of packages per week to individual consumers who had purchased them online.  This evidence constitutes "a part of the transaction that serves as the basis for the criminal charge," *Dorsey*, 677 F.3d at 951, and, therefore, is a "single criminal episode," *Soliman*, 813 F.2d at 279.  The scope of the conspiracy alleged is broad both in terms of timeframe (a decade) and in terms of the volume and type of products sold.  *See* ECF 210. While the substantive intellectual property violations charged are limited to products bearing either a Samsung or Apple trademark, the wire fraud conspiracy encompasses two

material misrepresentations:  (1) that the products were sold as "new" when they in fact were not; and (2) that the products sold were not authentic.  *See* ECF 210, 5–7 (Count 1 charging wire fraud based on selling counterfeit and used products between 2008 and 2018).

Further, both the scope and means of the conspiracy require discussion of the products discovered during the investigation.  *See, e.g.*, Ex. 2, at 26–27 (discussing selling only on eBay, not selling iPhones for a while, and instead selling "lg, HTC, and Motorola"). Likewise, evidence related to the purchase of Qualcomm chargers from Sahara Case, another business operated by Piotr, Tim, and Pavel Babichenko, is key evidence of the conspiracies.  Throughout the investigation, Piotr, Tim, and Pavel Babichenko represented to customs officials, their employees, and even the CHS during an undercover buy, that their cellphone *case* business, Sahara Case, was thriving and their primary business.  *See* Ex. 3 (Sahara Case website); *see also* Ex. 4 (Pavel Babichenko representing to customs official that he owns a cellphone case business, Sahara Case, while traveling through Shanghai). They represented that the success was attributed to their own product—a case they designed and manufactured.  *See* Ex. 3, at 2 (photo of Sahara cellphone case).  In reality, Sahara Case was just another means of hiding the true nature of their scheme to sell counterfeit products online.

Overall, the vast majority of the evidence the Government will offer during its case in chief will be products bearing a counterfeit mark of Samsung or Apple.  In order to provide the jury with full picture of the conspiracies, however, a smaller portion of the Government's proffered evidence also touches other brands.  This evidence is necessary to contextualize the scheme for the jury.  As evidence of the conspiracies charged, it is admissible.

II.     **Dangerous Material (ECF 799; ECF 812; ECF 813, at 6–8; 822)**

Defendant Mikhail Iyerusalimet's moves in limine to exclude: (1) testimony related to safety issues and alleged harm (ECF 799), and (2) statements made by Mr. Iyerusalimets during an undercover purchase in 2016 (ECF 812).  For the following reasons, the Government respectfully requests that the motions be denied.

A.     **Harm is Directly Relevant to the Charged Crimes (ECF 799; ECF 813, 6–8)**

In the Defendants' first motion, they seek to exclude all evidence and argument of the harm posed by counterfeit contraband as irrelevant and unfairly prejudicial.  They also seek to exclude all evidence and argument, to include customer complaints and other unidentified items, as inadmissible hearsay that is not subject to any exception.  The Defendants, however, misstate the law and simply misapprehend the nature of the action.  For those reasons, the Defendants' motion must be denied.

1.     **Relevance and Unfair Prejudice**

Relevant evidence includes only those items that have "the tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Fed. R. Evid. 402.  Even relevant evidence can be excluded if its probative value is "substantially outweighed" by a danger of, among other things, unfair prejudice, confusing the issues, or misleading the jury.  Fed. R. Evid. 403.  To be sure, relevant evidence "is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403." *United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000) (internal quotation marks omitted).  The application "of Rule 403 must be cautious and sparing," lest trials be "conducted as scenarios, or unreal facts tailored and sanitized for the occasion."  *See id.*  In

other words, unfair prejudice is an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  *Id.*

### 2.    The Defendants Misinterpret Section 2320

To the Defendants, whether any of the alleged contraband caused harm—or presented a safety issue—is irrelevant because those factors appear nowhere in the statutory language of 18 U.S.C. § 2320, but this argument reflects a fundamental misunderstanding of trademark-counterfeiting law.

Trademark owners are victims of trademark-counterfeiting; they enjoy an exclusive right to prohibit others from trafficking in the spurious versions of goods and services bearing their marks, whether they take the form of words, names, symbols, devices (or some combination thereof) that indicate the source of particular goods.  *See Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017); *see also* 18 U.S.C. § 2320.  Congress crafted Section 2320, not only to protect consumers from deception or harm, but also as a means of protecting against "*the cheapening and dilution of the genuine product*."  *See United States v. Hon*, 904 F.2d 803, 806 (2d Cir. 1990) (emphasis added).  In other words, "[o]ne of the rights that a trademark confers upon its owner is the right to control the quality of the goods manufactured and sold under that trademark."  *United States v. Farmer*, 370 F.3d 435, 441 (4th Cir. 2004) (internal quotation marks omitted).

This right, however, is exclusive to mark holders, and Defendants cannot defend against trademark-counterfeiting charges by claiming that their products were of a similar quality.  *See Farmer*, 370 F.3d at 441 ("[I]t is the control of quality that a trademark holder is entitled to maintain.").  This means that product quality, though irrelevant when raised by a defendant, is relevant and probative of whether an item is counterfeit because mark holders

determine whether contraband lives up to their own standards.  *See id.* ("[T]he whole point is that deciding whether shirts pass muster is reserved to [the trademark holders], not to [the defendant].").

In fact, when considered against a defendant, product quality is probative of numerous legitimate issues at trial, including whether a defendant knew (or should have known) that certain items were indeed counterfeit.  *See, e.g.*, *Levi Strauss & Co. v. Diaz*, 778 F. Supp. 1206, 1208 (S.D. Fla. 1991) ("It is clear . . . that the goods transported to France were not of the type or quality normally produced by Levi Strauss.  The goods were of such inferior quality, that even a minimal inquiry . . . would have disclosed their counterfeit nature.").  Product quality may also bear upon a defendant's state of mind.  *See, e.g.*, *United States v. Yi*, 460 F.3d 623, 630 (5th Cir. 2006) (noting that "[t]he noticeably poor quality of most of the goods, purchased in a store owned by Zheng, provides further support" for the defendant's intent).  It may also be relevant to showing the existence of a counterfeit scheme in much the same way that evidence of loss directly bears upon the existence of a scheme to defraud.  *See, e.g.*, *United States v. Rasheed*, 663 F.2d 843, 850 (9th Cir. 1981) ("The mail fraud statute does not require proof that anyone has been defrauded. . . . [s]uch evidence may be relevant to show that a scheme to defraud existed.") (internal quotation marks omitted).

Finally, evidence of poor quality, including the potential for harm caused by that poor quality, is directly relevant to establishing a likelihood of confusion, mistake, or deception.  *See* 18 U.S.C. § 2320(f)(1)(A)(iv).  If a product, for example, bears an Apple trademark but is not an Apple product, that item is inherently fraudulent and almost certainly deceptive.  But there is more.  Many of the hundreds, if not thousands, of fake

products in this case carry additional misleading indicators of reliability that signal to the

consumer that the products are not only legitimate, but also backed by assurances of safety

and dependability.  One such indicator is a counterfeit certification mark from Underwriter

Laboratories ("UL"), which—if legitimate—is included by companies like Apple and

Samsung as assurances of product integrity.  A counterfeit Apple product, however, that

carries a UL mark[1] thus includes a double layer of deception—that not only Apple made

and stands by the product, but also that a company like UL has certified that product's

safety.

Thus, there exists a very real danger "when potential purchasers of [a trademark

holder's] goods see unauthentic goods and identify these goods with the trademark holder."

*United States v. Torkington*, 812 F.2d 1347, 1353 (11th Cir. 1987).  When counterfeiters flood

the market with illicit contraband, victim brands not only lose control over the quality of

those products, but they also lose control over any issues related to harm or dissatisfaction.[2]

*See Hon*, 904 F.3d at 806 ("[C]ounterfeiters [can earn] enormous profits . . . by capitalizing

on the reputations, development costs, and advertising efforts of honest manufacturers at

---

[1]     As Robert Pollock testified at the April 21 *Daubert* hearing, a counterfeit Apple
product naturally includes a spurious UL mark, as UL does not certify counterfeit products.
The Government has not received the transcript for this hearing; accordingly, this testimony
is based on counsels' recollection of the testimony.

[2]     The Defendants attempt to sidestep this legal framework, arguing that "it is common
knowledge that, just as allegedly 'counterfeit' products may be defective or cause harm to
consumers, so too, can genuine or authentic products."  ECF 799, at 4.  That is an exercise
in smoke and mirrors.  Trademark holders enjoy an exclusive right to control the quality of
their products, but that also means they assume potentials risks of malfunctions or public-
relations events.  Counterfeiters, by contrast, enjoy the goodwill and security engendered by
branded items while assuming none of the reputational risks, developmental costs, or
product-liability concerns assumed by mark holders.  *See Hon*, 904 F.3d at 806.

GOVERNMENT'S CONSOLIDATED RESPONSE
TO DEFENDANTS' MOTIONS IN LIMINE—11

little expense to themselves.").  If an individual customer purchases a dangerous item that bears an Apple trademark, for example, but that was not actually produced by Apple, that customer—at a minimum—is left with a negative impression of the brand, not the counterfeiter.  Given this, "[i]t is easy to see . . . why trademark holders like [Apple] and [Samsung] are accorded the right to control the quality of their goods," especially when a defendant's items are "almost certainly of inferior quality."  *See Farmer*, 370 F.3d at 441. The defendants' attempts to weaponize relevance and undue prejudice serve only to distract from legitimate inquiries into their years-long pattern of capitalizing on honest brands, at consumers' expense, while bearing none of the brand holders' risks and responsibilities.

## B.   Customer complaints have relevant non-hearsay uses and are admissible (ECF 799, at 6–10; ECF 822)

During its case in chief, the Government intends to offer witness testimony from individuals who purchased chargers that experienced some level of technological infirmity. Additionally,  the Government will proffer emails documenting complaints between the Defendants, Amazon, and their customers for two purposes:  (1) as notice to the former that the products sold were not genuine or new and (2) to explain to the jury the context of the fraudulent invoices the Defendants' sent in response to Amazon terminating their seller accounts.

Even the Defendants acknowledge that the first basis is a proper one to admit the evidence.  *See* ECF 822, at 3 ("Defendants acknowledge that the Amazon reviews may be conditionally relevant to establish a Defendant's notice that there may be issues related to the products.").  As such, they are admissible during trial.  *See United States v. Diamond*, No. 19-50317, 2021 WL 027365, at *1–2 (9th Cir. Mar. 17, 2021) (admitting "complaints from [the defendant's] customers into evidence" because "[t]he complaints were not testimonial

hearsay because they were introduced and admitted for the limited purpose of establishing notice to the recipient of the existence of those complaints, independent of whether the assertions in the complaints were true"); *see also United States v. McLennan*, 563 F.2d 943, 946–47 (9th Cir. 1977) (affirming admission of the following statement as notice and, therefore, not hearsay:  "For [goodness] sake, I told you that was illegal").

More fundamentally, however, the evidence of third-party platforms' termination of the Defendants' numerous businesses evidences key aspects of the fraud:  in response to Amazon's termination of their selling accounts, the Defendants manufactured fake invoices for "brand new" cellphones, chargers, and batteries.  *See* Ex. 1, at 7–15, 17–19.  These fraudulent invoices evidence that the items sold by the Defendants online were represented as both "genuine" and "new," not refurbished, used products.  Moreover, witnesses at trial will explain the efforts undertaken to avoid having their seller accounts terminated, including responding to the complaints and account terminations.  Likewise, Defendants went to great lengths to avoid detection by third-party platforms by creating new businesses, bank accounts, using new tablets and computers, and employing new hot spots, phone numbers, and even people's identities to open new accounts.  These evasive measures evidence the fraud and are key components of the employee-witnesses' testimony.  Finally, the responses to customer complaints and selling-account termination evidences the conspirators' reliance on each other:  through e-mails and messages, the co-conspirators shared methods of responding to complaints and threatened termination, including specific language and terms.  *See* Ex. 1.  This coordination is evidence of the conspiracy and is only understandable through the complaints, Amazon and eBay termination, and the responses thereto.

The Government also intends to call coconspirators and former employees who can testify to the Defendants' knowledge of customer complaints, the frequency with which their companies received complaints, and measures that were taken in response to complaints. Many of these measures were deceptive in nature and included the repeated transmission of false, misleading, and/or fraudulent invoices to allow the scheme to persist. But nevertheless, the Defendants attacks on the alleged untrustworthiness (or self-serving nature) of customer complaints is misplaced and ignores the deep body of caselaw that supports using customer complaints for various non-hearsay purposes.

To be clear, the Defendants do not seek to exclude any *specific* complaints at issue; they broadly reference customer complaints related to health-and-safety issues. Nevertheless, the Defendants' request misses the mark. As recently as last month, the Ninth Circuit reaffirmed its long-standing principle that customer complaints are non-testimonial hearsay when they are offered and admitted for "the limited purpose of establishing notice to the recipient of the existence of those complaints, independent of whether the assertions in the complaints were true." *Diamond*, 2021 WL 1027365, at *1.

These principles have remained constant for decades, with any deviations resulting from district courts failing to provide adequate limiting instructions. *See United States v. Wilson*, No. 18-50333, 2021 WL 463445, at *2 (9th Cir. Feb. 9, 2021) ("The FTC press release, the email from Tony Brown, and testimony about customer complaints were properly admitted for the non-hearsay purpose of showing Wilson's state of mind—specifically, his knowledge that his companies were engaging in conduct that was considered fraudulent."); *United States v. Showa*, Nos. 96-50698, 97-50017, 1997 WL 801452, at *5 (9th Cir. 1997) (Table) ("[T]he district court made it clear to the jury by cautionary

instruction that the letters were to be considered only for the limited purpose of showing that the defendants were on notice of complaints about NPCC.  Thus, there was no violation of the hearsay rule."); *United States v. Wiseman,* Nos. 90–10612, 90–10616 and 90–10617, 1993 WL 118176, at *6 (9th Cir. 1993) (Table) ("Because the court made it clear that the complaint letters and documents were admitted not to show their truth but rather to show the defendants' state of mind, we conclude the trial court did not abuse its discretion in admitting the letters."); *but see United States v. Marsh*, 144 F.3d 1229, 1240 (9th Cir. 1998) ("The jury was told that only defendants who knew or "should have known" of the documents should be charged with notice of their contents.  This instruction in no way limited the jury in considering the truth of the contents.").  This is also standard practice around the country.  *See, e.g.*, *United States v. Moseley*, 980 F.3d 9, 27 (2d Cir. 2020) ("Evidence of customer complaints may be introduced to show the defendant's culpable state of mind, however, and when so used, they are not considered to prove the truth of the matter asserted in the statement.") (internal quotation marks omitted).

The Defendants' pay lip service to these principles, arguing that there is "very little evidence" that they knew of such complaints, and even if they knew about them, that awareness alone does not translate to knowledge that the products were counterfeit.  *See* ECF 799, at 7–8.  Their assertion of "very little evidence" is both unsupported and simply mistaken.  The Defendants received customer complaints—that products were counterfeit[3] and/or presented safety problems—on the various platforms that they used to sell products, as well as in email or other communications.  Among other things, the Government will

---

[3]     The Defendants seem to be challenging only those unidentified complaints that implicate health-and-safety issues, not complaints strictly tied to a product's authenticity.

introduce communications, elicit in-person testimony, and offer business records that

establish the Defendants' connections to platforms and accounts where they received

customer complaints. [4]  And to the extent the Defendants maintain that complaints of

misfiring chargers fails to establish knowledge, product quality as one indicia of

authenticity, state of mind, or of other issues has been addressed in this Response.

　　　Without identifying any specific records or items of evidence, the Defendants next

argue that no hearsay exception, including the business-records provision, applies to the

customer complaints.  As a threshold matter, the Government has noticed various records

obtained from online platforms and email accounts—records that carry certifications that

comply with Rule 803(6) of the Federal Rules of Evidence, the business-records exception.

The Government will offer these complaints for relevant non-hearsay purposes, including,

state of mind, notice of wrongdoing, and or the existence of a scheme to defraud.  *See*

*Wiseman,* 1993 WL 118176, at *6 ("[T]he complaint letters and documents were admitted

not to show their truth but rather to show the defendants' state of mind."); *see also Showa*,

1997 WL 801452, at *5.  And even if the Government relies on 803(6), the Government will

lay the proper foundation to admit those records.  *See United States v. Fuchs*, 218 F.3d 957,

965 (9th Cir. 2000) ("Although contested by the defendants, the record reflects that the audit

---

[4]　　　The Government can prove a defendant's knowledge or state of mind using
numerous means, including by willful blindness or deliberate ignorance.  In fact, Congress
specifically intended for this instruction to be used in trademark-counterfeiting cases, and
the Ninth Circuit has acknowledged its use in this context.  *See* Joint Statement, 130 Cong.
Rec. 31,674 (1984) ("[I]f the prosecution proves that the defendant was 'willfully blind' to
the counterfeit nature of the mark, it will have met its burden of showing knowledge."
(internal quotation marks omitted); *see also United States v. Hamamoto*, No. 99-10019, 2000
WL 1036199, at *1 (9th Cir. 2000) (explaining, in a trademark-counterfeiting case, that "[t]o
act 'knowingly,' . . . is not necessarily to act only with positive knowledge, but also to act
with an awareness of the high probability of the existence of the fact in question.").

report was made in the regular course of USDA–OIG's regular activity and that it was the regular practice of USDA–OIG to prepare such a report."); *see also White v. Ford Motor Co.*, 312 F.3d 998, 1009 (9th Cir. 2002), *opinion amended on denial of reh'g*, 335 F.3d 833 (9th Cir. 2003) ("As for the customer reports, they were clearly admissible under the business records exception to the hearsay rule to show that Ford had notice of rollaways.").

Finally, the Defendants argue that, even if relevant, the Government should be precluded from presenting customer complaints that reference harm or malfunction because of the risk of undue prejudice or causing a trial within a trial.  Again, to the extent the Government introduces complaints in which the complainant will not be testifying, the Government will be doing so to establish non-hearsay purposes of intent, notice, and state of mind, all of which are probative in establishing and proving a criminal scheme.  For testimony or records in which the complainant testifies, those items (which the defense has had an opportunity to review for years) will be admitted into evidence and evaluated by expert witnesses who have already been noticed.  That some of these items or evidence may produce an emotional response is not enough to exclude them under Rule 403.  *See Diamond*, 2021 WL 1027365, at *2 (noting that even if "complaints are at times emotional, [the defendant] does not make a compelling case that the risk of prejudice so outweighed their probative value that the district court's decision to admit them was beyond the pale.").

### C.    Undercover Video (ECF 812)

By way of separate motion, Defendant Mikhail Iyerusalimets seeks to exclude comments that he made during an undercover recording, casting them as irrelevant, unfairly prejudicial, and so misconstrued as to require a mini trial to resolve their meaning.  He also seeks to preclude law enforcement witnesses, specifically Special Agent Christopher

Sheehan, from interpreting statements or actions in the video.  Finally, he seeks to prohibit the Government from mentioning the incident in its opening statement without any foundation having been laid at trial.  While initially noting that the undercover video's context is important, Mr. Iyerusalimets then recasts his clandestine interactions as innocuous, offering as support the declaration of a former employee and noting that Mr. Iyerusalimets laughed about a combustible device just as "one reflects on a potentially frightening incident that worked out without significant harm."  ECF 812, at 6.

Although Mr. Iyerusalimets' arguments are unpersuasive, he is correct on one point: his comments should not be considered in a vacuum.  Unfortunately for him, a holistic review of the undercover video, including the purchases that resulted, reveals the existence of a counterfeiting scheme and the means by which he and his co-defendants perpetrated it. Among other things, Mr. Iyerusalimets and his co-defendant in the undercover video discussed other phone suppliers being shut down by law enforcement, *see* 787-2, at 4:8–:25; differentiated between items that were branded and unbranded, including suggestions that the CHS "sell whatever crap you can sell" to be reinstated at Amazon, *see id.* at 14:1–:9; noted misspellings on products, *see id.* at 8:12–:25; and mentioned evaluating the internal parts of certain products and noticing that "if you open them up inside, they're like a lot of weird stuff in there," *id.* at 9:7–:8.  Finally, while laughing, Mr. Iyerusalimets mentions that Apple dongles were "a fire hazard," before claiming that "I had them beep.  I had them explode. I had them smoke. . . .  I had a phone that blew up in my other place already. It made a huge hole in my carpet."  *See* 16:4–:7.  Mr. Iyerusalimets then watched as Defendant David Bibikov consummated a hand-to-hand purchase of cellphones and chargers, which were later determined to be counterfeit.

To the extent that Mr. Iyerusalimets challenges his statements as irrelevant, the Government has addressed issues related to product quality earlier in this Response.  That same reasoning applies here.  In addition, it is perhaps telling that Mr. Iyerusalimets challenges the relevancy of only those quality-related comments that relate to health-and-safety issues, and not those comments related to blatant misspellings or other obvious quality-control issues.  One would assume that, under the Defendant's logic, he would seek to exclude *all* quality-control issues and not simply those related to harm.  But he does not, and that omission is revealing.  He is seeking to exclude relevant and probative evidence of possible harm, using Rule 403 as a pretense to sanitize potentially inconvenient facts, which the Ninth Circuit does not allow.  *See Hankey*, 203 F.3d at 1172.

Mr. Iyerusalimets next offers the declaration of a former employee whose hand allegedly slipped while repairing a device, causing a battery to smoke.  He offers this as some form of justification for laughing during a clandestine hand-to-hand purchase of items that were later deemed to be counterfeit.  To be clear, this employee has not been charged in this case, and his knowledge of product authenticity is unclear, at best.  His knowledge of Mr. Iyerusalimets' knowledge of wrongdoing is similarly speculative, and his reliance on Mr. Iyerusalimets for employment perhaps skews his perception of events.  *See, e.g.*, *United States v. Abel*, 469 U.S. 45, 52 (1984) ("Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest.").  For those reasons, at this stage, his declaration is of little probative value.  Nevertheless, the basis for that employee's declaration is, at a minimum, a factual dispute that would be inappropriately resolved in limine.  *See Ashland Inc.*, 539 F. Supp. at 323.

The Defendant next seeks to preclude law enforcement witnesses, and specifically Special Agent Christopher Sheehan, from editorializing the undercover video. As foundation, he points to previous testimony where Special Agent Sheehan commented that Mr. Iyerusalimets was laughing while discussing a dangerous phone, which anyone who watches the video can see. On this note, the Government will follow black-letter law in the Ninth Circuit, which allows law enforcement officers to offer "lay testimony" that consists of "his interpretations of ambiguous conversations based upon his direct knowledge of the investigation." *See United States v. Freeman*, 498 F.3d 893, 904–05 (9th Cir. 2007); *see also United States v. Beck*, 418 F.3d 1008, 1015 (9th Cir. 2005) (holding that a lay witness's testimony is rationally based on the witness's perceptions if it is "based upon personal observation and recollection of concrete facts").

Finally, the Defendant wants to preclude the Government from mentioning the harmful nature of these products in opening if the proper foundation is not lain. The Government will follow normal procedures during opening statements, including "outlin[ing] the issues for the jury and, among other subjects, set[ing] out a purely factual background," to include certain demonstratives, photographs, and other graphics. *See United States v. Lahiji*, No. 3:10-CR-506-(1,2)-KI, 2013 WL 5963033, at *9 (D. Or. Nov. 7, 2013).

## III.   Financial Transfers and Communications with Bill Eisenberg (ECF 806, at 3–4)

Defendant Pavel Babichenko objects to any evidence of his activity with Robert Eisenberg, a convicted trafficker of counterfeit products. Evidence related to Pavel and Tim Babichenko's dealings with Eisenberg is part and parcel with the charges against the Defendants: namely, conspiracies to commit wire fraud, § 2320, and money laundering.

Between July 2010 and August 2011, Pavel Babichenko received $6,078,910 in deposits from entities in Hong Kong and controlled by Eisenberg. During that same timeframe, Pavel Babichenko moved $5,609,220.50 to another entity controlled by Eisenberg. *See* ECF 816, Ex. 1 ("Eisenberg Summary"). For example, on December 2, 2010, Pavel Babichenko received $795,675 from Galaxy Telecom in Hong Kong. The same day, Pavel Babichenko wired $750,000 to Billfish USA. Defendant Tim Babichenko likewise wired money to Pavel Babichenko's Midstar account, which was then wired to Billfish the same day after a nominal amount was siphoned off. For example, on February 16, 2011, Defendant Tim Babichenko wired $59,880 to Midstar. Days later, Pavel Babichenko wired $58,600 to Billfish USA.

As the Defendant noted in his motion, shortly after these large financial transfers, the owner of Billfish pleaded guilty to trafficking in counterfeit cellphones and forfeited 34 million dollars as part of that criminal process. The evidence shows that in addition to Pavel and Tim Babichenko's financial transactions in 2010, Tim Babichenko reengaged his business dealings with Eisenberg later in the conspiracy. In 2015, Tim Babichenko asks in an e-mail to "Robert Eisenberg": "lol, nice, you back bro[?]" *See* Ex. 5, at 1. Defendant Tim Babichenko then asks whether "Rob" has a "large qty of as is iPhone 5s[?]" *See id.* These financial transfers and communications evidence the charges against Tim and Pavel Babichenko. While all evidence of guilt is prejudicial, this evidence is not unfairly so and is relevant to the jury's determination of whether Defendant Pavel Babichenko and Tim Babichenko conspired to commit wire fraud, § 2320, and launder criminal proceeds. The Defendants may certainly raise the points made in the motion in limine during cross

examination, but they cannot simply exclude relevant evidence because it is proof of their guilt.

## IV.   U.S. Customs and Border Protection Evidence (ECF 807; 813, at 9–10; 823; 847, at 8–9)

Three Defendants raise separate challenges to the admission of the CBP records and evidence:  (1) Defendant Anna Iyerusalimets challenges the admission of CBP records under Rule 803(8)(A)(ii), arguing that these records are criminal investigative reports that fall outside the public-records exception; (2) Defendant David Bibikov argues that the definition of counterfeiting differs in the context of CBP seizures, rendering any record or evidence related to seizures inadmissible and that admission of any record would violate due process; and (3) Defendant Mikhail Iyerusalimets challenges the Government's ability to lay a proper foundation for the physical evidence underpinning a particular seizure and argues the admission of CBP records would violate his confrontation rights.  All base their motions on a misunderstanding of the law or facts.  Accordingly, each should be denied.

### A.   U.S. Customs and Border Protection Background

Under the Tariff Act, the importation of counterfeit merchandise is prohibited.  *See* Tariff Act of 1930, 19 U.S.C. § 1202 *et seq.*  Under the Anticounterfeiting Consumer Protection Act (ACPA), U.S. Customs and Border Protection monitors international shipments of goods coming into the United States for counterfeit merchandise.  19 U.S.C. § 1526(e); 19 C.F.R. § 133.21.  The agency has 328 ports of entry across the United States; at each port, the agency effectuates the agency's missions to ensure the integrity of the borders by, *inter alia*, circumventing packages suspected of containing contraband.  *See* 19 C.F.R. § 162.21(a); *see also* https://www.cbp.gov/newsroom/video-gallery/video-library/introduction-cbp-import-process# (discussing process of importing goods from

overseas).  Seizure by a port officer triggers an administrative procedure of notice to the

recipient, forfeiture of the seized property, and potential imposition of civil fines for seized

products.  *See* 19 U.S.C. § 1526; 19 C.F.R. § 133.21; *see also* Administrative Procedure Act, 5

U.S.C. § 701.  Pursuant to regulations, CBP must memorialize details regarding these

seizures, which are routinely collected and maintained by the agency.  *See, e.g.*, 19 C.F.R.

§ 162.31(b) (regulation detailing information required in notice).

Over the course of a decade, the Defendants and their employees have had 61

international shipments containing 33,243 separate items seized by U.S. Customs and

Border Protection at various port authorities across the United States.  CBP seized these

shipments as cellphones and cellphone accessories bearing counterfeit marks.  In a summary

chart,[5] Homeland Security Investigation Special Agent Kristina Denning distilled the

following information contained in CBP records into a single format:  the date of the

seizure; the port; the consignee (recipient) and their address; the sender and their address;

the proclaimed manufacturer and their address; description of the goods; quantity; declared

value and contents; actual value or MSRP; whether the recipient challenged the seizure;

whether that challenge was successful; and the name of the petitioner or challenger of the

seizure.  None of the seizures serve as a basis for the charges here.  Rather, the charges in

this criminal case all stem from evidence obtained during the criminal investigation through

search warrants and undercover purchases online and in person.

In addition to the summary chart, the Government intends to call several former

employees of Piotr Babichenko, Pavel Babichenko, Anna Iyerusalimets, and Mikhail

---

[5]      In its own motion, the Government seeks to admit the Customs and Border
Protection records pursuant to Federal Rule of Evidence 1006.  *See* ECF 816.  The
challenges raised to the chart will be addressed in the Government's reply.

Iyerusalimets to testify about the impetus for their leaving that employment:  namely, that

they were concerned by the notice from the seizures that they were selling counterfeit

products.  Simply, this notice prompted their withdrawal from the scheme and is only

explained through contextualizing the seizures.

> **B.** **The Government is offering the CBP summary chart as notice; as such, this evidence is not hearsay.**

The Government intends to offer the CBP summary chart as notice to the

Defendants that the packages contained material CBP deemed counterfeit; as such, these

documents would not be testimonial hearsay.  *See United States v. McLennan*, 563 F.2d 943,

946–47 (9th Cir. 1977) (affirming admission of the following statement as notice and,

therefore, not hearsay:  "For [goodness] sake, I told you that was illegal"); *see also United

States v. Lane*, No. CR-12-01419-PHX-DGC, 2013 WL 3716601, at * 2–3 (D. Ariz. July 13,

2013) (admitting CBP documents as notice to the defendant in a drug prosecution as

relevant to his knowledge).

> **C.** **CBP records are public records and, therefore, are an exception to the prohibition of hearsay under Rule 803(8), (ECF 813, at 9–10; ECF 847, at 5).**

While the Government intends to offer the CBP Summary Chart solely to establish

notice and, therefore, falls outside the definition of hearsay, these records also fall within the

public-records exception to the rule prohibiting hearsay.  Under either theory, hearsay is not

a basis for excluding the evidence.  Accordingly, the summary chart proffered by the

Government is admissible in its case in chief.

Defendant Anna and Mikhail Iyerusalimets argue that Rule 803(8)(A)(ii) prevents

admission of the CBP records because these records are tantamount to police reports in a

criminal case.  294 F. 3d 1143, 1150 (9th Cir. 2002).  Not so.

Rule 803(8) exempts from the general prohibition against hearsay certain records or statements of a public office.  A "record or statement of public office" qualifies under this exception if:

(A)    It sets out:

      (i)    The office's activities;

      (ii)    A matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or

      (iii)    In a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and

(B)    The opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Fed. R. Evid. 803(8)(A).  Subsection (ii) therefore does not prohibit all public records of "a matter observed by law-enforcement personnel."  Instead the distinction lies between law enforcement reports prepared in a routine, non-adversarial setting, and those resulting from the arguably more subjective endeavor of investigating a crime and evaluating the results of that investigation.  *See United States v. Cerda-Ramirez*, 730 F. App'x 449, 453 (9th Cir. 2018).  The former is admissible, the latter is not.  *United States v. Fryberg*, 854 F.3d 1126, 1132 (9th Cir. 2017); *see also United States v. Noria*, 945 F.3d 847, 852–53 (5th Cir. 2019) (admitting form collecting information obtained from individual suspected of being unlawful alien in the United States).

Here, the records created by CBP were made pursuant to the legal duties imposed under the ACPA and required of the agency, not for the purpose of establishing or proving a fact at trial.  19 U.S.C. § 1526(e); 19 C.F.R. § 133.21; *see Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009).  When, as here, records are prepared for administrative purposes, the

Ninth Circuit has held that such records are public and not hearsay.  *United States v. Torralba-Mendia*, 784 F.3d 652, 664–65 (9th Cir. 2015).  Accordingly, the CBP records fall within the public records exception to hearsay as routine records documenting the duties of the agency. *See United States v. Orozco-Acosta*, 607 F.3d 1156, 1164 (9th Cir. 2010) (recognizing records "created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial" were public records).

This conclusion is supported by the case law:  the Fourth, Fifth, and Ninth Circuits have all concluded that CBP records fall within the public-records exception to hearsay under Rule 803(8) as non-adversarial public records.  *See United States v. Cabrera–Beltran*, 660 F.3d 742, 753 (4th Cir. 2011); *United States v. Puente*, 826 F.2d 1415, 1417–18 (5th Cir. 1987); *United States v. Orozco*, 590 F.2d 789, 794 (9th Cir. 1979); *see also United States v. Univar USA Inc.*, 294 F. Supp. 3d 1314, 1323–24 (Ct. Int'l Trade 2018) (Taiwanese custom summaries public records).

Nevertheless, as support for their argument that these records are not public, the Defendants rely on *United States v. Orellana-Blanco*, 294 F.3d 1143 (9th Cir. 2002).  *See* ECF 813, at 9–10.  Crucial differences distinguish the records in *Orellana-Blanco* from the records here.  Unlike the record in *Orellana-Blanco*, the CBP recordations were not the officer's notes of his subjective observations during an interview of the defendant (who was placed under oath) that served as "the scene of the crime."  *See* 294 F.3d at 1150–51.  Rather, the CBP records reflect the ministerial task (and legally mandated duty under the ACPA) of documenting seizures, which are routinely collected and maintained by CBP.  *See, e.g.*, 19 U.S.C. § 1526(e); 19 C.F.R. § 133.21; *see Melendez-Diaz*, 557 U.S. at 324.  When, as here, records are prepared for administrative purposes, the Ninth Circuit has held that such

records are public and not hearsay.  Accordingly, the CBP records fall within the public records exception to hearsay as routine records documenting the duties of the agency.

> **D.**     **The Definition of "Counterfeit" (ECF 823, 12–14).**

Section 526(e) of the Tariff Act mandates that imported merchandise bearing a counterfeit mark shall be seized.  "Counterfeit mark" under § 526(e) is defined in the Lanham Act, 15 U.S.C. § 1127, as "a spurious mark that is identical with or substantially indistinguishable from, a registered mark."  15 U.S.C. § 1127.  Under Ninth Circuit law, civil penalties imposed under the Tariff Act require "the offending merchandise must bear a mark identical to or substantially indistinguishable from a registered trademark owned by a United States citizen or corporation."  *See United States v. Able Time, Inc.*, 545 F.3d 824, 829–330 (9th Cir. 2008); 15 U.S.C. § 1127; 19 U.S.C. § 1526(e).

This definition includes the same "likelihood of confusion" requirement as that articulated in § 2320(f)(1)(A)(iv).  *See Able Time, Inc.*, 545 F.3d at 830 (discussing definition as "meaning that it is likely to cause the public to associate the offending merchandise with the registered trademark," *i.e.*, the likelihood to cause confusion component).  Accordingly, the Defendants' assertion that no CBP seizure is relevant to the present prosecution because the civil definition differs from the criminal one is simply wrong.  *See* ECF 823, at 13 ("Conversely, to qualify as a 'counterfeit' mark under the criminal statute, the jury must also conclude that a spurious mark's use was likely to cause confusion[.]").

> **E.**     **The Government does not intend to admit the underlying physical evidence of the cellphones and accessories seized by CBP**.

At this time, the Government does not intend to offer the many thousands of items seized by CBP into evidence.  Simply, this evidence would be cumbersome and is unnecessary in light of the evidentiary value of the proffered CBP summary chart.

Accordingly, Defendants Mikhail Iyerusalimets' and David Bibikov's motions challenging the admissibility of the CBP seized physical evidence is moot.  Regardless, the legal argument underpinning both is flawed and addressed herein.

### 1.    Chain of Custody (ECF 807)

Defendant Mikhail Iyerusalimets asserts that the Government cannot properly authenticate physical evidence seized by CBP on September 14, 2017 because the number of phones obtained by HSI from CBP was less than the recorded amount initially recorded as seized by CBP.  First, the Government does not intend to introduce this physical evidence at trial.  Accordingly, this motion is moot.  Second, even if the Government had intended to introduce this evidence, it could properly authenticate it.  The Defendant's motion exposes a fundamental misapprehension of the rules of evidence governing the standards of admissibility.

On September 14, 2017, CBP documented a seizure of a shipment of 30 Apple iPhones to Mikhail Iyerusalimets at "12554 Bridger 122" from "Sonc Wireless" at "Rm 2503 EW International TWR, 120-124 TEX, Tsuen Wan, HK."  *See* Summary CBP Chart (Row 58).  As documented in the investigative reports, HSI Special Agent Kristina Denning requested the physical evidence from CBP.  In response, Agent Denning received 14 iPhones.  Accordingly, Agent Denning reported to the proper internal affairs personnel the discrepancy.

First, the Government would be able to satisfy the low bar of authentication to admit this physical evidence.  Of course, regarding the chain-of-custody of evidence, "[t]he prosecution must introduce sufficient proof so that a reasonable juror could find that [the items] are in substantially the same condition as when they were seized, and may admit [the

items] if there is a reasonable probability [the items] have not been changed in important respects." *United States v. Matta–Ballesteros*, 71 F.3d 754, 768 (9th Cir. 1995). The Ninth Circuit recognizes that "defect[s] in the chain of custody go[] to the weight, not the admissibility, of the evidence introduced." *Id.* at 769. The disparity between number of phones documented by CBP and received by Agent Denning goes to the weight, not admissibility of this evidence.

Regardless, as reflected in the draft exhibit lists provided to the defense, however, the Government does not intend to admit the physical evidence underpinning the individual CBP seizures during its case in chief. Such evidence (numbering in the thousands) would overwhelm the jury and is unnecessary. Rather, at this time, the Government intends to introduce the CBP summary exhibit as relevant evidence of notice to Mikhail Iyerusalimets and others that the products purchased were viewed by customs officials as counterfeit. Accordingly, the present issue is moot.

## 2.    Destruction of CBP Seizures (ECF 823, at 14–17)

Pursuant to its statutory and regulatory duties, CBP seized, forfeited, and destroyed a number of packages destined for the Defendants and their employees. Those that were not administratively forfeited and destroyed were obtained by HSI Special Agent Denning. Defendant David Bibikov asserts that the Government cannot admit any physical items seized by CBP because some were administratively forfeited and destroyed. First, the Government does not intend to introduce this physical evidence at trial. Accordingly, this motion is moot. Second, even if the Government had intended to introduce this evidence, it could do so.

The Government is only offering the CBP summary chart as notice, not as the evidence underpinning the substantive charges against the Defendants.  This basis distinguishes the cases relied upon by Defendant David Bibikov.  *See* ECF 823, at 15.  And, if the Government chose to admit the seized items obtained by federal agents, the defense would have that material available for review.

Nevertheless, Mr. Bibikov asserts that these destroyed products "would have played a significant role in the defense against the conspiracy charge by showing the legitimacy of the goods."  *Id.* at 16.  To date, however, one defense counsel has reviewed items from only 3 seizures out of 15 seizures that were not destroyed and are maintained by HSI. Accordingly, there is no reason to believe the defense would have evaluated the destroyed packages even if available to do so.  What is more, there are literally thousands of comparable items seized during the August 18, 2018 search of 12586 and 12554 Bridger Street Warehouses, as well as the residences, that are available for the defense review. Numbering over 100,000 separate items, these items are held in federal evidence lockers in Boise, as well as a facility in Riverside, California, which the Defendants have never examined despite invitations to do so.  Simply, their proclamation that no comparable evidence exists is simply false.  There is a wealth of comparable evidence that the defense has always been welcome to review.

## F.    Confrontation Rights (ECF 847, at 11)

Finally, Defendant Mikhail Iyerusalimets argues that admission of the CBP records would violate his Sixth Amendment right to confront his accusers.  Not so.

First, as currently intended, the CBP material is offered solely as notice to the Defendants.  Accordingly, no confrontation clause issues arise.  *See United States v.*

*Wahchumwah*, 710 F.3d 862, 871 (9th Cir. 2013) (admitting complaints from unnamed persons that the defendant was selling eagle parts in prosecution for violation of the Bald and Golden Eagle Protection Act, 16 U.S.C. § 668(a), and holding no confrontation right was implicated because the statements were offered for non-hearsay purpose).

Second, even if the Government intended to admit the materials as public records, the Ninth Circuit has recognized such records are not testimonial. *United States v. Orozco-Acosta*, 607 F.3d 1156, 1164 (9th Cir. 2010) (recognizing records "created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial" were public records and, therefore, not testimonial). Only if records were created with a "primary purpose" of use in litigation, would they become testimonial. *See id.* As discussed in Section IV.A, the CBP records were created by the agency to fulfill their administrative mandate under the ACPA. Accordingly, they are not testimonial. *See Lane*, 2013 WL 3716601, at *3–4 (admitting CBP seizure records because "[t]heir primary purpose was administrative, and the fact that they might later become relevant to a criminal prosecution does not make them testimonial").

## V.    Opinion Mental State (ECF 806, at 9–12; ECF 808; ECF 810; ECF 813, at 8)

The Government will offer expert testimony and may offer lay testimony as to opinions. For each, the Government will comply with the proper rules as to the role of the witness.

Under Rule 704(b) of the Federal Rules of Evidence, an expert witness may not testify "with respect to the mental state or condition of a defendant." Fed. R. Evid. 704(b). As an expert witness, Ms. Czemerys will testify about general accounting practices and background information regarding methods of laundering money, including the following

examples as means of concealing or disguising the nature, location, source, ownership, or control of proceeds through the use of: (1) "funnel accounts" to move money from one place to another through the banking system; (2) multiple employees' personal and business accounts to transfer proceeds into bank accounts controlled by others; (3) cash; (4) interpersonal and intercompany transfers; and (5) the conversion of criminal proceeds into large purchases and/or international real estate development. Her testimony will entail her forensic analysis in this case based on years of relevant experience, not speculation or conclusions as to the mental state of any Defendant that runs afoul of Rule 704(b). *See United States v. Hayat*, 710 F.3d 875, 901–902 (9th Cir. 2013) (recognizing the Ninth Circuit's "narrow" interpretation of the rule); *see also United States v. Nichols*, 786 F. App'x 624, (9th Cir. 2019) (affirming expert testimony on methods of criminal activity (drug distribution) as complying with Rule 704(b) "so long as the expert does not draw the ultimate inference or conclusion and the ultimate" and it does not "necessarily follow from the testimony").

Likewise, before eliciting testimony from the CHS that she believed that any of the defendants were involved in money laundering or tax evasion, the Government agrees to lay the proper foundation for such testimony. Under Rule 701 of the Federal Rules of Evidence, a lay witness may testify as to opinions that are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of [Federal Rule of Evidence] 702." Fed. R. Evid. 701. "Rule 701(a) contains a personal knowledge requirement." *United States v. Lopez*, 762 F.3d 852, 864 (9th Cir. 2014).

"In presenting lay opinions, the personal knowledge requirement may be met if the witness can demonstrate firsthand knowledge or observation." *Id.* "A lay witness's opinion testimony necessarily draws on the witness's own understanding, including a wealth of personal information, experience, and education, that cannot be placed before the jury." *United States v. Gadson*, 763 F.3d 1189, 1208 (9th Cir. 2014). But a lay opinion witness "may not testify based on speculation, rely on hearsay or interpret unambiguous, clear statements." *United States v. Vera*, 770 F.3d 1232, 1242 (9th Cir. 2014). The Government agrees that before it elicits a lay opinion from its witnesses, it will necessarily be required to lay the proper foundations for such a lay witness opinion. *United States v. Lloyd*, 807 F.3d 1128, 1154 (9th Cir. 2015).

## VI.   Certain Terms (ECF 815)

The Defendants move to preclude the Government or its witnesses from using certain terms or titles, to include victim, counterfeit, trafficker, Babichenkos, the defendants, and co-conspirator. ECF 815. The Government agrees to instruct its witnesses to refer to victims as "alleged victims," and to identify and refer to individuals as opposed to "Babichenkos," defendants, and co-conspirators. The Government does not intend to refer to the Defendant's as "traffickers," but will present evidence that the Defendants conspired to traffic in counterfeit goods.

## VII.   Marital Communications (ECF 813, at 13–14)

Of the nine Defendants who will be tried in June, six are married couples: (1) Anna and Mikhail Iyerusalimets; (2) Pavel and Natalya Babichenko; (3) Timofey and Kristina Babichenko. Anna Iyerusalimets asserts any proffered communications between she and her husband are privileged and, therefore, inadmissible at trial. *See* ECF 813, at 13–14

(relying on "marital communications" privilege).  Not so.  Communications between married co-defendants that furthered the criminal conspiracies alleged are not privileged.  *See United States v. Marashi*, 913 F.2d 724, 730–31 (9th Cir. 1990) ("We have emphasized that the policies underlying the marital communications privilege pale in the face of public concerns about bringing criminals to justice.").  All the communications the Government will proffer at trial were made in furtherance of the conspiracies and, therefore, fall squarely within the crime-fraud exception.  Further, many were made in the presence of a third person, thereby rendering the "marital communications" privilege inapplicable.  *See United States v. Montgomery*, 384 F.3d 1050, 1056–57 (9th Cir. 2004).

## VIII.   Motion to Compel Samsung Material (ECF 817)

Defendant Piotr Babichenko moves the Court to compel the Government to provide material held by Samsung Electronics America Inc.  *See* ECF 817.  The Government does not possess the materials requested and, therefore, cannot provide it.  *See United States v. Bryan*, 868 F.2d 1032, 1036–37 (9th Cir. 1989) (holding that discovery obligations extended to documents the government knows of and has access to).  Moreover, the Government assumes that the material requested was the subject matter of *ex parte* litigation between the Defendant and Samsung.  *See* Tr. Status Conference, ECF 782, at 15:13–17:21 (recognizing that hearing was conducted *ex parte* and without participation by the Government).  Accordingly, the Government has no knowledge of the order cited in Defendant Piotr Babichenko's motion to compel.  *See* ECF 817, at 2 (citing docket entry 699).  As such, it cannot respond to the present motion.

IX.    **Bruton/Coconspirator Statements (ECF 813, at 2–5)**

In her consolidated motion in limine, Defendant Anna Iyerusalimets asks this Court to exclude statements under *Bruton* and require a pre-trial *James* hearing to determine the admissibility of coconspirator statements.   The Court has previously rejected both requests. *See* Order, ECF 676 (denying, without prejudice, motions to exclude *Bruton* statements); *see also* Tr. H'rg, ECF 680, at 14:04–15:14 (Aug. 28, 2020) (denying request for pre-trial *James* hearing to rule on admissibility of coconspirator statements).

X.    **Motion for Bill of Particulars (ECF 818)**

Defendant Piotr Babichenko asks this Court to order the Government provide a bill of particulars as to "open" questions regarding the counterfeiting analyses.   *See* ECF 818, at 5.  Specifically, he asks:  whether a "bad logo [is] necessary for a counterfeit phone" and whether "bad functioning [is] necessary to a counterfeit phone?"   *Id.*   These are legal questions.   They are not factual questions related to the nature of the charges that warrant clarification under Rule 7 through a bill of particulars.   *See* Wright & Miller, Federal Practice and Procedure § 130 (4th ed.).   Accordingly, the Defendants' invocation of Rule 7 is procedurally inappropriate.

Moreover, the Court has previously found that the Government satisfied Rule 7's command by charging sufficient detail in the Superseding Indictment as to the allegations of conspiracy to commit fraud, trafficking in counterfeit trademarked goods, and money laundering.   *See* Order, ECF 631, at 12–13 (holding Counts 1, 20, and 35 sufficiently pled to satisfy Rule 7 when challenged on separate bases).   As reflected in that order, the Superseding Indictment specifically details the fraud alleged as selling counterfeit products as new and genuine on third-party platforms.   *See id.*; ECF 210.   The details in the

Superseding Indictment make clear the essential facts supporting the crimes alleged.  *See* ECF 210.

Beyond the Superseding Indictment, through discovery and meetings with defense counsel, the Government has detailed the counterfeit nature of the products through examination of the physical products themselves with defense counsel, as well as the many reports, supplemental declarations, and materials provided by the trademark holders.  *See, e.g.*, Supplemental Declarations, ECF 836-1, -2, -3, and -4.  These efforts far exceed the mandates of Rule 7.  More fundamentally, however, Rule 7 is not a means of posing legal questions to the Government.  Accordingly, the Court should deny Defendant Piotr Babichenko's motion.

## XI.   Confrontation Clause Rights (ECF 813, at 5–6)

Anna Iyerusaliments seeks to exclude any statements that violate her confrontation clause rights.  The Government intends to fully comply with all Defendants' constitutional rights at trial, including confrontation rights.  Accordingly, this motion is moot.

## XII.   Ivan Kalin and Samsung Watches (ECF 821)

Defendants moved in limine to exclude "(1) evidence that Customs seized allegedly counterfeit Samsung smartphones from Ivan Kalin and that Samsung sent Kalin a cease-and-desist letter; and (2) hearsay testimony that Paul Babichenko requested original Samsung watch boxes and that Paul wanted boxes to 'hide' watches in."  ECF 821.  The Government agrees not to proffer this evidence or testimony in its case-in-chief, rendering this motion moot.[6]

---

[6]     In accordance with this agreement, the Government will remove rows 26 and 27 from the CBP summary chart.  *See* ECF 816, Exhibit 1 (CBP Summary Chart).

## CONCLUSION

For the foregoing reasons, the Court should allow the Government to provide the jury the full picture of the conspiracies charged.  Accordingly, the Government requests that Court rule on the pending motions as follows:

- Motions in Limine ECF Nos. 807; 813, at 2–6; 815; 821; 823, at 14–17 should be denied as moot;

- Motions in Limine ECF Nos. 799, 806, 808, 810, 812, 813, 817, 818, 822, 823, and 847, at 8–9; should be denied on their merits.

Respectfully submitted this 29th day of April, 2021.

RAFAEL M. GONZALEZ, JR.
ACTING UNITED STATES ATTORNEY
By:

*/s/ Katherine L. Horwitz*
KATHERINE L. HORWITZ
Assistant United States Attorney

*/s/ Christian Nafzger*
CHRISTIAN NAFZGER
Assistant United States Attorney

*/s/ Timothy Flowers*
TIMOTHY FLOWERS
U.S. Department of Justice Trial Attorney

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 29, 2021, the foregoing **GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS IN LIMINE** was electronically filed with the Clerk of the Court using the CM/ECF system, and that a copy was served on the following parties or counsel by:

| |
|---|
| JOHN DEFRANCO<br>1031 E. Park Blvd.<br>Boise, ID 83712<br>jcd@greyhawklaw.com<br>*Attorney for Pavel Babichenko* |
| JEFFREY BROWNSON<br>223 North 6th Street, Suite 215<br>Boise, Idaho 83702<br>*Attorney for Gennady Babitchenko* |
| PAUL E. RIGGINS<br>380 South 4th Street, Ste. 104<br>Boise, ID 83702<br>rigginslaw@gmail.com<br>*Attorney for Piotr Babichenko* |
| ROB S. LEWIS<br>913 W. River Street, Ste. 430<br>Boise, ID 83702<br>office@roblewislaw.com<br>*Attorney for Timofey Babichenko* |
| GREG S. SILVEY<br>P.O. Box 5501<br>Boise, ID 83705<br>greg@idahoappeals.com<br>*Attorney for Kristina Babichenko* |

J.D. MERRIS
913 W. River Street, Ste. 420
Boise, ID 83702
jmerris@earthlink.net
*Attorney for Natalya Babichenko*

ROBYN A. FYFFE
P.O. Box 5681
Boise, ID 83705
robyn@fyffelaw.com
*Attorney for David Bibikov*

MELISSA WINBERG
702 W. Idaho Street, Ste. 1000
Boise, ID 83702
melissa_winberg@fd.org
*Attorney for Anna Iyerusalimets*

ELLEN NICHOLE SMITH
P.O. Box 140857
Garden City, ID 83714
ellen@smithhorras.com
*Attorney for Mikhail Iyerusalimets*

/s/ *Katherine Horwitz*
Assistant United States Attorney

GOVERNMENT'S CONSOLIDATED RESPONSE
TO DEFENDANTS' MOTIONS IN LIMINE—39