UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>PAVEL BABICHENKO,<br>PIOTR BABICHENKO,<br>TIMOFEY BABICHENKO,<br>KRISTINA BABICHENKO,<br>DAVID BIBIKOV,<br>ANNA IYERUSALIMETS, and<br>MIKHAIL IYERUSALIMETS,<br><br>    Defendants. | Case No. 1:18-cr-00258-BLW<br><br>**MEMORANDUM DECISION &<br>ORDER RE MOTION TO<br>EXCLUDE POLLOCK<br>TESTIMONY** |

## INTRODUCTION

Before the Court is Defendants' Joint Motion to Exclude Testimony of Government's Expert Pollock or for *Daubert* Hearing. *See* Dkt. 1306. The Court conducted a *Daubert* hearing on May 5, 2022 and now issues its decision.  For the reasons explained below, the Court will deny the motion.

## BACKGROUND

During the first trial of this matter, the government offered expert testimony from Robert Pollock. Mr. Pollock is an electrical engineer who works as the Director of Market Surveillance for UL LLC. At trial, Mr. Pollock generally

described UL as follows: "UL is a product safety organization. Our motto is 'Working for a safer world.' So we test products to set the requirements and allow the use of our mark as evidence of compliance with those requirements." *Day 19 Trial Tr.,* Dkt. 1083, at 3110:23 to 3111:2. Mr. Pollock explained that manufacturers come to UL to have their products evaluated and certified so that they can demonstrate to consumers that their products are safe. If the products pass UL's requirements, the manufacturers can obtain the right to use the UL mark. Additionally, if a product contains a correct mark, UL would be able to determine precisely where the item was manufactured. If, on the other hand, a product contains an incorrect mark then, according to Pollock, UL would not be able to trace the product to its manufacturer and the product would not have gone through UL's rigorous certification process. *Id.* at 3121. Mr. Pollock further testified that UL believes power supply chargers are the most-counterfeited products bearings its mark. *Id.* at 3122.

During the first trial, the Court did not allow Mr. Pollock to testify regarding a so-called "White Paper." UL created this paper, which is formally titled "Counterfeit Phone Adapters – A UL Technical Investigation Shows a 99 Percent Failure Rate." *See* Dkt. 340-5; *see generally Pollock Dec.*, Dkt. 836-3, ¶ 27. The government had intended to question Mr. Pollock about the investigation documented in the White Paper, but the Court explained that because there was no

evidence that the testing described in the White Paper had been performed on any of the chargers involved in this case, testimony regarding the White Paper would prejudice the defendants under Federal Rule of Evidence 403. *See Trial Tr.* at 3105:22 to 3106:21.

In anticipation of the second trial, the government provided a supplemental expert declaration from Mr. Pollock. *See* Dkt. 1288. Mr. Pollock reports that in January 2022 – after the first trial and in the months leading up to the second trial – he "oversaw and observed" another UL employee conduct testing on 117 power adapters involved in this case. During one test – the electric strength test – UL employee Randy Johnson was tasked with applying "a voltage across the device which ramps up to approximately 4,250 volts, and then holding that voltage for one minute." *Id.* ¶ 8. Pollock reports that the vast majority of the chargers – 104 of 117 – failed the test. Pollock says an authentic charger bearing the UL mark would not fail the same test. Mr. Pollock also oversaw testing of the advertised voltage and current ratings of the 117 chargers. He reported that none delivered the advertised ratings. *See Id.* ¶¶ 8-12. The government represents that the testing performed on the 117 chargers directly parallels the testing that was conducted in connection with the White Paper.

The defendants ask the Court to preclude Mr. Pollock from offering testimony about this testing at the retrial.

## GOVERNING LEGAL STANDARDS

The admissibility of expert testimony is governed by Rule 702 of the Federal

Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.

579 (1993). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The district court's role in applying Rule 702 is to be a

gatekeeper. *Daubert*, 509 U.S. at 589. In that role, the court considers both

relevance and reliability of the proffered evidence. *Kumho Tire Co. v. Carmichael*,

526 U.S. 137, 141 (1999). "Expert opinion testimony is relevant if the knowledge

underlying it has a valid connection to the pertinent inquiry. And it is reliable if the

knowledge underlying it has a reliable basis in the knowledge and experience of

the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010)

(quotation marks and citation omitted).

*Daubert* discussed several reliability factors, including testing, peer review and publication, known or potential rate of error, and general acceptance in the relevant scientific community. 509 U.S. at 592-94. In later decisions, the Supreme Court clarified that the gatekeeping function described in *Daubert* applies not only to testimony based on scientific knowledge, but also to testimony based on technical or specialized knowledge. *Kumho Tire*, 526 U.S at 141. But the "reliability inquiry is a 'flexible one,'" and the district court has "broad latitude to determine" what factors in *Daubert*, if any, are relevant to the reliability determination. *Estate of Barabin v. AstenJohnson, Inc*., 740 F.3d 457, 463 (9th Cir. 2014) (en banc) (*quoting Kumho Tire*, 526 U.S. at 153).

The Court's analysis focuses "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. The Court's "task . . . is to analyze not what the experts say, but what basis they have for saying it." *Wendell v. GlaxoSmithKlein LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (citation omitted).

Evaluating the admissibility of expert witness testimony for relevance and reliability is distinct from challenges to the testimony made by impeachment or cross-examination. *See City of Pomona v. SQMN N. Am. Corp*., 750 F.3d 1036, 1044 (9th Cir. 2014) (The court must "screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable.").

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *United States v. Wells*, 879 F.3d 900, 933 (9th Cir. 2018) (*quoting Daubert*, 509 U.S. at 596). Challenges going to the weight of the evidence and credibility determinations are reserved for the finder of fact. *City of Pomona*, 750 F.3d at 1044.

Finally, the district court "has broad latitude in determining the appropriate form of the inquiry." *Id.* (*citing United States v. Alatorre*, 222 F.3d 1098, 1102 (9th Cir. 2000)). Courts often hold pretrial *Daubert* hearings to determine the admissibility of expert opinion testimony. But a separate, pretrial hearing is not required so long as the court performs its gatekeeping function, creates a record of the inquiry, and articulates a basis for admitting or excluding the testimony. *See United States v. Alatorre*, 222 F.3d 1098, 1100 (9th Cir. 2000) ("trial courts are not compelled to conduct pretrial hearings in order to discharge the gatekeeping function"). Here, for the reasons explained below, and based on the briefing and the record, the Court has determined that Mr. Pollock is qualified to offer expert opinion testimony regarding the testing of the 117 chargers, that his methodology and conclusions are reliable, and that his testimony will be helpful to the jury.

## DISCUSSION

The Court will first resolve the challenge to Mr. Pollock's qualifications and then address reliability and relevance.

## 1.     Pollock's Qualifications

Defendants challenge Pollock's qualifications, noting that during the *Daubert* hearing conducted before the first trial, Pollock testified that in his current position with UL, he no longer conducts hands-on testing of products. *Apr. 4, 2021 Daubert Hearing Tr.*, Dkt. 871, at 98. Defendants point the Court to this portion of Pollock's testimony:

> Q.     You direct investigations.
>        You no longer perform actual testing of product?
>
> A.     No. No. I – at this point in my life, I am no longer qualified
>        to operate anything in the lab.
>
> Q.     Okay.
>
> A.     I have to walk through with safety glasses on. That's my –
>        what I can do.

*Id.* at 98:1-7.

The Court is not persuaded that Mr. Pollock's transition into his current role – directing investigations rather than performing hand-on testing – disqualifies him from rendering opinions regarding the testing performed on the 117 chargers at issue in this case. Just before giving the above, block-quoted testimony, Pollock testified that his duties include *directing* investigations into products that have been

referred to UL because those products are "not correct" or because there are "concerns" regarding the products. *Id.* at 97. In other words, as his career progressed, Mr. Pollock affirmed that he moved into a directorial position after having previously been in a "hands-on testing position . . . ." *Id.* at 98.

Otherwise, and more broadly, Mr. Pollock is qualified for at least these reasons: he has a degree in electrical engineering; he's licensed by the State of California as professional engineer; he has been with UL for nearly 44 years; he directs investigations into product noncompliance and misuse of UL certification marks; he has helped develop electrical safety standards (including having been the principal engineer on some standards); and he is familiar with power adapters and their expected performance.

Defendants next argue that although Pollock is a trained engineer, he doesn't truly have the expertise necessary because he "has spent his decades-long career focused on a different field of inquiry – the interaction of certified products within the free market." *Reply*, Dkt. 1378, at 3.

The Court is not persuaded by defendants' crabbed view of Mr. Pollock's career. Granted, Mr. Pollock's experience and responsibilities include a market-surveillance component. But it's not accurate to say he has spent his career focused on a field of inquiry different from electrical engineering. To the contrary, Mr. Pollock's education, experience, and training – as summarized above and as laid

out more thoroughly in the declarations on file with the Court – demonstrate that he is well qualified to offer opinions regarding the electrical performance of the chargers tested in this case, to include testifying as to the specifics of the testing procedures used.

Finally, the cases defendants rely upon to support their challenge are distinguishable. The first case, *Herrera v. Werner Enterprises*, No. SA-14-CV-385-XR, 2015 U.S. Dist. LEXIS 182596 (W.D. Tex. 2015), is a car-accident case. The court granted plaintiff's motion to exclude expert testimony from two defense witnesses. Both experts had engineering degrees, but neither was a medical doctor. Understandably, then, the court concluded that these experts could offer opinions as to accident reconstruction but could not offer medical opinions as to the specific cause of the plaintiff's injuries.

In the second case, *Rambus Inc. v. Hynix Semiconductor, Inc.*, 254 F.R.D. 597, 603-04 (N.D. Cal. 2008), the court held that an individual who had studied electrical engineering and designed semiconductor devices for over 33 years could not testify as to certain aspects of why a product might enjoy "commercial success." 254 F.R.D. at 604. The court explained that this individual lacked the expertise to "explain whether or not advertising, standardization, import laws, contractual relationships, or any of a number of other factors influenced the commercial success" of the products at issue. *Id.* at 604.

MEMORANDUM DECISION & ORDER - 9

Here, unlike the experts in the above cases, and as already described above, Mr. Pollock has the relevant underlying training and experience needed to offer his expert opinions. Defendants are of course free to point out on cross-examination that Mr. Pollock no longer conducts hands-on testing at this point in his career, but this is not enough to persuade the Court that Mr. Pollock is unqualified to offer opinion testimony regarding the testing performed on the 117 chargers.

## 2. Reliability

Defendants next challenge the reliability of the testing methodology. Their key arguments are: (1) the testing is not reliable because Mr. Pollock didn't test a control group of UL-certified chargers alongside the 117 power adapters; (2) the government failed to provide key information regarding the testing methodology, which prevents defendants from probing and verifying Pollock's conclusions; and (3) the government destroyed all 117 chargers during the testing, meaning that defendants are unable to replicate the testing. The Court will address each argument in turn.

### A.     The Control-Group Argument

Defendants first suggest that if any comparison-type experiment is to pass muster under the *Daubert* reliability inquiry, the experimenter must use a control group. In this case, then, the alleged failure is Pollock's failure to subject a control group of chargers (i.e., a group of genuine, UL-certified chargers) to the same

testing performed on the 117 chargers at issue here. The Court is not persuaded by this argument for at least three reasons.

*First,* and most generally, the *Daubert* reliability inquiry is meant to be a flexible one. The Court is not required to tick through a rigid, definitive checklist (including, for example, whether any given test included a control group) to conclude that the testing methodology and results are reliable. Rather, the reliability inquiry is flexible, and it is meant to "be applied with a 'liberal thrust favoring admission,'" *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (quoting Daubert, 509 U.S. at 588). The Court's basic function is to close the courtroom door to junk science by ensuring that an expert has "'good grounds' for his or her conclusions.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (citations omitted).

*Second,* Pollock has stated that the tests he performed are two of the standard tests UL performs to determine whether a charger will be UL-certified. These tests are accepted in the marketplace to the extent that manufacturers who seek UL certification (including Apple and Samsung) submit representative samples to undergo these tests, among others. In other words, rather than developing a new test or methodology, Pollock was subjecting the chargers to established tests. Pollock says the tests performed on the 117 chargers have been performed on other genuine UL-certified chargers, and that they passed.

Additionally, during the May 5, 2022 *Daubert* hearing, Pollock provided additional information regarding the electric-strength test. He explained that the particular voltage used (4,242 volts) was selected by consulting a publicly available standard. And that standard is a "consensus document" developed by a standards committee that evaluates viewpoints of different stakeholders. He explained that the standard is harmonized with the standard used in Canada, and, further, that it's very similar to standards used around the world.

Under these circumstances, the Court finds that use of a control group is not required to conclude that the testing methodology is reliable.

*Third,* the cases defendants rely upon to demonstrate that importance of using a control group are distinguishable. Two of these cases involve significantly more complex causative questions – namely: (1) *Did Prozac cause a person to kill his wife, his dog, and himself?*[1] and (2) *Did silicone breast implants cause women to suffer autoimmune diseases and other injuries?*[2] Those sorts of inquiries are far more fraught than the questions at issue here. The questions here were simply whether the chargers produced their advertised voltage and current ratings and whether they could withstand a high voltage charge without the insulation breaking

---

[1] *Rimbert v. Eli Lilly & Co.*, No. CIV 06-0874-JCH/LFG, 2009 WL 2208570, at *2 (D.N.M. July 21, 2009).

[2] *In re Breast Implant Litig.,* 11 F. Supp.2d 1217, 1224 (D. Colo. 1998).

down. Given these far simpler questions, along with the fact that UL was subjecting the chargers to established tests, the Court deems the methodology and testing reliable even though UL did not simultaneously test genuine UL-certified chargers.

Defendants also point to Court of International Trade's decision in *Dal-Tile Corp. v. United States,* 28 C.I.T. 358 (Ct. Int'l Trade 2004). In that case, the court was not tasked with determining whether to allow an expert to testify before a jury. Rather, the court was charged with deciding how Mexican wall tile should be classified for U.S. Customs purposes. While this oversimplifies issues in that case, the court's main task was to evaluate two competing methodologies and then determine which methodology was more reliable. In evaluating those competing methodologies, the Court noted that one of the parties had failed to use a control group in developing and conducting its test – which meant, in that particular situation, that the court accorded little weight to the reliability of the methodology. *Id.* at 378.

Here, the Court is not tasked with choosing between two competing methodologies, and more to the point, Pollock was not developing a new test to determine whether the 117 chargers could withstand electric shock. Granted, the defendants may wish to cross-examine him on the fact that he didn't use a control group on the day of testing. They can also point out, as they did during the *Daubert*

hearing, that while the testing is typically conducted on brand-new chargers, the 117 chargers had apparently been sitting around in storage for several years by the time they were tested. But given the circumstances of this testing, and the nature of the test itself, the Court is not persuaded that the failure to simultaneously test genuine, UL-certified chargers alongside the 117 chargers renders Mr. Pollock's conclusions or his methodology unreliable.

## B.   The Information Provided Regarding the Testing

Defendants also argue that "the circumstances and details of his testing – and the identity of the particular chargers tested – are a black box." *Motion,* Dkt. 1306, at 7. *See also Reply,* Dkt. 1378, at 4 (arguing that UL protocols and operating procedure are a "proprietary shroud" that makes it difficult to evaluate the testing that was performed). The Court is not persuaded that this is so. First, defendants overstate their argument. If the testing and results were a true "black-box" scenario, then the report would have been nothing more than a sentence or two stating that the 117 chargers had failed UL certification tests – period. That is was not what happened. Mr. Pollock provided a detailed, 37-page report. Among other things, that report describes: (1) the data underpinning the tests performed; (2) the products that were tested; (3) the test location; (4) the nature of the testing, (5) the conditions of testing; (5) the personnel who performed the testing; (6) the equipment and particular instruments that were used (by identification number);

and (7) the settings, voltage shape, voltage input, and breakdown points for each charger tested. *See Response,* Dkt. 1360, at 8-9 (citing Dkt. 1288-1). The report also segregates the test results, indicating how each individual charger performed on each test. The government also points out that at least some of the questions defendants have asked, such as *Did he use an isolation transformer? Was the earthling connection disconnected during testing?* and *Was heat applied to all units?* are answered within the report itself.[3]

More broadly, though, the Court is not persuaded that these questions – even if unanswered in the report – render Mr. Pollock's testing methodology unreliable or covered by a "proprietary shroud." In that regard, defendants compare the testing performed here with that performed in *United States v. Birdsbill,* 243 F. Supp. 2d 1128 (D. Mont. 2003). In *Birdsbill,* the court evaluated a test known as

---

[3] The government says this about these questions:

> Indeed, several of the questions raised by Defendants in their brief are already answered in the report provided by Mr. Pollock. Defendants ask whether Mr. Pollock used an isolation transformer, but the testing report shows that the equipment used was a Kikusui TOS5301, which includes an isolation transformer. Defendants also ask whether heat was applied to all units, but Mr. Pollock's report identifies each unit as either "warm" or "as received" and describes what these terms mean. *See* ECF 1288-1 at 37. Finally, as to any question the defense may have as to an "earthing" or "ground" connection, this line of inquiry is fair game on cross examination; this question is not answered in the report because the chargers in question do not have a ground.

*Response,* Dkt. 1360, at 16.

the "Abel Assessment for Sexual Interest" and determined that the test was not reliable for a number of different reasons. *Id.* at 1133-34. Among other things, the developer of the assessment refused to share his formula with anyone outside his company – meaning that the test could not be verified or replicated. One court has gone so far as to compare the Abel Assessment "to the magic of young Harry Potter's mixing of potions at the *Hogwarts School of Witchcraft and Wizardry.*" *Id.* at 1333 (quoting *In the Interest of CDK, JLK, and BJK*, 64 S.W.3d 679, 683-84 (Tex. Ct. App. Jan. 3, 2002)).

An assessment related to sexual attraction, with its true black-box formula, is, again, fundamentally different from the tests performed here.

### C.     The Destructive Nature of the Testing

Defendants also ask the Court to preclude testimony regarding the testing because the chargers were destroyed during testing. The government does not agree that the chargers were destroyed. It explains the testing as follows:

> The nature of some of the inspection and testing carries a necessary level of some destruction, such as cutting open the chargers to inspect the circuitry. Only two samples were cut during UL's testing. Other chargers were non-functional after testing but were not destroyed.

Dkt. 1360, at 4 n.1. Regardless of how the testing is described – as having destroyed the chargers or as having altered them – the Court will not exclude Mr. Pollock's planned testimony.

MEMORANDUM DECISION & ORDER - 16

### i. Governing Legal Standards

Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness." *California v. Trombetta*, 467 U.S. 479 (1984). The Supreme Court has interpreted this standard to require that defendants be afforded a meaningful opportunity to present a complete defense, which includes "constitutionally guaranteed access to evidence." *Id.* (citation omitted).

Accordingly, the government has a duty to preserve material evidence, i.e., evidence whose exculpatory value was apparent before it was destroyed and that is of such a nature that the defendant cannot obtain comparable evidence by other reasonably available means. *See Trombetta*, 467 U.S. at 489; *Grisby v. Blodgett*, 130 F.3d 365, 371 (9th Cir. 1997). Although the good or bad faith of the government is irrelevant to the analysis when the government destroys material exculpatory evidence, the analysis is different if the evidence is only potentially useful. There is no due process violation unless there is bad faith conduct by the government in failing to preserve potentially useful evidence. *See Arizona v. Youngblood*, 488 U.S. 51, 58 (1993); *United States v. Sivilla*, 714 F.3d 1168 (9th Cir. 2013). Potentially useful evidence is "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood,* 488 U.S. at 57. Another

configuration of this test is that a constitutional violation will be found if a showing is made that (1) the government acted in bad faith, the presence or absence of which turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed, and (2) that the missing evidence is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Sivilla*, 714 F.3d at 1172 (internal quotation marks omitted).

Defendants do not squarely argue that the testing performed on the 117 chargers violated their due-process rights. Instead, they focus on cases such as *United States v. Loud Hawk,* 628 F.2d 1139, 1152 (9th Cir. 1979) (en banc), overruled on other grounds by *United States v. W.R. Grace*, 526 F.3d 499 (9th Cir. 2008). Under the *Loud Hawk* line of cases, the key considerations in determining whether to impose sanctions for destruction of evidence are: (1) the quality of the government's conduct; and (2) the degree of prejudice suffered by the defendant. The Government bears the burden of justifying its conduct, and the defendant bears the burden of demonstrating prejudice. *Id.*

In evaluating the government's conduct, the Court considers whether the evidence was lost or destroyed while in the government's custody, whether it acted in disregard of the defendant's interests, whether it was negligent, whether the prosecuting attorneys were involved, and, if the acts were deliberate, whether they

were taken in good faith or with reasonable justification. *Id.* at 1152. Factors

relevant to prejudice include the centrality and importance of the evidence to the

case, the probative value and reliability of secondary or substitute evidence, the

nature and probable weight of the factual inferences and kinds of proof lost to the

accused, and the probable effect on the jury from the absence of the evidence. *Id.;*

*see also Sivilla,* 714 F.3d at 1173.

### ii. Analysis

Having considered each of the factors set forth in *Loud Hawk,* the Court

finds that the defendants have not suffered prejudice. The government points out

that there are hundreds (if not thousands) of other chargers in evidence. Defendants

therefore could have asked to perform their own testing on a comparable set of

chargers. Defendants say that this is not so, because the government did not tell

them about the testing until "until well after it was completed and on the eve of

trial." *Supp Br.*, Dkt. 1416, at 5. But the government expert tested the chargers in

January 2022 and the government notified the defendants of the testing on

February 25, 2022 – nearly three months before the scheduled May 18, 2022 trial.

*See* Dkt. 1288. Within that time frame, the defendants could have sought to obtain

their own set of chargers for similar testing. Defendants have not adequately

explained why they did not do so.

As for the government's conduct, the Court is not persuaded that

government acted in bad faith or that the quality of its conduct otherwise warrants sanctions. The government has explained that it tested the chargers to meet the defense expert's assertion that the chargers were "rock solid." Also, given the thousands of chargers seized in this case, the Court cannot fault the government for electing to perform "destructive" testing on a small sample of chargers.[4]

The Court also cannot find any due process violation. Here, the analysis overlaps with the *Loud Hawk* analysis. For example, even if the Court were to find the chargers were "material" *and* that they were "destroyed" in the testing, the Court has already explained that the government did not act in bad faith. Further, the record shows that the defendants could easily obtain comparable evidence for testing – meaning that the evidence was not "material" in any event. Accordingly, defendants' due-process rights have not been violated.

## 4.  Relevance

Finally, the Court concludes that Mr. Pollock's anticipated testimony regarding the testing performed on the 117 chargers is relevant. This testimony will assist the jury in determining whether the power adapters were counterfeit, and,

---

[4] Still, the government could have avoided this entire issue by reaching out to defense counsel before the testing. This is particularly true in this case, as the government has complained the defendants unwittingly destroyed evidence and has obtained orders directing defendants to preserve evidence in the state in which it was provided to them. *See Order*, Dkt. 722. In the future, the Court expects government counsel to alert the defense if any testing will be performed.

therefore, whether the defendants trafficked in counterfeit goods. As explained in a separate decision, however, the Court is not persuaded that testimony regarding the White Paper is relevant. *See* Dkt. 1429.

## ORDER

**IT IS ORDERED that** Defendants' Joint Motion to Exclude Testimony of Government's Expert Pollock (Dkt. 1306) is **DENIED**.

DATED: May 11, 2022

B. Lynn Winmill
U.S. District Court Judge