UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>PAVEL BABICHENKO,<br>PIOTR BABICHENKO,<br>TIMOFEY BABICHENKO, and<br>MIKHAIL IYERUSALIMETS,<br><br>    Defendants. | Case No. 1:18-cr-00258-BLW<br><br>AMENDED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND PRELIMINARY ORDER OF FORFEITURE |

**INTRODUCTION**

Last year, the government moved for a preliminary order of forfeiture against Defendants Paul Babichenko, Peter Babichenko, Tim Babichenko, and Mikhail Iyerusalimets. Dkt. 1644. The Court conducted forfeiture hearings on January 24-26, 2023. The parties subsequently filed their proposed findings of fact and conclusions of law. The Court previously entered its findings of fact, conclusions of law, and preliminary order of forfeiture. Dkt. 1766. The government then objected to that ruling. Dkt. 1782. During the sentencing hearings, the Court sustained those objections and hereby amends the original preliminary order of

forfeiture.

## BACKGROUND

This case's history is too extensive to recite in detail. In short, the defendants were indicted in August 2018 for conspiracy to commit wire fraud, conspiracy to traffic in counterfeit goods, labels, or packaging, conspiracy to launder money, and individual substantive counts of the same crimes. Dkt. 1. A superseding indictment followed in May 2019, which included additional charges and criminal forfeiture allegations. Dkt. 210.

In 2021, the case went to trial. At the close of the government's case, it dismissed the money laundering counts. The jury acquitted various defendants of some individual counts but could not reach a verdict as to most of the charges.

The case was retried in 2022. The defendants were found guilty of conspiring to traffic in counterfeit goods and commit wire and mail fraud as well as some individual substantive counts of the same crimes. Dkt. 1594, 1595, 1596, 1600. Based on those convictions, the government has moved for a forfeiture money judgment and forfeiture of proceeds, facilitating property, and substitute assets. Dkt. 1644.

## LEGAL STANDARD

Criminal forfeiture is a mandatory part of punishment. 28 U.S.C. § 2461(c); *United States v. Nava*, 404 F.3d 1119, 1124 (9th Cir. 2005). "Criminal forfeiture

operates *in personam* against a defendant to divest him of his title to proceeds from his unlawful activity as a consequence of his criminal conviction." *United States v. Lazarenko*, 476 F.3d 642, 647 (9th Cir. 2007). Convicted defendants must forfeit "tainted property"—"property flowing from . . . or used in . . . the crime itself," which "the defendant himself actually acquired as the result of the crime." *Honeycutt v. United States*, 137 S. Ct. 1626, 1632, 1635 (2017). There is no joint and several liability in forfeiture. *Id.*

Federal Rule of Criminal Procedure 32.2 and 21 U.S.C. § 853 set out the standards and procedures for forfeiture. 18 U.S.C. § 2323(b)(2)(A); 28 U.S.C. § 2461(c); *Lazarenko*, 476 F.3d at 647. The government has the burden to show, by a preponderance of the evidence, that property is subject to forfeiture. *United States v. Garcia-Guizar*, 160 F.3d 511, 517 (9th Cir. 1998). That requires proof of a nexus between the property and the crime. *United States v. Liquidators of European Fed. Credit Bank*, 630 F.3d 1139, 1149 (9th Cir. 2011). The Court applies a "but for" test to nexus: the government must establish that the defendant would not have obtained the property but for his illegal activity. *United States v. Martin*, 2014 WL 221956, *4 (D. Idaho).

To determine nexus, the Court may rely on evidence admitted at trial as well as additional relevant and reliable evidence. Fed. R. Crim. P. 32.2(b)(1)(B). Because forfeiture is part of sentencing, the Court may consider evidence,

including hearsay, "without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." *United States v. Petty*, 982 F.2d 1365, 1367 (9th Cir. 1993) (quoting U.S.S.G. § 6A1.3(a)).

The Court must order forfeiture against a defendant convicted of wire or mail fraud. 18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c). In these cases, forfeitable property includes "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" the fraud. *Id.* The statute provides for forfeiture of either gross or net proceeds, depending on the nature of the crime. The Court has already determined that gross proceeds are forfeitable in this case because the defendants were convicted of committing wire fraud by selling counterfeit goods. *Order*, Dkt. 1678 at 3-6. Consequently, forfeitable proceeds include "property of any kind obtained directly or indirectly, as the result of" conspiracy to commit wire fraud by selling counterfeit goods "and any property traceable thereto." 18 U.S.C. § 981(a)(2)(A).

The Court must also order forfeiture against a defendant convicted of trafficking in counterfeit materials. 18 U.S.C. § 2323(b)(1). In these cases, federal law permits forfeiture of "[a]ny property constituting or derived from any proceeds obtained directly or indirectly as a result of the commission of" the crime. 18 U.S.C. § 2323(a)(1). The Court has previously ruled that in the context of this

statute, "proceeds" means gross proceeds. *Order*, Dkt. 1678 at 6-7.

The statute also provides for the forfeiture of "[a]ny property used, or intended to be used, in any manner or part to commit or facilitate the commission of" the counterfeit trafficking offense. 18 U.S.C. § 2323(a)(1). The statute's language is staggeringly broad, demonstrating congressional intent for forfeiture in criminal trademark and copyright cases to be extensive and punitive. Nevertheless, the defendants argue the Court should define facilitating property by transplanting the "substantial connection test"—which Congress devised for civil proceedings— into 18 U.S.C. § 983(c)(3). The Court declines to do so. The Ninth Circuit has not extended this test to criminal proceedings, much less the criminal intellectual property forfeiture provision specifically. More importantly, Congress chose to set out a wide-ranging standard rather than the substantial connection test.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

### A.    Double Counting in the Government's Forfeiture Motion

1.    Pursuant to Rule 32.2(b), the government seeks a money judgment against each defendant for the criminal proceeds he obtained, calculated from the total amount of Amazon deposits that he received. Dkt. 1644.

---

[1] The record in this case is extraordinarily vast. For ease of reference, the Court will refer to exhibits introduced in the second trial simply by exhibit number (e.g. Ex. 1000). When referring to exhibits introduced at other times, such in the first trial and forfeiture hearings, the Court will specify the proceeding (e.g. Trial 1, Ex. 1000).

2.  This option is clearly available to the government where, as here, the proceeds of the criminal activity are money. *United States v. Newman,* 659 F.3d 1235, 1242 (9th Cir. 2011). A money judgment is a proper form of criminal forfeiture. *Id.*

3.  Because the government requests money judgments for criminal proceeds, the procedural and substantive requirements of Rule 32.2(e) do not apply to the requested money judgment orders. *See Newman*, 659 F.3d at 1242–43 (recognizing that the government seeking a money judgment under Rule 32.2(b) does not need to satisfy the requirements of substitute assets under § 853(p) and Rule 32.2(e)).

4.  However, the government seeks more than money judgments. It also asks the Court to forfeit facilitating property from each defendant in the form of business bank accounts and other assets. Moreover, the government requests forfeiture of property purchased with criminal proceeds from Tim and Paul. Finally, the government wants substitute assets under the provisions of 21 U.S.C. § 853(p) and Rule 32.2(e).

5.  Given the government's election to seek a money judgment, all three of these requests could risk impermissible double counting.

6.  It is well established "double counting is flatly prohibited in the context of criminal forfeiture." *United States v. Young*, 330 F. Supp. 3d 424, 435

(D.D.C. 2018) (citing numerous cases prohibiting double counting of proceeds). "Courts have also cautioned against allowing the same funds or property to be ordered forfeited multiple times under different forfeiture provisions." *Id.*

7.     It is obvious that ordering both a money judgment for proceeds of a defendant's criminal activity, and forfeiture of property purchased with those proceeds would constitute impermissible double counting.

8.     The same specter of double counting shadows the government's request for forfeiture of facilitating property. That property cannot have been acquired with criminal proceeds that the Court has forfeited through a money judgment. Therefore, the Court may only order forfeiture of such property if the government establishes that it was not obtained using proceeds of the defendant's criminal activity. To do otherwise would result in impermissible double counting.

9.     The government has not offered any financial tracing to show that the defendants obtained the property purchased with proceeds, facilitating property, or substitute assets with funds separate from the proceeds represented in the money judgment.

10.    The government agrees, however, that the money judgment award for each defendant should be offset by the final forfeiture value obtained from the

liquidation of all forfeited property—regardless of whether that property is forfeitable as facilitating property, derivative of proceeds, or substitute assets.

11.   The Court will take that approach.

12.   The Court will order forfeiture of property that it determines facilitated the crime or was purchased with criminal proceeds. To avoid double counting, the Court will order that each defendant's forfeitable property, including real property and seized currency, be used to offset the money judgment amount for that defendant once the forfeiture is final.

13.   In effect, the Court will *presume* that all facilitating property and property purchased with proceeds is already represented in the money judgment. Such an offset ensures that future collection on the money judgment does not result in prohibited double counting.

### B.   Establishing Proceeds of Counterfeit Goods for Money Judgments

#### I.   Suppliers

14.   Trial evidence demonstrated that at least 93.1 percent of all the goods that Defendants Paul Babichenko, Tim Babichenko, Peter Babichenko, and Mikhail Iyerusalimets sold were counterfeit.

15.   The Court reaches that conclusion by looking to the defendants' sources of product supply, rather than combing through thousands of Amazon sales.

This approach is an efficient and effective method of assessing the nature of the goods sold.

16.     The defendants secured products in a variety of ways. Several obtained products for themselves. Paul communicated with counterfeit suppliers to arrange for purchases for himself, Peter, Tim, and Mikhail, as confirmed in chats, *see* Ex. 3005-65, and thousands of invoices seized from the warehouses, *see* Ex. 2403.

17.     93.1 percent of the goods sold came from only five suppliers: United Inform, Windigital, Sennex, Topphone, and Wiss Wireless. *See* Ex. 1263 (showing $19,132,076.90 sent to those suppliers and $1,424,464.27 sent to AT&T, BrightStar, and Verizon).

18.     The trial evidence established that these five suppliers provided goods bearing counterfeit marks frequently used throughout the ten-year conspiracy.

     a.   United Inform. *See* Ex. 1300; Ex. 2622; Exs. 3005-1–3005-67; Ex. 3006; Ex. 3020; Ex. 1263; Ex. 3020; Ex. 1263; Ex. 2601; Ex. 2401; Ex. 2403; Ex. 2467; Ex. 2479; Ex. 2820-24; Ex. 4176; Ex. 4227; Ex. 4239; Ex. 4252; Ex. 4261A; Ex. 4261B; Ex. 4702; Ex. 4703; Ex. 3604.

     b.   Windigital. *See* Ex. 1263; Ex. 2008D; Ex. 3646; Ex. 3647; Ex. 3653;

Exs. 3671-1–3671-20; Ex. 4092; Ex. 4102; Ex. 4120; Ex. 4231; Ex. 4242.

c.  Sennex. *See* Ex. 1263; Ex. 2403; Ex. 2442; Ex. 2479; Ex. 3604; Ex. 4098; Ex. 4161; Ex. 4193; Ex. 4421.

d.  Topphone. *See* Ex. 1263; Ex. 2434; Ex. 2442; Ex. 3604; Ex. 3655; Ex. 3656.

e.  Wiss Wireless. *See* Ex. 1263; Ex. 3019; Ex. 3025; Ex. 3040; Ex. 3088; Ex. 3654; Ex. 3661; Ex. 4264.

19.  Other trial evidence bolsters the conclusion that, at a minimum, 93.1 percent of the goods sold were counterfeit.

20.  For instance, brand representatives from Apple and Samsung testified that more than 90 percent of the items reviewed over the course of the years' long investigation bore counterfeit marks. *See, e.g.*, Trial 2 Tr. at 2787, 2803–04, 2999, 3003, 3007.

21.  Thousands of items seized from the Large Warehouse, chats, emails, employee testimony, and financial records likewise confirmed the counterfeit nature of the vast majority of these goods, labels, and packaging. *See* Trial 2 Tr. at 3145 (Pupko testifying that 90–95 percent of products came from Chinese suppliers, not auctions); *compare* Ex. 1263 (suppliers), *with* Ex. 1300 (Customs and Border Protection chart), *and* Ex. 3005-60

(Wallace United informing Paul that "[A]uction is not suitable for us").

22.     Of the thousands of items that the defendants sold, none had genuine packaging, genuine accessories, and genuine cellphones. *See* Def. Forfeiture Exs. D7.5F–D.7.5P (excel spreadsheets documenting Apple and Samsung's authenticity determinations of defendants' products).

23.     For each sale, there was a counterfeit trademark on one or more of the following: the packaging, the ear buds, the charger, and the cellphone. *See* Ex. 5002; Ex. 5003; Ex. 5004A; Ex. 5005; Ex. 5006; Ex. 5008; Ex. 5009; Ex. 5010; Ex. 5100; Ex. 5205; Ex. 5201B; Exs. 5301–5350; Exs. 5404–5408; Ex. 5412; Ex. 5413A–C; Ex. 5415; Ex. 5416; Exs. 5419–5421; Ex. 5501; Exs. 5503–5513; Exs. 5601–5610.

24.     The chats between all defendants, their coconspirators, employees, and suppliers likewise underscored how counterfeiting fraud permeated their business during the course of the proven conspiracy. *See, e.g.*, Trial 2 Tr. at 3128.

25.     Altogether, this evidence leads the Court to conclude that at least 93.1 percent of all the goods sold were counterfeit.

## II.     Product Mix

26.      The defendants say the Court should look at evidence of sales—rather than supplier evidence—to determine the proportion of the goods that were

counterfeit.

27.     They argue that the Court must consider that a portion of the product mix

that was sold over the years included brands other than Apple and Samsung

(the only brands that the government included in the Superseding

Indictment) and products accurately listed as used or refurbished.

28.     To support this argument, they rely on the Declaration of Christopher

Linscott. Def. Forfeiture Exs. D1.2A (Paul); Ex. A-2 (Peter); Ex. D3.10

(Tim); Ex. 5D.1 (Mikhail); Dkt. 1666-1. The Court finds the declaration

meets the basic requirement of reliability and so will overrule the

government's objection and admit the exhibit.

29.     Mr. Linscott offered an opinion that an average of 14.3 percent of the goods

sold were brands other than Apple and Samsung or accurately listed as used

or refurbished. Mr. Linscott reached this determination by reviewing bank

records, account documents, corporate records, revenue detail, and "other

information." Dkt. 1666-1 at 2.

30.     The Court finds this evidence less compelling than the evidence from

suppliers, which is supported by the defendants' communications, emails,

and invoices, as well as the testimony of the brand representatives and the

physical evidence collected during the course of the investigation. Therefore,

the Court will rely on the supplier evidence.

31.   Still, the Court finds that the government has not met its burden to prove by a preponderance of the evidence that the other 6.9 percent of products sold were counterfeit.

32.   The government argues that these sales perpetuated the scheme. It claims that the defendants intentionally interspersed or separately sold non-counterfeit products simply as a ruse to facilitate the counterfeit scheme.

33.   The government relies primarily on statements that Defendants Mikhail Iyerusalimets and David Bibikov made during one of the undercover purchases at the Small Warehouse. The Court has reviewed the cited exhibit. Ex. 2010A.

34.   Although Mikhail does talk about the importance of being a "power seller" on Ebay, at no point does he actually say that one had to sell cheaper generics in order to fraudulently sell branded counterfeit items as "new" online. That is the government's inference. It is not supported.

35.   A more reasonable interpretation of this exchange is that Mikhail was expressing his frustration because his accounts had been closed and he wanted them reopened. He informed the CI that to have accounts reopened, one had to first sell cheaper, generic items, to build a record up. He said nothing about using generics *as a ruse to sell counterfeit, branded items as "new."*

36. The Court concludes that the government's reliance on that snippet of a conversation is too thin a reed on which to base its entire theory. The evidence at trial showed that the products came in bulk, were quickly tested for basic functionality, and then were sold and sent to customers. There is insufficient evidence from trial that employees intentionally included or sold separately genuine products to facilitate counterfeit sales.

37. The government did not establish a nexus as to the 6.9 percent of non-counterfeit products. Accordingly, the Court will reduce the total Amazon sales figure by 6.9 percent for each defendant.

### III.   Duplicate Revenues

38. The government relied on Linda Czemerys's calculations to determine the amount of the money judgment sought against each defendant.

39. In his declaration, Mr. Linscott offers the opinion that Ms. Czemerys included the amount that Paul received from Peter, Tim, and Mikhail as Amazon deposits. Dkt. 1666-1 at 3. He says that "Linda Czemerys has double counted the same Amazon sales; first, in the bank account deposits for Mikhail, Tim, and Peter; and second when she also counts the transfers from those defendants to Paul Babichenko." *Id.*

40. The government has not offered any evidence in rebuttal. Trial evidence demonstrated other mistakes in Ms. Czemerys's calculations. *See* Trial 1 Tr.

at 4990-92; Trial 2 Tr. at 2404.

41.    As the proceeds passed through and ultimately went to Paul, the Court finds
       that it is more appropriate to charge the double counted amounts in
       forfeitable proceeds to Paul rather than Peter, Tim, and Mikhail.

42.    Accordingly, the Court will reduce the total Amazon sales figures attributed
       to Peter, Tim, and Mikhail by the amounts that Mr. Linscott determined
       were also ascribed to Paul, as further discussed below.

### C.    Paul Babichenko

#### I.    *Money Judgment*

43.    Based on the financial records, Paul Babichenko received at least
       $53,219,430 during the scope of the proven conspiracies. *See* Ex. 1250 at 5.
       Of these total deposits, $36,206,982.10 were Amazon deposits Paul
       personally received during the conspiracies proven at trial. *See id.*; Ex 1257;
       Ex. 1256 at 5; *see also Government Brief*, Dkt. 1711 at 10-11 (summarizing
       deposits).

44.    During trial, the Court heard testimony from Paul's employees. They
       recounted operating selling accounts for him. They also described his
       directives to transfer proceeds via cash, money orders, and checks to him,
       his business, and his wife's personal bank account. *See, e.g.*, Trial 2 Tr. at
       4288, 4307–08. Text messages and bank records admitted at trial likewise

demonstrated this pattern. *See, e.g.*, Ex. 3221-12 (Paul directing David

Bibikov to "get[ ] money from amazon" and "count it up and bring cash");

D-2002 at 27 (showing summary of Amazon proceed transfers from

employees' accounts to Midstar LLC bank account 6620 and Natalie

Babichenko's 9602 account).

45.    As a result, Paul must forfeit all Amazon deposits that he received for the

sale of counterfeit goods.

46.    As discussed above, the government has proven that 93.1 percent of the

goods Paul sold were counterfeit. Therefore, 93.1 percent of the Amazon

deposits represent proceeds of the crime that Paul personally received in his

various business accounts and, thus, are forfeitable as a money judgment

order.

47.    The Court will enter a money judgment in the amount of $33,708,700.30.

## II.    *Property Purchased with Proceeds*

48.    The government claims that Paul used his criminal proceeds to pay for two

vehicles: a 2016 Lexus LX570 (Property No. 1.F) and 2012 Jeep Wrangler

(Property No. 1.G).

49.    As to the Lexus, the government offers only the bare assertion that Paul used

his criminal proceeds to pay for the vehicle without citation to any specific

evidence to support that contention. Dkt. 1644 at 15-16.

50.     The defense, however, has offered evidence to the contrary.

51.     When Paul bought the car, a $29,000 credit was provided off the purchase price for a trade-in allowance. Gov. Forfeiture Ex. 1.F at 2. There is no evidence the vehicle traded in was purchased with offense proceeds.

52.     In addition, after his arrest, Paul continued to make vehicle loan payments in the total amount of $31,504.98. *See* Def. Forfeiture Ex. D1.F-1. There is no evidence Paul's post-arrest car payments were derived from offense proceeds.

53.     Although there is no evidence the car was purchased with tainted property, the Court will grant the government's motion for forfeiture of the Lexus (Property No. 1.F) as a substitute asset.

54.     As to the Jeep, Paul used $20,000 from his wife's account 9602 to purchase the car, made monthly payments from account 9602, and used $15,000 cash to make the down payment on this vehicle. *See* Gov. Forfeiture Ex. 1.G.

55.     Employees testified and the financial records proved at trial that, on Paul's instruction, his sellers deposited cash from their sales of his cellphones and wrote checks into this same account (ending in 9602). *See* Ex. D-2002 at 27 (showing $545,392.25 in Amazon proceeds transferred from Edgard Bobarykin, Andrey Lazukin, Nik. P. Bukhantsov, Igor Bukhantsov, Nik N. Bukhantsov, and Ivan Bukhantsov to Natalie Babichenko's 9602 bank

account at Paul's direction); *see also* Trial 1, Ex. 1225-3 (showing Amazon deposits into Account 9602). During the first trial, the government admitted financial summaries detailing the deposits into Account 9602 from coconspirators. *See* Trial 1, Ex. 1234-3 (financial summary exhibits showing deposits into 9602 account).

56.    The Jeep is therefore forfeitable. The government's motion to forfeit the Jeep (Property No. 1.G) is granted.

57.    It is further ordered that the value of both vehicles be credited towards the money judgment against Paul once the final order of forfeiture is issued.

### III.    *Facilitating Property*

#### i.    909 N. Cole Road

58.    Under a facilitation theory, the government seeks to forfeit real property located at 909 N. Cole Rd., Boise, Idaho (Property No. 1.A), which is owned by Paul and Gennady's company Babichenko LLC.

59.    The government argues that the property facilitated the crime because Paul used the 909 N. Cole Rd. address for a few business documents.

60.    The address was listed on the Pacific Cellular Certificate of Organization with the Secretary of State, Ex. 1607 at 21, and a Pacific Cellular bank account that received $915,234.59 in Amazon direct deposits, Ex. 1256 at 7.

61.    Paul further listed 909 N. Cole Road as Midstar's address in direct email

communication with Amazon to "prove the authenticity of the item" and "reinstate [his] listing because [he had] checked the items with the manufacture for authenticity." Ex. 4056 at 1.

62.   Finally, the address was listed for Midstar on fraudulent invoices created for Cell2U4Less. Ex. 4054. Arthur Pupko testified that he and Paul both created such invoices, and he did not know who had created those particular ones. Trial 2 Tr. at 3286:25-3287:8. Pupko also testified that the business name and address were already linked in the invoice software. Trial 1 Tr. at 4474:23-4475:23. He would pick the business he needed and the address would automatically populate. *Id.* He did not change addresses. Trial 2 Tr. at 3289:7-12.

63.   The Court finds that the government has established the required nexus between the 909 N. Cole Rd. property and the offense. Simply put, using the property's address facilitated Pacific Cellular and Midstar's illegal business activities. That is a sufficient nexus under the very permissive standard that Congress established in 18 U.S.C. § 2323(a)(1).

64.   The government's motion to forfeit 909 N. Cole Rd. property (Property No. 1.A) is granted.

65.   The value of the property must be credited towards the money judgment against Paul when the final order of forfeiture is issued.

## ii. *Sahara Case Bank Account*

66.    The government seeks forfeiture of a bank account linked to Sahara case—Acct No. 8429-Mtn West (Property No. 1.D and Property No. 1.E).[2]

67.    The government fails to establish a nexus between the seized funds and Paul's crime.

68.    Sahara Case is a company selling cell phone cases separate from the offense-related businesses, as indicated by Peter's trial testimony (Trial 1 Tr. at 6092–6102, 6115-6120, 6172-6174; Trial 2 Tr. at 4771-4882), the Sahara Case website (Trial 1 Ex. 2802), the trademark and patent applications (Trial 1 Exs. 8351-8356; Trial 1, Exs. 8360-8368; Trial 1 Exs. 8369, 8370), and the trade show photograph (Trial 1 Ex. 8358).

69.    No tracing of the seized Sahara Case funds connected those funds to the offenses of conviction. Rather, to support its facilitation theory, the government points to a single transaction—Peter's sale of three counterfeit "Qualcomm" chargers for $38.97.

70.    The Court is not persuaded. This transaction had nothing to do with Paul (or Tim, *see* Part E.III). There is nothing showing the proceeds of that sale was

---

[2] Although the government's forfeiture motion labels the account as two separate properties with two different accounts, this is a clerical matter. There is ultimately one account with that single account number.

deposited in the Sahara Case bank accounts. Even if, circumstantially, the Court assumes the money was so deposited, this single less-than-$40 transaction does not sufficiently connect the forfeiture of $67,508.87 from the Sahara Case bank account.

71.    Nevertheless, the Court will order the forfeiture of the Sahara Case bank account funds (Property Nos. 1.D and 1.E) as substitute assets.

72.    The Court further orders that half the value of the account be credited towards the money judgment against Paul once the final order of forfeiture is issued.

### iii.   *Business Bank Accounts*

73.    Paul operated numerous cellphone and cellphone accessory business bank accounts as another means of obscuring his fraudulent conduct. *See, e.g*., Ex. 1256 at 6 (Property No.1.C); *see* Ex. 1257 at 3–4, 6 (showing deposits into Property No. 1.B). Notably, Power Moxie (Property No. 1.C) sold counterfeit Samsung batteries, which were additionally marked with Defendant Paul, Peter, and Tim's mark for "Power Moxie." *See, e.g*., Trial 1, Ex. 2435 at 1; Ex. 1611 at 1 (showing Power Moxie LLC).

74.    Each of these business bank accounts was used to facilitate the criminal scheme. As such, the Court finds that the funds seized from the following accounts constitute forfeitable facilitating property:

a. Acct No. 6620-Mtn West (Property No. 1.B) ($396,321.39)

b. Acct No. 8410-Mtn West (Property No. 1.C) ($9,501.03)

75. For that reason, the government's motion to forfeit the business bank account funds (Property Nos. 1.B and 1.C) is granted.

76. The value of the funds in these accounts shall be credited against the money judgment once they are finally forfeited to prevent any double counting.

### IV.   Substitute Assets

77. The Court will grant the government's motion seeking the following substitute assets as to Paul:

a. Property No. 1.K: Real Property located at 0 West Chinden Blvd, Meridian Idaho[3];

b. Property Nos. 1.L, 1.M, 1.N, and 1.O: $9,105.15 in currency seized from Paul's personal residence, Babichenko LLC bank account 3168, and personal bank account 7819.

78. The value of these assets shall be credited against the money judgment once

---

[3] The parties dispute the valuation of this real property. *Compare* Gov. Forfeiture Ex. 1.K (showing valuation of property as $615,725), *with* Def. Forfeiture Ex. D1.K-1 at 11 (showing valuation of property as $2,239,000).

The Court finds that it does not need resolve this dispute. For substitute assets, valuation must be determined at the time the asset is liquidated. The money acquired upon liquidation must be credited against the money judgment. The government shall provide Paul Babichenko with an accounting of the amount credited toward his money judgment.

they are finally forfeited to prevent any double counting.

### D.     Peter Babichenko

79.    At the forfeiture hearing on January 24, 2023, Peter introduced Defendant's

Forfeiture Exhibit A-1—a Declaration and attached exhibits from Denise

McClure, a forensic accountant and certified fraud examiner. Ms. McClure's

Declaration was previously filed with the Court on January 3, 2023. Dkt.

1663. The government objected, but the Court overrules that objection and

admits the exhibit. The Court finds the declaration meets the basic

requirement of reliability in this sentencing hearing.

### I.     *Money Judgment*

80.    Based on the financial records, Peter Babichenko received at least

$7,737,573.94 during the scope of the proven conspiracies. *See* Ex. 1250 at

4. Of these total deposits, $4,361,502.34 were Amazon deposits that Peter

personally received during the conspiracies proven at trial through his many

cellphone businesses. *See id.*; Ex. 1255; Ex. 1506; Ex. 1606.

81.    The Court finds that Peter Babichenko's entire cellphone businesses

perpetuated the fraud on which he was convicted. The chats between Peter,

his coconspirators, and his suppliers demonstrated the permeation of the

fraud throughout his business during the course of the proven conspiracy.

*See, e.g.*, Ex. 3671-02; Ex. 3208-2–3208-5; Ex. 3647; Ex. 3671-01, -02, -12,

-16, -21; Ex. 3662. Peter instructed others as to how to avoid Amazon account shutdowns, Ex. 3208-2, and provided fraudulent explanations for other conspirators to use, *see* Ex. 3668.

82.     As a result, Peter must forfeit all Amazon deposits for the sale of counterfeit goods that he received.

83.     As discussed above, the government has established that 93.1 percent of the goods Peter sold were counterfeit. Therefore, 93.1 percent of these Amazon deposits represent proceeds of the crime that Peter personally received in his various business accounts and, thus, are forfeitable as a money judgment order.

84.     In addition, Mr. Linscott determined that $798,793 of Peter's Amazon deposits were double counted as forfeitable proceeds from both Paul and Peter. Dkt. 1666-1 at 3. Peter's forfeiture will be reduced by that amount.

85.     The Court will enter a money judgment order against Peter Babichenko in the amount of $3,316,882.40.

## II.     *Business Bank Accounts*

86.     Peter operated numerous cellphone and cellphone accessory business bank accounts as another means of obscuring his fraudulent conduct. *See, e.g.*, Ex. 1255 at 2 (including Property Nos. 2.A, 2.B, 2.C, 2.D); Ex. 1506. Each of these business bank accounts was used to facilitate the criminal scheme.

    a.  Acct No. X4046-Mtn West (Property No. 2.A) ($100.00)

    b.  Acct No. X679-Mtn West (Property No. 2.B) ($1,565.21)

    c.  Acct No. X0660-Mtn West (Property No. 2.C) ($5.00)

    d.  Acct No. X3600-Mtn West (Property No. 2.D) ($302.37)

87.    The Court concludes that the government has proven a nexus between the accounts and Peter's criminal conduct. The funds seized from these accounts are facilitating property.

88.    For that reason, the government's motion to forfeit the business bank account funds (Property Nos. 2.A, 2.B, 2.C, and 2.D) is granted.

89.    The value of the funds in these accounts shall be credited against the money judgment once they are finally forfeited to prevent any double counting.

### E.    Tim Babichenko

#### *I.    Money Judgment*

90.    Based on the financial records, Tim Babichenko received at least $25,858,795.74 during the scope of the proven conspiracies. *See* Ex. 1250 at 2. Of these total deposits, $11,004,926.31 were Amazon deposits Tim personally received during the conspiracies proven at trial through his many cellphone businesses. *See id.*; Ex. 1252; Ex. 1253; Ex. 1504; Ex. 1508; Ex. 1509; Ex. 1604.

91.    The Court finds that Tim's entire cellphone businesses perpetuated the fraud

on which he was convicted. The chats and emails between Tim, his coconspirators, employees, and his suppliers established the permeation of the fraud throughout his business during the course of the proven conspiracy. *See, e.g.*, Ex. 2460 (fraudulent invoices); Ex. 3138 (email with supplier); Ex. 4143A (infringement letter); Ex. 4442 (customer complaint email).

92. As a result, Tim must forfeit all Amazon deposits for the sale of counterfeit goods that he received.

93. As noted, the government has proven that 93.1 percent of the goods Tim sold were counterfeit. Therefore, 93.1 percent of those Amazon deposits represent proceeds of the counterfeiting crime that Tim personally received in his various business accounts and, thus, are forfeitable as a money judgment order.

94. The Court further concludes based on Mr. Linscott's opinion that $1,090,644 are Paul's proceeds that were double counted against Tim. Dkt. 1666-1 at 3. The Court will deduct that amount from the total Amazon deposits.

95. The Court will enter a money judgment in the amount of $9,230,196.82.

## II.   *Property Purchased with Proceeds*

96. Tim purchased a 2015 Ford F-150 (Property No. 3.L) with a Global Distributors Washington Federal account 4112 that received $2,444,529.08

in Amazon deposits. *See* Gov. Forfeiture Ex. 3.L; Ex. 1253 at 6. As such, it is forfeitable.

97.   The government's motion to forfeit the F-150 (Property No. 3.L) is granted. The value of the truck will be credited towards the money judgment against Tim once the final order of forfeiture is issued.

98.   Tim also used his criminal proceeds to pay for real property at 2051 Three Lakes (Property No. 3.K). He used $250,000 from Global Distributors Washington Federal bank account 4112 to purchase this land in May 2018. *See* Gov. Forfeiture Ex. 3.K; Ex. 2719 at 7. At face value, that means the real property is forfeitable.

99.   The defense argues that ordering forfeiture of the truck and the land is impermissible double counting. The Court disagrees. Because the Court will use these assets to offset Tim's money judgment, there is no risk that he is forfeiting the same property twice. To hold otherwise would deny the government's rightful forfeiture motion.

100.   Nevertheless, the Court is persuaded that the real property "has been commingled with other property which cannot be divided without difficulty" and so should not be directly forfeited. 21 U.S.C. § 853(p)(1)(E).

101.   In 2021 and 2022, Tim built a house on the lot using his non-proceeds income.

    a. Def. Forfeiture Ex. D3.K2 shows that through November 2022, the house building costs totaled $1,186,775.78.

        i. The Court arrives at this number by adding the January and February 2022 HSBC bank statements showing funds spent on house construction (Def. Forfeiture Ex. D.K-5), construction invoices (Def. Forfeiture Ex. D.K-3), Citizens Bank statements for February through November 2022 showing construction costs (Def. Forfeiture Ex. D3.K-4), and a Capitol One credit card statement showing a construction cost (Def. Forfeiture Ex. D3.K-6).

    b. Tim made $166,661 in 2020 and $800,881 in 2021 through Sahara Case. Def. Forfeiture Ex. D3.K-7. In 2022, Tim made about $822,500 through Sahara case. Def. Forfeiture Ex. D3.K-5. There is no suggestion that any money coming in from 2020 through 2022 was criminal proceeds.

    c. In short, Tim had sufficient, legitimate income to build the house. The government has not shown the house is a forfeitable asset.

102. Since the tainted lot has been comingled with the untainted house (which itself cost nearly four times the original cost of the lot), the Court finds that the requirements of 21 U.S.C. § 853(p) are met. Therefore, forfeiture of

substitute property, rather than the lot itself, is appropriate.

103.   Still, the value of any substitute asset will be counted towards Tim's money judgment. For that reason, allowing for the forfeiture of substitute property instead of the real property is redundant.

104.   The Court will not order the forfeiture of the real property at 2051 Three Lakes (Property No. 3.K).

### III.   Bank Accounts

105.   To facilitate his crime, Tim operated numerous cellphone business bank accounts. Of the $25,858,795.74 deposited into his accounts, Tim transferred millions among his many business and personal accounts, *see* Ex. 1252 at 8, and received proceeds from his employees' sales (who functioned as so-called "Six Percenters," *see id.* at 6). *Compare* Trial 1, Ex. 1220-2 (showing major depositors into various business and personal accounts as Alex Trofimuk, Denis Popudnik, Innessa Babichenko, Nikolay Bukhantsov, Vadim Galushkin, and Sahara Case) *and* Ex. 1253 at 4, *with* Ex. 2466 at 2–3; Ex. 4122 (Amazon shutdown email from Tim to Innessa Babichenko); Ex. 4501 (email listing Vahdim Galushkin as tester of phones employed by Tim); *see also* Ex. 2457 at 21–30 (checks from employees for phone sales proceeds).

106.   Tim's business accounts received millions in Amazon direct deposits. *See,*

*e.g.*, Ex. 1250 at 2 (showing Amazon deposits into business Account Nos. 3.B, 3.D–3.I held by Tim); Trial 1, Ex. 1291-3 (summary showing Amazon deposits by account).

107.    In total, the government seized $517,135.99 in Tim's bank accounts. Of those accounts, the following constitute facilitating property because they are tied to companies that sold the counterfeit items:

    a.  Acct. No. 1190-Amazon (Property No. 3.A) ($23.16)

    b.  Account No. 4252-WA Fed (Property No. 3.D) ($980.73)

    c.  Acct. No 7081-Mtn West (Property No. 3.E) ($6,799.44)

    d.  Acct. 4260-WA Fed (Property No. 3.F) ($2,126.33)

    e.  Acct. 8347-Mtn West (Property No. 3.G) ($149,108.49)

    f.  Acct 4112-WA Fed (Property No. 3.H) ($82,704.31)

    g.  Acct 8410-Mtn West $9,501.03 (Property No. 3.I)

108.    In addition, the government seeks forfeiture of Wells Fargo account 5152 (Property No. 3.B) ($120,765.33). Although this is a personal account for Tim and Kristina Babichenko, it received $3,913.06 in Amazon deposits between 2016-2018. Ex 1252. That meets 18 U.S.C. § 2323(a)(1)'s broad facilitation definition. Accordingly, the account constitutes facilitating property.

109.    The government's motion to forfeit the business bank account funds

(Property Nos. 3.A, 3.D, 3.E, 3.F, 3.G, 3.H, and 3.I) is granted.

110. The government's also moved to forfeit Wells Fargo account 2293 (Property No. 3.C). This is not facilitating property. It is a personal account of Tim and Kristina. The government has not shown that this account received Amazon deposits or facilitated Tim's crime in a different way. The government fails to prove nexus. However, the Court will order the account forfeited as a substitute asset.

111. The value of the funds in these accounts shall be credited against the money judgment once they are finally forfeited to prevent any double counting.

112. Finally, the government's motion to forfeit Mountain West account 8429 (Property No. 3.J) is granted. This account is tied to Sahara Case. As explained above, the Court finds that the government has not met its burden to show that Sahara Case facilitated the crime, but will order forfeiture of the account as a substitute asset. *See* Part C.III.ii. The Court further orders that half the value of the account be credited towards the money judgment against Tim once the final order of forfeiture is issued.

### IV. *Substitute Assets*

113. The government seeks substitute assets as to Tim as follows:

    a. 2016 Harley Davidson XL 1200V (Property No. 3.M), *see* Ex. 1253 at

6 and Gov. Forfeiture Ex. 3.M;

    b.  $3,785 in currency seized from Tim's personal residence (Property

       No. 3.N).

114.  The government also seeks the following substitute assets against Paul,

    although Paul and Tim agree that the assets belonged to Tim:

    a.  Men's Rolex Watch (Property No. 1.H)

    b.  30 Assorted Diamond Rings (Property No. 1.I)

115.  Trial evidence showed that law enforcement seized the Rolex watch and

    assorted diamond rings from Room F. Def. Forfeiture Ex. D1.H-1 at 4-5. It

    was undisputed throughout the trials that Room F was associated with Tim,

    and not Paul. *See* Trial 1 Exhibit. 2401A at 25-35 (photographs of Room F).

    Further, Paul makes no claim of these items and stated in his forfeiture

    hearing that they are not his. *See* Dkt. 1694 at 43 ("Property 1.H is a Rolex

    watch and 1.I is diamond rings. We are not making any argument about

    them. They weren't Paul Babichenko's property."). Accordingly, the Court

    finds that these items should be forfeited as the substitute property of Tim.

116.  The government has satisfied the requirements of 21 U.S.C. § 853(p) to seek

    the substitute asset of 2016 Harley Davidson XL 1200V (Property No. 3.M),

    $3,785 in currency seized from Tim's personal residence (Property No. 3.N),

    the men's Rolex watch (Property No. 1.H), and the 30 assorted diamond

rings (Property No. 1.I). These assets are herein forfeited.

## V.    *Stipulated Forfeiture*

117. Pursuant to the parties' stipulation (Dkt. 1708), the Court forfeits Western
     Digital hard drive bearing serial number WXA1E944SJ3J as containing
     illegal contraband and herein orders that the government destroy this hard
     drive.

## F.    **Mikhail Iyerusalimets**

118. Mikhail Iyerusalimets and his wife Anna (younger sister to Paul, Peter, and
     Tim Babichenko) each operated online businesses in the secondary phone
     market. Ex. 1501, 1502.

119. Anna was actively involved in the online businesses and operated several
     that generated income exclusively in her name. *See, e.g.*, Ex. 1501.

120. Mikhail did the same.

121. In 2018, Anna and Mikhail were both indicted in this case. A jury convicted
     Mikhail of wire fraud, mail fraud, trafficking in counterfeit goods, and
     conspiring to do the same. The jury acquitted Anna of all charges.

## I.    *Separating Mikhail's Proceeds*

122. The Court finds that Mikhail's entire cellphone businesses perpetuated the
     fraud on which he was convicted: the communications between Mikhail, his
     coconspirators, employees, seizures, and his suppliers established the

permeation of the fraud throughout his business during the course of the
proven conspiracy. *See, e.g.*, Exs. 1319–21; Ex. 1400; Ex. 1509; Ex. 1602;
Ex. 2818-1–2818-18; Ex. 3205; Ex. 3216-08; Ex. 3511; Ex. 3514; Ex. 3516.

123.   As a result, Mikhail must forfeit all Amazon deposits for the sale of
counterfeit goods that he received.

124.   The government seeks a money judgment against Mikhail for proceeds from
Amazon businesses that belonged to him.

125.   Mobile Rack, LLC, Electro Metro, Advantage Wireless, LCC, Cellaris LLC,
Simplified Selling, LLC, and one account for Mountain Wireless
Distributing (Washington Federal Bank 7900) were linked to bank accounts
solely in Mikhail's name. Ex. 1251-3. The total Amazon deposits for
businesses *solely* in Mikhail's name is $1,196,165.51. Ex. 1251-6.

126.   To the extent those proceeds were from the sale of counterfeit goods, they
are forfeitable.

i.   *Anna's Proceeds*

127.   The government also seeks to include proceeds from Amazon businesses
that belonged to Anna in the money judgment against Mikhail.

a.   Star-KS, LLC, Droid Masterz, LLC, and AIMEO, LLC were linked to
bank accounts solely in Anna's name. Ex. 1251-3.

b.   Star KS received $97,305.74 in Amazon deposits. Ex. 1251-6.

    c.  Droid Masterz received $288,126.78 in Amazon deposits. Ex. 1251-6.

    d.  AIMEO received $6,431.06 in Amazon deposits. Ex. 1251-6.

    e.  The total Amazon deposits for businesses *solely* in Anna's name is $391,863.58.

128.  The government does not explain why Mikhail should forfeit proceeds generated by Anna's business activities. At best, it offers the statement that the deposits "represent proceeds of the crime Mikhail controlled and received, either directly through bank accounts he held or *those he controlled indirectly through his wife, Anna*." Dkt. 1711 at ¶ 59 (emphasis added).

129.  The government has not met its burden to prove that Mikhail must forfeit proceeds that Anna generated and received into bank accounts that were solely in her name. The government's argument is conclusory and flies in the face of the evidence and argument that it offered at trial of Anna's heavy involvement in business activities. There is simply not a preponderance of evidence that Mikhail controlled proceeds indirectly through Anna.

130.  Under *Honeycutt,* 137 S. Ct. at 1632, 1635, Mikhail is responsible only for his own ill-gotten gains. There is no joint and several liability for co-conspirators. Without a nexus between Anna's proceeds and Mikhail's criminal conduct, they are not forfeitable.

131. Moreover, because the jury acquitted Anna of all charges, her businesses' proceeds are not "tainted" property. It is "clean" property. As such, it is non-forfeitable.

132. Consequently, the Court will not include the $391,863.58 in proceeds from Anna's businesses in Mikhail's money judgment.

### ii. *Joint Proceeds with Anna*

133. The government further asks to include the proceeds from Amazon businesses that Mikhail shared with Anna in his money judgment.

   a. Cell Zone, LLC and Mountain Wireless Distributing (Mountain West Bank 7872) were linked to bank accounts jointly held by Anna and Mikhail. Ex. 1251-2.

   b. Cell Zone received $1,590,345.41 in Amazon deposits. Ex. 1251-6.

   c. Mountain Wireless received $392,753.31 in Amazon deposits. Ex. 1251-6.

   d. The total Amazon Deposits for businesses *shared jointly* by Anna and Mikhail is $1,983,098.72. Ex. 1251-6.

134. The government has failed to prove a nexus between Mikhail's criminal activity and the entire proceeds generated by the businesses that he and Anna owned jointly.

135. Mikhail undoubtably exercised control of the businesses. Money was

transferred from his business, Cubic Wireless, to Cell Zone. *See* Ex. 1041, Ex. 1046 at 13. He submitted insurance documents, Ex. 2607 and tax records, Ex. 2610. He said in texts with Tim that he was "stressed out" and "scared" about Cell Zone getting shut down. Ex. 3216-07. Product invoices listed "Mike" as associated with "Cellphone Zone." *See* Ex. 3506. Mikhail used the Cell Zone email to communicate with his employee. Trial 2 Tr. at 3727:9-16. Of the 20 checks written to the employee, 19 were signed by Mikhail and one was signed by Anna. Trial 2 Tr. at 4274:3-13; Ex. 1025 at 1-2; Trial 2 Tr. at 1164:17-1165:9.

136.    That said, at trial the government argued that Cell Zone was linked to Anna. *See, e.g.* Ex. 1501. In fact, the jury saw an exhibit that linked Cell Zone's $1,861,159.72 in proceeds solely to Anna. *Compare id. with* Exhibit 1502 (listing Mikhail's Amazon records, which do not include Cell Zone); *See also* Ex. D-1600 (listing Cell Zone only under Anna but listing Mountain Wireless under both Mikhail and Anna).

137.    Trial evidence showed that Anna also exercised control of the businesses. Agent Akers testified that he associated Cell Zone with Anna through bank records and her communications with the Idaho Department of Labor. Trial 2 Tr. at 1167:14-22. In fact, when a Department of Labor employee contacted Anna in November 2015, she identified Cell Zone as a company

that she and Mikhail had operated together for two years. Ex. 1003 at 2.

138.    When Amazon shut Cell Zone down, Anna told Paul, "Im still trying to get

cellzone reopened lol . . . . . I wrote them everyday lol." Ex. 3557 at 11. In

later messages, Peter asked "Anna[. ] Are you cellphone zone[?]". Ex

3208.03. Anna responded, "Yes it got reinstated?". *Id.* She then indicated

that she and Mikhail would tell their employee to adjust a product price. *Id.*

Peter and Anna repeatedly tussled over the prices she set on Cell Zone

listings. Ex. 3208-4. She demonstrated a sophisticated knowledge of the

businesses.

139.    Anna and her brothers apparently agreed that Mikhail was not a particularly

good businessman. Trial 2 Tr. at 4846. In a text message, Anna told her

brothers to ignore Mikhail because he "doesn't know anything" about the

businesses, particularly the financial side of the businesses. Trial 2 Tr. at

3895-96; Ex. 3205 at 2.

140.    In short, trial evidence demonstrated that Anna and Mikhail were both

heavily involved in operating their joint businesses. But under *Honeycutt*,

Mikhail is liable only for the property that he "himself actually acquired as a

result of the crime" and not "property obtained by his [acquitted] co-

conspirator." 137 S.Ct. at 1635.

141.    Because the government failed to demonstrate a nexus between Mikhail's

criminal conduct and the full amount of the jointly held Mountain Wireless and Cell Zone account proceeds, a portion of the proceeds must be excluded as generated at least partially from Anna's activities.

142. The Court need not calculate Anna's participation with numerical precision. She was deeply involved in all business activities. The Court finds it appropriate to deduct one-half of the proceeds from these jointly held businesses as attributable to Anna's activities, for a total of $991,549.36.

143. Accordingly, between the businesses held exclusively in Anna's name and the jointly held businesses, the Court concludes that $1,383,412.94 of the Amazon deposits are proceeds attributable to Anna's activity and, therefore, are not forfeitable criminally through Mikhail.

### iii.  *Double Counted Proceeds*

144. The Court further concludes based on Mr. Linscott's opinion that another $1,639,584 are Paul's proceeds that were double counted against Mikhail. Dkt. 1666-1 at 3. The Court will not include that amount.

145. Also, at some point, Peter transferred one of his businesses, Rubiks Cube, LLC, to Mikhail. The government is seeking forfeitable proceeds from both Mikhail and Peter for Rubiks Cube for at least some of the same years. Ex. 1251-6; Ex. 1255-3. For Mikhail the government claims $612,444.74 in Amazon deposits for Rubiks Cube as forfeitable. Ex. 1251-6. Some portion

of that amount must be excluded as proceeds attributable to Peter. The Court concludes that it is appropriate to exclude from Mikhail's total the $136,502.62 that the government seeks from Peter from this same account. *See* Ex. 1255-5.

146.   That leaves $1,024,072.99 of proceeds from the Amazon deposits attributable solely to Mikhail's conduct.[4]

147.   As discussed above, the government has shown that 93.1 percent of the goods Mikhail sold were counterfeit. Therefore, 93.1 percent of those Amazon deposits represent proceeds of the crime that Mikhail personally received in his various business accounts and, thus, are forfeitable as a money judgment order.

148.   The Court will enter a money judgment order against Mikhail Iyerusalimets in the amount of $953,411.95.

## II.   *Specific Property*

149.   To facilitate his crime, Mikhail operated numerous cellphone and cellphone accessory business bank accounts. *See* Ex. 1251 at 3 (including Property Nos. 5.B, 5.C, and 5.D). Each of these business bank accounts was used to

---

[4] $4,183,572.55 (total deposits) less $391,863.58 (Anna's sole proceeds) less $991,549.36 (Anna's shared proceeds) less $1,639,584 (Paul's proceeds) less $136,502.62 (Peter's proceeds from Rubiks Cube) equals $1,024,072.99

facilitate the criminal scheme:

    a.  Acct No. 2418-Mtn West (Property No. 5.B) ($38.52)

    b.  Acct No. 7900-WA Fed (Property No. 5.C) ($27,237.76)

    c.  Acct No. 6274-Mtn West (Property No. 5.D.) ($43,985.55)

150.   As such, the Court concludes that these accounts are facilitating property.

151.   Mikhail used a 2010 Land Rover (Property No. 5.A) to facilitate the crimes by delivering packages containing counterfeit goods, packaging, and labels. *See* Ex. 2002B (surveillance photographs of Mikhail dropping off counterfeit products purchased undercover by agents). That is sufficient to satisfy the broad facilitating standard in the counterfeit trafficking forfeiture provisions.

152.   For that reason, the government's motion to forfeit the business bank account funds and the 2010 Land Rover (Property Nos. 5.A, 5.B, 5.C, and 5.D) is granted.

153.   The value of these assets shall be credited against the money judgment once they are finally forfeited to prevent any double counting.

### G.    Contraband

154.   From the Small Warehouse, agents seized nine pallets of counterfeit goods, which totaled to 13,416 separate items. *See* Trial 2 Tr. at 2021; Ex. 2501.

155.   In the Large Warehouse, agents seized fifty-one pallets, totaling 90,357

separate items, which included 8,399 empty Apple iPhone packages and
18,768 empty Samsung packages. *See, e.g.*, Exs. 2401, 2402.

156. Pursuant to the expanded provisions of the intellectual property provisions,
these 103,773 items seized and packaged onto sixty pallets are forfeitable
contraband. *See* Trial 2 Tr. at 645–46; *see also* 18 U.S.C. § 2323(a)(1)(A)
("Any article, the making or trafficking of which is, prohibited under section
506 of title 17, or section 2318, 2319A, 2319B, or 2320, or chapter 90, of
this title").

## H.    Eighth Amendment

157. The Eighth Amendment prohibits the imposition of "excessive fines." U.S.
CONST. AMEND. VIII. The Constitution thus "limits the government's power
to extract payments, whether in cash or in kind, as punishment for some
offense." *United States v. Bajakajian*, 524 U.S. 321, 328 (1998) (quotation
and citation omitted).

158. Forfeitures are fines subject to Eighth Amendment scrutiny if they constitute
punishment for an offense. *Id*.

159. "[A] punitive forfeiture violates the Excessive Fines Clause if it is grossly
disproportional to the gravity of the defendant's offense." *Id*. at 334.

160. The Court considers "four factors when weighing the gravity of an offense:
(1) the nature and extent of the crime, (2) whether the violation was related

to other illegal activities, (3) the other penalties that may be imposed for the

violation, and (4) the extent of the harm caused." *United States v. Beecroft*,

825 F.3d 991, 1000 (9th Cir. 2016) (citation and quotation omitted).

161.  The defendants were convicted of operating a ten-year, sophisticated

scheme. They participated in a massive conspiracy to import hundreds of

thousands of counterfeit trademarked goods, repackage them, and sell them

online.

162.  They defrauded thousands of unsuspecting consumers.

163.  They stole valuable intellectual property from trademark owners, who enjoy

an exclusive right to prohibit others from trafficking in the spurious versions

of goods and services bearing their marks. *Matal v. Tam*, 137 S. Ct. 1744,

1751 (2017); *see also* 18 U.S.C. § 2320.

164.  To facilitate this scheme, the defendants solicited the help of unsuspecting

young members of their community who operated numerous online

businesses and tested products. *See, e.g.*, Ex. D-2002 at 4 (chart of

employees).

165.  In short, the defendants' crimes were extensive and grave.

166.  There is no indication that the crimes were connected to other illegal

activities. To the contrary, although the government initially charged the

defendants with money laundering, the government dismissed those charges

after the close of its case at the first trial.

167.   "In considering an offense's gravity, the other penalties that the Legislature

has authorized are certainly relevant evidence, as are the maximum penalties

that could have been imposed under the Sentencing Guidelines." *United*

*States v. 132,245.00 in United States Currency*, 764 F.3d 1055, 1059-60 (9th

Cir. 2014) (quotations and citations omitted). "[T]he maximum penalties

under the Sentencing Guidelines should be given greater weight than the

statutory maximum because the Guidelines take into account the specific

culpability of the offender." *Id.*

168.   For a first offense of trafficking in counterfeit goods, the statutory maximum

term of imprisonment is 10 years and the maximum fine is $2,000,000. 18

U.S.C. § 2320(b)(1)

169.   For a mail and wire fraud offense, the statutory maximum term of

imprisonment is 20 years and the maximum fine is $250,000. 18 U.S.C.

§§ 1343, 1341, 1349.

170.   The U.S. Probation Office calculated the guideline range for the defendants

as 188-235 months for Paul, 108-135 months for Peter, 135-168 months for

Tim, and 97-121 months for Mikhail. Both the government and the defense

have pending objections to the guideline ranges.

171.   Again, both the maximum penalties and the anticipated guideline ranges

underscore the severity of the defendants' criminal conduct. By prescribing such severe penalties, Congress clearly indicated its view that these crimes constitute significant harm.

172.   The Court recognizes that the money judgments alone far exceed the maximum fine for mail and wire fraud and exceed (except for Mikhail) the maximum for counterfeit trafficking.

    a.   Paul's judgment of $33,708,700.30 is almost 17 times the $2,000,000 maximum penalty for counterfeit trafficking.

    b.   Peter's judgment of $4,060,558.68 is around 1.6 times the maximum penalty.

    c.   Tim's judgment of $9,230,196.82 is about 6.5 times the maximum fine.

173.   Although these penalties are undoubtably severe, the disparity is warranted because it corresponds to the injuries sustained by the trademark holders and the defrauded consumers over a decade.

174.   The defendants argue that the actual benefit they received should inform the Court's assessment of the severity of the offense. Seventy-four percent of their proceeds went to cover the costs of goods sold and shipping costs. Dkt 1666-1 at 13. Once operating expenses were paid for, the defendants earned about a 9 percent profit on the Amazon sales. *Id.*

175.  The Court is not persuaded by this argument. The Eighth Amendment is concerned with the proportionality between the offense and the fine.

176.  That the defendants committed the offense in a manner that left them with a low profit margin does not factor into that proportionality. *See United States v. Abhijit Prasad*, 18 F.4th 313, 322 (9th Cir. 2021) ("A criminal forfeiture that simply divests a defendant of the profits from his crime has little deterrent value."). As the old adage goes, "crime doesn't pay."

177.  In light of the seriousness of the offense, the penalties imposed, and extent of harm caused, the money judgment amounts are constitutionally proportional to the crimes of conviction.

## ORDER

1.  The government's motion for preliminary order of forfeiture (Dkt. 1644) is GRANTED IN PART.

2.  The Court grants the government the following money judgments pursuant to Rule 32.2:

    a.  A judgment of $33,708,700.30 against Paul Babichenko

    b.  A judgment of $3,316,882.40 against Peter Babichenko

    c.  A judgment of $9,230,196.82 against Tim Babichenko

    d.  A judgment of $953,411.95 against Mikhail Iyerusalimets

3.  The Court enters a preliminary order of forfeiture for the following assets as

to Paul Babichenko:

    a.  Property No. 1.A (facilitating property): Real Property located at 909 North Cole Rd., Boise, Idaho

    b.  Property No. 1.B (facilitating property): Acct No. 6620-Mtn West ($396,321.39)

    c.  Property No. 1.C (facilitating property): Acct No. 8410-Mtn West ($9,501.03), with Paul to receive a credit for half the account towards his money judgment

    d.  Property No. 1.D (substitute asset): Acct No. 8429-Mtn West ($59,741.95), with Paul to receive a credit for half the account towards his money judgment

    e.  Property No. 1.E (substitute asset): Acct No. X8429-Mtn West ($7,766.92), with Paul to receive a credit for half the account towards his money judgment

    f.  Property No. 1.F (substitute asset): 2016 Lexus LX570

    g.  Property No. 1.G (purchased with proceeds): 2012 Jeep Wrangler Rubicon

    h.  Property No. 1.K (substitute asset): Real Property located at 0 West Chinden Blvd, Meridian, Idaho

    i.  Property No. 1.L (substitute asset): Acct No. 3168-Mtn West

($719.69)

    j.  Property No. 1.M (substitute asset): Approximately $4,982.00 in U.S. Currency

    k.  Property No. 1.N (substitute asset): Acct No. 7819-Mtn West ($3,403.46)

    l.  Property No. 1.O (substitute asset): One Silver bar and 103 seized Silver Coins

4.    The Court enters a preliminary order of forfeiture for the following assets as to Peter Babichenko:

    a.  Property No. 2.A (facilitating property): Acct No. X4046-Mtn West ($100.00)

    b.  Property No. 2.B (facilitating property): Acct No. X0679-Mtn West ($1,565.21)

    c.  Property No. 2.C (facilitating property): Acct No. X0660-Mtn West ($5.00)

    d.  Property No. 2.D (facilitating property): Acct No. X3600-Mtn West ($302.37)

5.    The Court enters a preliminary order of forfeiture for the following assets as to Tim Babichenko:

    a.  Property No. 3.A (facilitating property): Acct No. 1190-Amazon

($23.16)

b.   Property No. 3.B (facilitating property): Acct No. 5152-Wells Fargo

($120,765.33)

c.   Property No. 3.C (substitute asset): Acct No. 2293-Wells Fargo

($77,618.30)

d.   Property No. 3.D (facilitating property): Acct No. 4252-WA Fed

($980.73)

e.   Property No. 3.E (facilitating property): Acct No. 7081-Mtn West

($6,799.44)

f.   Property No. 3.F (facilitating property): Acct No. 4260-WA Fed

($2,126.33)

g.   Property No. 3.G (facilitating property): Acct No. 8347-Mtn West

($149,108.49)

h.   Property No. 3.H (facilitating property): Acct No. 4112-WA Fed

($82,704.31)

i.   Property No. 3.I (facilitating property): Acct No. 8410-Mtn West

($9,501.03), with Tim to receive a credit for half the account towards

his money judgment

j.   Property No. 3.J (substitute asset): Acct No. 8429-Mtn West

($67,508.87), with Tim to receive a credit for half the account towards

his money judgment

    k.  Property No. 3.L (purchased with proceeds): 2015 Ford F-150 VIN: 1FTFW1EF0FFB06787

    l.  Property No. 3.M (substitute asset): 2016 Harley Davidson XL 1200V

    m.  Property No. 3.N (substitute asset): Approximately $3,785.00 in U.S. Currency

    n.  Property No. 1.H (substitute asset): One Men's Rolex Watch, Model #16013

    o.  Property No. 1.I (substitute asset): 30 Assorted Diamond Rings

6.      The Court enters a preliminary order of forfeiture for the following assets as to Mikhail Iyerusalimets:

    a.  Property No. 5.A (facilitating property): 2010 Land Rover

    b.  Property No. 5.B (facilitating property): Acct No. 2418-Mtn West ($38.52)

    c.  Property No. 5.C (facilitating property): Acct No. 7900-WA Fed ($27,237.76)

    d.  Property No. 5.D (facilitating property): Acct No. 6274-Mtn West ($43,985.55)

7.      Each defendant's forfeitable property, as outlined in paragraphs 3-6 of this order, shall be used to offset the money judgment amount for that defendant

once the forfeiture is final.

8.    The Court orders that the following specific property be forfeited as illegal

contraband:

   a.  Approximately 103,773 items seized and packaged onto sixty pallets

       are forfeitable contraband;

   b.  Western Digital hard drive bearing serial number WXA1E944SJ3J

9.    The government's motion for forfeiture is DENIED in all other respects.

DATED: May 2, 2023

B. Lynn Winmill
U.S. District Court Judge